JOHN C. CRUDEN
Assistant Attorney General
WILLIAM E. GERARD
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-305-0475
william.gerard@usdoj.gov
DAVID A. CARSON
Environment and Natural Resources Division
U.S. Department of Justice
South Terrace – Suite 370
999 18th Street
Denver, CO 80202
Telephone: 303-844-1349
Fax: 303- 844-1350
david.a.carson@usdoj.gov

CHRISTOPHER A. CROFTS
United States Attorney
NICHOLAS VASSALLO (WY Bar #5-2443)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
nick.vassallo@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, et al., | ) | |
| | ) | Civil Case No. 15-CV-43-S |
| *Petitioners*, | ) | (consolidated with 15-CV-41-S) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | **RESPONDENTS' BRIEF IN** |
| THE INTERIOR; et al., | ) | **OPPOSITION TO WYOMING'S** |
| | ) | **AND COLORADO'S MOTION FOR** |
| *Respondents*. | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## TABLE OF CONTENTS

I. Introduction ................................................................................................................ 2

II. Petitioners are not entitled to a preliminary injunction ............................................. 5

    A. Petitioners fail to demonstrate a likelihood of success on the merits ........................... 6

        1. BLM has authority under its governing statutes to promulgate the Final
           Rule ..................................................................................................... 7

        2. The SDWA Does Not Displace BLM's Authority under FLPMA and the
           MLA ...................................................................................................... 14

    B. Petitioners fail to demonstrate irreparable harm ........................................................ 20

    C. The balance of harms and public interest do not favor a preliminary injunction ......... 24

III. Conclusion ................................................................................................................ 25

Petitioners State of Wyoming and State of Colorado seek to enjoin Respondent Bureau of Land Management ("BLM") from applying its Rule on Hydraulic Fracturing on Federal and Indian Lands ("Final Rule")[1] until the resolution of their suit. Their motion falls far short of standards for obtaining that extraordinary remedy. Contrary to Petitioners' assertions, several statutes provide the Secretary of the Interior ("Secretary")–and by delegation, BLM–with broad authority over the use and management of federal and Indian lands and mineral resources, including the regulation of hydraulic fracturing used to extract minerals from those lands. This authority is premised on the unexceptional notion that BLM, the federal agency charged with management and stewardship of those lands, would be able to set terms and conditions for their use. Petitioners' arguments that Congress intended to displace these authorities through the Safe Drinking Water Act ("SDWA") and the Energy Policy Act of 2005 are baseless, as they find no support either in the text of those statutes or their legislative history. Consequently, Petitioners are unlikely to succeed on the merits of their suit.

Petitioners also fail to establish irreparable harm absent a preliminary injunction. Nothing in the Final Rule intrudes on the rights of Wyoming or Colorado to continue regulating hydraulic fracturing. Nor is irreparable harm established by the purely speculative economic harms identified by Petitioners and Amicus Curiae Wyoming County Commissioners Association ("Amicus") – harms that are refuted by the BLM studies conducted for the Final Rule.

Finally, the balance of harms and public interest weigh strongly against an injunction. While Colorado and Wyoming both have hydraulic fracturing regulations, their regulatory authority does not extend beyond their borders. BLM's rule protects public lands and covered Indian lands throughout the United States. Without a rule of nationwide application, the public

---

[1] 80 Fed. Reg. 16,128 – 16,222 (Mar. 26, 2015).

interest would be harmed. Currently, there are oil and gas leases on federal lands in 30 states other than Wyoming and Colorado. Second Declaration of Steven Wells ("2ⁿᵈ Wells Decl.") ¶ 6; *see also* 80 Fed. Reg. at 16,129. Petitioners' brief never references another state's program, let alone offers any evidence showing that any state's regulations other than their own are adequate to address the concerns and risks explicitly motivating the Final Rule. *See Hannah Wiseman, Untested Waters: The Rise of Hydraulic Fracturing in Oil and Gas Production and the Need to Revisit Regulation*, 20 Fordham Envtl. L. Rev. 115, 167 (2009) ("[S]ome states are not adequately protecting underground sources of drinking water–sources that are of federal concern–from the impacts of fracking."); 80 Fed. Reg. 16,128, 16,133 (BLM determining "that a major impetus for a separate BLM rule is that states are not legally required to meet the stewardship standards that apply to public lands and do not have trust responsibilities for Indian lands under Federal laws"). Therefore, the public interest can only be served by denying the requested relief so that BLM can protect federal and tribal lands throughout the United States. Thus, Petitioners' motion for preliminary injunction should be denied.

## I. INTRODUCTION

**BLM's Oil and Gas Regulations and Final Rule**.[2] BLM regulates oil and gas operations on federal lands, and on Indian lands held in trust by the federal government for tribes and individual allottees, pursuant to several statutes, including the Mineral Leasing Act of 1920, as amended ("MLA"), 30 U.S.C. §§ 181, 223 – 236, the Mineral Leasing Act for Acquired Lands of 1947 ("MLAA"), *id.* §§ 351 – 360, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 – 1787, the Indian Mineral Leasing Act ("IMLA"), 25 U.S.C. §§

---

[2] A more comprehensive statement of the context and elements of the Final Rule is contained in Respondents' Brief in Opposition to Petitioners' Motion for Preliminary Injunction, at 2-5, filed in *Independent Petroleum Ass'n of America v. Jewell*, No. 2:15-cv-00041-SWS (D. Wyo. June 1, 2015) (ECF. No. 20), and the Declaration of Steven Wells filed therewith.

396, 396d, and the Indian Mineral Development Act, *id.* §§ 2101-2108 ("IMDA"). Pursuant to

those authorities, BLM for decades has regulated oil and gas operations on federal and Indian

lands. *See* 43 C.F.R. part 3160. These regulations impose on operators, for example, permitting

and disclosure requirements,[3] requirements for well casing and cementing to ensure the

structural integrity of the wellbore and to isolate and protect usable groundwater zones,[4] and

requirements for storage and disposal of water produced by the well.[5] However, since those rules

for conventional oil and gas operations were last updated, technological advances in horizontal

drilling, in combination with hydraulic fracturing, have led to production from geologic

formations in parts of the country that previously did not produce significant amounts of oil or

gas. 80 Fed. Reg. at 16,130 – 16,131. Recognizing that existing requirements–which required

pre-operation notice to BLM only for "nonroutine fracturing jobs[,]" 43 C.F.R. § 3162.3-2(a)

(2014)–were in need of update, BLM undertook rulemaking to supplement and revise its existing

regulations. *See, e.g.*, 80 Fed. Reg. at 16,131.

      **The Safe Drinking Water Act Underground Injection Control Program**.  Congress

enacted the SDWA, 42 U.S.C. §§ 300f - 300j-26, in 1974 to ensure that the nation's sources of

drinking water are protected against contamination.  Part C of the SDWA, 42 U.S.C. §§ 300h -

300h-8, established a regulatory program "to prevent underground injection which endangers

drinking water sources." 42 U.S.C. § 300h(b).  The SDWA directed EPA to promulgate

regulations containing minimum requirements for State underground injection control ("UIC")

programs, 42 U.S.C. § 300h, and required States identified by EPA to submit UIC programs

meeting those minimum requirements. *Id.* § 300h-1; *see also* 40 C.F.R. § 144.1(e) (requiring all

---

[3] *See* 43 C.F.R. 3162.3-1(c).

[4] *See* Section III.B of Onshore Order 2, 53 Fed. Reg. 46,798, 46,808 – 46,809 (Nov. 18, 1988).

[5] *See* 43 C.F.R. 3162.5-1(b); Part III.B of Onshore Order 7, 58 Fed. Reg. 47,354, 47,362 – 47,365 (Sept. 8, 1993).

50 States to submit UIC programs).  After EPA approves a State UIC program, that State is granted "primary enforcement responsibility" ("primacy") for administering that UIC program. 42 U.S.C. § 300h-1(b)(3).[6]  EPA can enforce requirements in an approved State UIC program after notification if the State fails to enforce them.  *Id.* § 300h-2(a), (b), (c).  Such requirements may also be enforced under the SDWA citizen suit provision.  *Id.* § 300j-8.

EPA is to promulgate a Federal UIC program to cover those circumstances where EPA disapproves a State's UIC program or where a State fails to submit a UIC program. 42 U.S.C. § 300h-1(c).  In addition, EPA generally exercises SDWA primacy over lands that meet the definition of "Indian lands" under 40 C.F.R. § 144.3[7]

No matter which entity exercises SDWA primacy, new underground injection is prohibited unless specifically authorized by a permit or by rule.  *See* 40 C.F.R. §§ 141.11, 144.31.  In addition, injection wells cannot be operated in a manner that would allow endangerment of an underground source of drinking water. 42 U.S.C. § 300h(b)(1); 40 C.F.R. § 144.12(a) (prohibiting endangerment), 144.3 (defining "underground source of drinking water").

**The Exclusion of Non-Diesel Hydraulic Fracturing Operations from the Statutory Definition of "Underground Injection."**  Congress established the scope of the UIC program through its definition of "underground injection" as "the subsurface emplacement of fluids by well injection." 42 U.S.C. § 300h(d)(1)(A).  Congress has narrowed the UIC program's coverage, however, by establishing two exclusions from that definition: (1) "the underground

---

[6]  EPA's regulations implementing Part C of the SDWA are contained in 40 C.F.R. Pts. 144-47.  Part 145 contains the requirements that each State must meet in order to obtain primary enforcement authority for the UIC program in that State.  Approved State programs are codified in 40 C.F.R. Pt. 147.

[7]  EPA has defined "Indian lands" under 40 C.F.R. § 144.3 to mean lands that are "Indian country" under 18 U.S.C. § 1151. "Indian country" includes Indian reservations (including tribal trust lands), dependent Indian communities, and certain Indian allotments.  18 U.S.C. § 1151.  *See also* 40 C.F.R. § 144.3.  EPA may also delegate primary enforcement authority to Tribes.  42 U.S.C. § 300j-11(a).

injection of natural gas for purposes of storage" and (2) "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production activities." *Id*. § 300h(d)(1)(B).  The exclusion of non-diesel hydraulic fracturing operations was added to the SDWA in 2005 by the Energy Policy Act of 2005.  Pub. L. No. 109-58, § 322, 19 Stat. 594 (2005).  This occurred after the court's holding in *Legal Envtl. Assistance Found., Inc. v. EPA,* 118 F.3d 1467, 1474 (11th Cir. 1997)("*LEAF*"), that EPA was required to regulate the injections of fluids associated with hydraulic fracturing operations under the UIC program.  Under the amended definition, neither EPA nor any State may regulate non-diesel hydraulic fracturing operations under the SDWA UIC program, and any State regulation of non-diesel hydraulic fracturing operations under state law is not federally enforceable by EPA or under the SDWA citizen suit provision.  *See* 42 U.S.C. § 300h-2 (a), (b), (c) (providing for EPA enforcement of an "applicable underground injection control program"); *id.* § 300h-1(d) (defining "applicable underground injection control program" as either a state program that has been approved by EPA under the SDWA or a UIC program that has been prescribed by EPA); *id.* § 300j-8(a)(1) (providing for citizen-suit enforcement of "any requirement prescribed by or under" the SDWA).

## II.   PETITIONERS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original; citation omitted); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003) (citation omitted) (the movant's "right to relief must be clear and unequivocal"). The movant's "requirement for substantial proof is much higher" for a motion for a preliminary injunction than it is for a motion

for summary judgment. *Mazurek*, 520 U.S. at 972.[8] To prevail, "the moving party must establish four elements: (1) a substantial likelihood that it will ultimately succeed on the merits of its suit; (2) it is likely to be irreparably injured without an injunction; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) the injunction, if issued, will not adversely affect the public interest." *N. Arapaho Tribe v. Burwell*, No. 14-cv-247-SWS, 2015 U.S. Dist. LEXIS 30480 at *25-26 (D. Wyo., Feb. 26, 2015) (citations omitted). If a movant fails to meet its burden on any of these four requirements, its request must be denied. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22-23 (2008); *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1489 (10th Cir. 1997). Here, Petitioners have failed to meet any of the four elements, let alone all four, and thus their motion should be denied.

### A. Petitioners Fail to Demonstrate a Likelihood of Success on the Merits

Petitioners seek review of BLM's Final Rule pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Wyo. and Colo. Am. Pet. for Review ¶ 1 (ECF No. 26). Petitioners assert that no statutes "authorize [BLM] to regulate hydraulic fracturing[,]" but that "[i]nstead, the Safe Drinking Water Act and the 2005 Energy Policy Act grant that authority directly to the states[,]" and therefore, the Final Rule "is in excess of its statutory authority" under the standard applied in the APA. Pet'rs' Mem. in Supp. of Mot. for Preliminary Injunction ("Pet. Mem.") at 6 (ECF No. 32), citing 5 U.S.C. § 706 (other citations omitted). Petitioners err on all counts, and are thus unlikely to succeed on the merits.

---

[8] The en banc majority opinion in *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004), cited by Petitioners, does not stand for the proposition that "[t]he Court typically favors restoring and maintaining the status quo during the pendency of litigation." Pet. Mem. 22-23, citing 389 F.3d at 975. Instead, it states only that preliminary injunctions that alter the status quo are *dis*favored. *Id.*

### 1.  BLM Has Authority under Its Governing Statutes to Promulgate the Final Rule

Congress delegated its authority over federal public lands and minerals as both a proprietor and a regulator to BLM through the auspices of the MLA, FLPMA, and other statutes. *See, e.g., Hannifin v. Morton*, 444 F.2d 200, 202 (10th Cir. 1971). The Secretary has delegated to BLM part of her federal trust responsibilities for tribal and individual Indian landowners, specifically to regulate oil and gas development on Indian lands. As with other aspects of BLM's extensive and longstanding oil and gas regulations, the Final Rule falls well within these broad statutory delegations. *See, e.g*., 80 Fed. Reg. at 16129, 16141, 16186, 16211.

The plain language of BLM's governing statutes contemplates BLM's exercise of authority in promulgating the Final Rule. Within the scope of FLPMA, the MLA, and other statutes, Congress has delegated to BLM (through the Secretary), the United States' power as both a proprietor and regulator of federal property. The United States' power over federal property derives from the Property Clause of the U.S. Constitution, art. IV, § 3, cl. 2, and "is without limitations[,]" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (citation and quotation marks omitted), encompassing both the proprietor's right to set terms and conditions for the use of its property and also regulatory authority, "the power of legislating for the protection of public lands," *see Camfield v. United States,* 167 U.S. 518, 525-226 (1897); *see also United States v. Ohio Oil Co.,* 163 F.2d 633, 639 (10th Cir. 1947), *cert. denied*, 333 U.S. 833 (1948).

Congress delegated dual regulatory and proprietary authority to BLM under the MLA. *See, e.g*., *Diamond Shamrock Expl'n Co. v. Hodel*, 1987 U.S. Dist. LEXIS 509, at *17-18 (E.D. La.), *aff'd & remanded*, 853 F.2d 1159 (5th Cir. 1988) (citation omitted); *Forbes v. United States*, 125 F.2d 404, 408 (9th Cir. 1942). The MLA and MLAA authorize BLM (through the Secretary's delegation) to lease Federal lands for the extraction of certain minerals, including oil and gas. *See* 30 U.S.C. §§ 181, 223 – 236, 351 – 360. The MLA also "authorize[s]" BLM "to

prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter . . . ." 30 U.S.C. § 189. Finally, the MLA also imposes a duty on BLM and its lessees to prevent waste of federal mineral resources, 30 U.S.C. §§ 225, and to regulate all surface-disturbing activities "in the interest of conservation of surface resources…" *id*. § 226(g).

BLM and its predecessor agencies have exercised Section 189 authority to set terms and conditions for minerals leasing and to prescribe rules and regulations governing the conduct of oil and gas operations on federal lands since the passage of the MLA in 1920. BLM's predecessor first did so in regulations promulgated in the 1920. *See* 47 I.D. 437 (1921), attached to the Second Declaration of Steven Wells; *see also id*. ¶¶ 17-21. Although challenges have been few, courts have previously upheld BLM's (and its predecessors') exercise of MLA authority under Section 189. In *Forbes*, the Ninth Circuit sustained the 1920 regulations, which imposed record-keeping and prior notice requirements; required the permittee to conform to the terms and conditions of its permit and use reasonable precautions to prevent waste or harm from its operations; and provided the agency authority to impose corrective measures at the permittee's expense. *See* 125 F.2d at 409. Although the Court addressed only one provision of the rule– authorizing the agency to plug, at permittee's expense, any dry or abandoned well that permittee fails to properly plug–it found that, because unplugged wells risked damage to mineral resources, the provision was authorized by Section 189 as "necessary and proper" in order to carry out the purposes of the MLA. *Id*. at 409-410 (citations omitted).

Similarly, a court in this District sustained the agency's exercise of Section 189 power with respect to suspension of oil and gas operations in *Getty Oil Co. v. Clark*, 614 F. Supp. 904, 915-17 (D. Wyo. 1985). There, the agency had conditioned a suspension of oil and gas

operations pending the outcome of an environmental study to determine if those operations posed a danger to environmental values. *Id.* The court rejected the argument that, in the absence of any express authorization in the MLA for the Secretary to impose conditions on a suspension, the Secretary had no authority to impose such conditions and must only grant or deny requests for such suspensions. *Id.* Instead, the court found authority for such conditions in Section 189, which "grants the Secretary broad powers and authority commensurate with the broad responsibilities imposed upon his office." *Id.*, citing *Grindstone Butte Proj. v. Kleppe*, 638 F.2d 100, 102 (9th Cir. 1981), *United States v. Wilbur*, 283 U.S. 414, 419 (1931) (other citations omitted). As the court did in *Getty Oil*, this Court should find that the broad powers granted BLM under the MLA include authority for the Final Rule.

FLPMA also authorizes the Final Rule. Under FLPMA, Congress delegated to BLM broad authority and discretion to manage and regulate activities on public lands. Section 302 of FLPMA directs BLM to "manage the public lands under principles of multiple use and sustained yield . . . ." 43 U.S.C. § 1732(a); *see also Topaz Beryllium Co. v. United States*, 479 F. Supp. 309 (D. Utah 1979), *aff'd*, 649 F.2d 775 (10th Cir. 1981). "Multiple use" under FLPMA, "means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people[,]" and expressly includes resource development, recreation, conservation, and other values. 43 U.S.C. § 1702(c). Courts have routinely held that the "multiple use" mandate provides the agency with substantial policy discretion in managing federal lands and resources. *See, e.g.*, *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975) (the multiple use mandate "breathe[s] discretion at every pore."); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 518 (D.C. Cir. 2010) ("the Bureau has wide discretion to determine how" this mandate "should be applied").

In addition, under FLPMA, the Secretary must "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Courts have consistently held that this provision "does not mandate specific BLM action," *see, e.g.*, *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1044 (9th Cir. 2013), but instead affords the BLM "a great deal of discretion[,]" including by exercising its "discretion to choose appropriate measures to address the environmental degradation." *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011). Like the MLA, FLPMA provides a number of tools, authorizing BLM to "regulate, through easements, permits, leases, licenses, published rules, or other instruments . . . the use, occupancy, and development of the public lands[,]" 43 U.S.C. § 1732(b), and to "promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands[,]" *id*. § 1740. The Final Rule falls squarely within this very broad authority.

Similarly, the IMDA and IMLA provide authority for the Final Rule with respect to oil and gas operations on tribal lands held in trust by the federal government for tribes or individual Indians. Under IMDA and IMLA, those lands may be leased, with the Secretary's approval, for oil and gas development. 25 U.S.C. §§ 396, 396d. Pursuant to those statutes, the Secretary "is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect[,]" *id*. § 396, and "[a]ll operations under any oil, gas, or other mineral lease issued pursuant to" these laws "shall be subject to the rules and regulations promulgated by the Secretary of the Interior[,]" including BLM's regulations, *id*. § 396d; *see also* 25 C.F.R. §§ 211.4, 212.4, 225.4.

As previously explained, BLM already has decades-old regulations governing oil and gas operations, including, *e.g*., authorization and disclosure requirements, requirements for well casing and cementing to ensure the structural integrity of the wellbore and isolate and protect

groundwater zones, and requirements for storage and disposal of water recovered from the well. The existing regulations also address hydraulic fracturing, albeit minimally because the practice was not extensive (or similar to present-day design) when the regulations were promulgated. 43 C.F.R. § 3262.3-2(a),(b) (2014). The Final Rule extends and adapts these requirements to subsequent hydraulic fracturing operations in the well bore–including authorization and disclosure requirements, requirements for testing well casing and cementing to ensure the structural integrity of the wellbore and to isolate and protect usable groundwater zones, and requirements for proper temporary storage of water recovered from the well. *See, e.g.*, 80 Fed. Reg. at 16,129 – 16,130, 16,217 – 16,222. The Final Rule is thus only part of BLM's cradle-to-grave regulation of oil and gas activities that begins with development of resource management plans and does not conclude until the final plugging of wells and reclamation of the sites.

As explained in the Final Rule's preamble, these measures respond to BLM's obligation to "administer[] oil and gas operations in a manner that protects Federal and Indian lands while allowing for appropriate development of the resource." *See* 80 Fed. Reg. at 16,129; *see also Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 42 (D.D.C. 2003) (FLPMA "vests" BLM with authority and obligation "to disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land"). Like preexisting oil and gas operations regulations, the Final Rule is necessary to ensure that BLM is able to "manage the public lands under principles of multiple use and sustained yield" to "best meet the present and future needs" of the American people, *see* 43 U.S.C. §§ 1702(c), 1732(a), "to prevent unnecessary or undue degradation of the lands[,]" *see id*. § 1732(b), to ensure that lessees are meeting their obligation to prevent waste of federal mineral resources, *see* 30 U.S.C. § 225, and to ensure that operations are done with skill and care, *see id.*

§ 187. The Final Rule provides BLM with the tools needed to administer oil and gas leases on federal and Indian lands in compliance with these statutory objectives and obligations. *See, e.g.,* 80 Fed. Reg. at 16,129, 16,130, 16,137 (explaining BLM's stewardship obligations and their role in the development of the Final Rule). Thus, these provisions fall squarely within the grant of authority to BLM under its governing statutes. And even if such authority were ambiguous, BLM's interpretation is permissible and therefore entitled to deference.[9]

Petitioners dispute that any of BLM's governing statutes provide authority for the Final Rule. Their argument that Congress intended, through the SDWA and Energy Policy Act, to displace and preclude any federal regulation of hydraulic fracturing is refuted below. In addition, Petitioners assert that the MLA gives BLM authority only to lease federal resources, that FLPMA is only a land use planning statute, that both statutes expressly disclaim any intent to infringe on states' rights to regulate pollution control or water resources (disclaimers which Petitioners interpret as applying to regulation of hydraulic fracturing), and that other governing statutes similarly give no such authority. *See* Pet. Mem. 10-16. Petitioners err in their characterizations of these statutes and in their conclusion that BLM lacks authority to promulgate the Final Rule. And as a threshold matter, Petitioners fail to support their assertion that no statute

---

[9] Because this case involves an agency's construction of statutes that it administers, the Court's analysis is governed by the familiar two-step test established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984). "The *Chevron* test requires [the Court] to ask first 'whether Congress has directly spoken to the precise question at issue.'" *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 684 (10th Cir. 2015), quoting *Chevron,* 467 U.S. at 842. The Court's inquiry under this first step begins, and often ends, with the text of the statute and its context. *See Conn. Nat'l Bank v. German*, 503 U.S. 249, 253-54 (1992). A court will proceed to the second step in the *Chevron* test if "the statute is silent or ambiguous with respect to the specific issue," at which point "the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *WildEarth Guardians*, 784 F.3d at 684, quoting *Chevron,* 467 U.S. at 843. "An agency interpretation is permissible where it is not arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 684, quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148 (10th Cir. 2013), *Chevron*, 467 U.S. at 843–44 (internal quotations omitted).

authorizes the Final Rule, as they do not even attempt to address BLM's authority under IMDA and IMLA to regulate oil and gas operations on Indian lands. *See id.* 10-16.

Petitioners' assertion that the MLA gives no authority for the Final Rule is premised on a faulty interpretation of that statute – namely, that "the creation of a regulatory scheme for hydraulic fracturing does not flow from the general authority to lease property." *Id*. 13-14. But this argument proves too much. If it were true, BLM would not have had authority to promulgate its existing regulations that have been in place for decades. As shown in the 1920 and 1973 edition of the oil and gas regulations–both attached to the Second Wells Declaration–and in 43 C.F.R. part 3160 (2014), the Secretary has for 95 years consistently regulated under the MLA not just leasing but also oil and gas operations on public lands. No court has ever ruled that the Secretary has exceeded statutory authority in doing so.

Similarly, in light of the broad authority and discretion provided BLM under FLPMA, Petitioners' reasoning that the statute does not "provide[] [BLM] with authority to regulate hydraulic fracturing . . ." cannot be squared with their simultaneous concession that it "provide[s] the authority to manage the public lands for multiple uses and sustained yield of natural resources[.]" *See* Pet. Mem. 11. As explained above, the Final Rule's provisions are designed to enable exploitation of federal mineral resources while protecting them from waste and protecting water resources from contamination, among other goals. Such measures fall squarely within the FLPMA's broad delegation of authority and discretion to manage federal lands and resources for "multiple uses and sustained yield."

Petitioners' arguments that particular FLPMA provisions preclude this authority similarly falter. Petitioners assert that FLPMA Section 202 "precludes the Bureau from regulating the potential groundwater impacts of fracking." *Id*. 11-12, citing 43 U.S.C. § 1712(c)(8) (emphasis

omitted). But that provision merely stipulates that BLM's *land use plans* must provide for compliance with applicable pollution control laws – *i.e.*, that BLM's land use plans cannot set a level of protection below that of applicable pollution control laws. *See id*. That provision is irrelevant here because it does not apply outside of the land-use planning process. Moreover, the Final Rule does not purport to preempt any state law and in fact requires operators comply with all applicable pollution control provisions.[10] Similarly misplaced is Petitioners' assertion that the Final Rule violates MLA Section 189, which preserves states' ability "to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States." 30 U.S.C. § 189, cited in Pet. Mem. 14. The Final Rule simply does not affect the States' ability to impose taxes on lessees' property or other assets.

### 2. The SDWA Does Not Displace BLM's Authority under FLPMA and the MLA.

Petitioners' SDWA argument boils down to a contention that Congress intended in the SDWA that all underground injection of fluids could be regulated solely under the SDWA UIC program and not under any other federal statute, including FLPMA or the MLA.  According to Petitioners, when Congress amended the SDWA to exclude non-diesel hydraulic fracturing operations from the definition of "underground injection" under the UIC program, the regulation of non-diesel fluid injection associated with hydraulic fracturing operations was left entirely to the States, with no federal role whatsoever.  This argument is wrong for a number of reasons.

---

[10] *See, e.g.*, 80 Fed. Reg. at 16178 - 79; 43 C.F.R. 3162.1(a). Petitioners also assert that the Rule is "a direct violation[,]" Pet. Mem. 12, of a portion of the note to FLPMA Section 701, which states that "[n]othing in this Act shall be construed as limiting or restricting the power and authority of the United States or" changing a list of existing rights, authorities, and relationships with respect to federal and state water rights. *See* 43 U.S.C. § 1701 note (g)(1)-(4), 90 Stat. 2743. The Final Rule does not regulate water rights, and Petitioners have not explained how BLM's regulation of hydraulic fracturing on federal lands would be "a direct violation" of this statement.

14

First, Petitioners cite no provision in the SDWA to demonstrate that Congress intended to prevent the regulation of underground injection under any other federal statute, and no such provision exists.  *See* 42 U.S.C. §§ 300f-300j-26.  Rather, Petitioners' argument hangs solely upon a single sentence in *LEAF*, 118 F.3d at 1474, where the court stated that "it is clear that Congress dictated that *all* underground injection be regulated under the UIC programs."  *Id.* (emphasis in original). Pet. Mem. 8.  From the *LEAF* court's use of the word "all" in this sentence (and nothing more), Petitioners jump to the conclusion that Congress intended that underground injection may be regulated solely under the SDWA UIC program. *Id.*  This argument misreads *LEAF*, and is at odds with the SDWA's legislative history.

*LEAF* concerned whether EPA was required to regulate underground injections associated with hydraulic fracturing under the SDWA UIC program prior to the Energy Policy Act.  *LEAF*, 118 F.3d at 1469.  EPA had historically taken the position that the hydraulic fracturing of the coal bed methane wells at issue in *LEAF* did not fall within the statutory definition of "underground injection" because the principal purpose of the wells was gas production, and not the underground emplacement of fluids. *Id.* at 1471.  The court rejected this interpretation, and it is in this context that the court found that Congress intended that *all* underground injection must be regulated under the UIC program. *Id.* at 1474.  The court was not faced with the question of whether hydraulic fracturing could be regulated under any other federal statute, nor did it answer that question.  *See id.*  Petitioners' argument should therefore be rejected because their underlying premise is completely without foundation.

In fact, the 1974 legislative history of the SDWA makes clear that the UIC program was not intended to repeal or limit DOI's authority to prevent groundwater contamination under the MLA.  In discussing the UIC program, the House Report specifically stated:

> The Committee intends that the Environmental Protection Agency will, in the exercise of its responsibilities under this bill, coordinate with the United States Geological Survey so that EPA will not duplicate efforts of the U.S.G.S. to prevent groundwater contamination under the Mineral Leasing Act. *The Committee does not intend any of the provisions of this bill to repeal or limit any authority the U.S.G.S may have under any other legislation.*

H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6484-85 (emphasis added). When the SDWA was passed in 1974, certain functions that BLM now exercises under the MLA were exercised by the United States Geological Survey ("U.S.G.S."), a component of DOI. Specifically, the U.S.G.S. had promulgated regulations under the MLA with respect to the development and production of minerals, including oil and gas, owned by the United States, or on lands owned by the United States. 30 C.F.R. § 221.1 (1973). *See also* 38 Fed. Reg. 10,002 (Apr. 23, 1973). The 1973 U.S.G.S. regulations were specifically intended, in part, to ensure that covered oil and gas operations do not damage formations or deposits containing water. *See, e.g.,* 30 C.F.R. §§ 221.5, 221.8, 221.9, 221.18, 221.28, 221.32. The regulations specifically provided that a lessee "shall not . . . stimulate production [at a well] by . . . *water injection, or any other method* . . . without . . . receiving written approval prior to commencing the contemplated work." *Id.* § 221.21(b) (emphasis added).[11] Thus, at the time the SDWA was passed, DOI was regulating injection activity related to oil and gas operations on federal lands under the MLA, including as necessary to protect groundwater, and Congress specifically intended that the SDWA UIC program would not repeal or limit DOI's authority to do so. Petitioners' arguments should therefore be rejected.

---

[11]   As part of an internal reorganization at DOI, these regulatory functions of the U.S.G.S. were transferred to the Minerals Management Service and then to BLM. United States Department of the Interior, Office of the Secretary, Order No. 3071 (Jan. 19, 1982); Order No. 3071, Amendment No. 1 (May 10, 1982); Order No. 3071, Amendment No. 2 (May 26, 1982). These documents and the 1973 regulations are attached to the Second Wells Declaration.

Petitioners' follow-up argument, that the Energy Policy Act eliminated all federal regulation of hydraulic fracturing operations, is also wrong.  Petitioners' interpretation rests solely upon a single sentence in a law review article that does not even address BLM's authority under FLPMA and the MLA.  Pet. Mem. 10 (citing *Hannah Wiseman, Untested Waters: The Rise of Hydraulic Fracturing in Oil and Gas Production and the Need to Revisit Regulation*, 20 Fordham Envtl. L. Rev. 115, 145 (2009)).  In fact, there is absolutely nothing on the face of the Energy Policy Act's amendment to the SDWA to suggest that Congress intended to repeal the longstanding authority of BLM to regulate hydraulic fracturing on public lands under FLPMA or the MLA.  *See* 42 U.S.C. § 300h(d)(1)(B); Pub. L. No. 109-58, § 322, 19 Stat. 594.  As discussed above, the Energy Policy Act effectively overturned the *LEAF* decision, which had required that underground injections associated with hydraulic fracturing be regulated under the SDWA UIC program.  *See Congressional Research Service, RL 33302, Energy Policy Act of 2005:  Summary and Analysis of Enacted Provisions,* 23 (2006).  Congress simply excluded hydraulic fracturing activities using fluids other than diesel fuels from the definition of "underground injection" under the SDWA.  *See* 42 U.S.C. § 300h(d)(1).  Congress did not there speak to BLM's separate authority to address hydraulic fracturing under FLPMA and the MLA, let alone indicate an intention to repeal that authority.  *See id.* Therefore, the Energy Policy Act did not expressly repeal BLM's authority to regulate hydraulic fracturing operations under FLPMA or the MLA.

To the extent Petitioners argue that the Energy Policy Act repealed BLM's authority under FLPMA and the MLA by implication, "[i]t is a cardinal principle of statutory construction that repeals by implication are not favored." *Franklin v. United States*, 992 F.2d 1492, 1501 (10th Cir. 1993) (internal quotation marks and citations omitted).  "Thus, even where two statutes are not entirely harmonious, courts must, if possible, give effect to both, unless Congress

clearly intended to repeal the earlier statute." *Id.* at 1502. *See also FCC v. Nextwave Pers. Commc'ns Inc.,* 537 U.S. 293, 304 (2003) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (internal quotation and citations omitted).

The SDWA, as amended by the Energy Policy Act, is completely capable of coexistence with FLPMA and the MLA.  As discussed above, it has been Congress' intent from the very beginning of the SDWA in 1974 that DOI would continue to exercise its pre-existing authority to protect groundwater resources on federal lands under the MLA, and that the UIC Program was not intended to constrain DOI's exercise of that authority.  By excluding non-diesel hydraulic fracturing from regulation under the SDWA UIC program in response to the *LEAF* decision, Congress has simply provided the States with flexibility to regulate hydraulic fracturing operations as they see fit on lands within their jurisdiction under state law, while (tacitly) preserving BLM's long-held authority under FLPMA and the MLA to protect groundwater resources and other natural resources from the impacts of all oil and gas operations, including hydraulic fracturing, on federal lands and Indian lands to fulfill its duties as steward and trustee.

Petitioners' interpretation of the Energy Policy Act as precluding all federal regulation of hydraulic fracturing should also be rejected because it would lead to absurd results.  Petitioners' interpretation would leave a regulatory gap on federal lands and Indian lands where the relevant States or Tribes are not sufficiently regulating hydraulic fracturing under state or tribal law. Petitioners recognize the need to regulate hydraulic fracturing in order to protect the environment.  Indeed, they emphasize how stringent their own regulatory programs are.  Pet. Mem. 3 ("Wyoming's regulations are comprehensive, . . . Colorado's program is robust . . . .").  Yet, even the law review article they rely upon concludes "that some states are not adequately

protecting underground sources of drinking water – sources that are of federal concern – from

the impacts of fracing." *Wiseman,* 20 Fordham Envtl. L. Rev. at 167.[12]  In promulgating the Final

Rule, BLM has similarly determined "that a major impetus for a separate BLM rule is that states

are not legally required to meet the stewardship standards that apply to public lands and do not

have trust responsibilities for Indian lands under Federal law."  80 Fed. Reg. at 16,133.  It should

not be presumed that Congress intended that the protection of federal and tribal lands and

resources would be left to a patch-work of state regulation – or no regulation at all – when it

excluded non-diesel hydraulic fracturing operations from regulation under the SDWA UIC

program.  *See FCC v. Nextwave Pers. Commc'ns Inc.,* 537 U.S. at 304 (2003) ("[W]hen two

statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed

congressional intention to the contrary, to regard each as effective.").  Petitioners' argument

should therefore be rejected because it would lead to absurd results not intended by Congress.

Finally, Petitioners' reliance on the federal facilities provision of the SDWA adds nothing

to their argument.  Under that provision, federal agencies who are *themselves engaged* in

underground injection which endangers drinking water within the meaning of 42 U.S.C. §

300h(d)(2), are subject to federal, state, and local requirements respecting underground injection

in the same manner and to the same extent as any other person is subject to such requirements.

42 U.S.C. § 300j-6(a).  Because BLM is not itself engaged in regulated underground injection,

the federal facilities provision of the SDWA is irrelevant here, and it does not curtail BLM's

authority under FLPMA and the MLA.

---

[12]  "Fracing," and "fracking" are both shorthand ways of referring to hydraulic fracturing.

B. **Petitioners Fail to Demonstrate Irreparable Harm**

Because Petitioners have failed to demonstrate a likelihood of success on the merits, the Court may deny Petitioners' motion on that basis alone. *See, e.g., Winter*, 555 U.S. at 23-24; *Sprint Spectrum, L.P. v. State Corp. Comm'n of Kan.*, 149 F.3d 1058, 1060-62 (10th Cir. 1998). Moreover, Petitioners' motion should also be denied because Petitioners have failed to demonstrate irreparable harm.[13] *See, e.g., Heideman*, 348 F.3d at 1189 (movant "must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm").

Petitioners, supported by Amicus, assert that they will be subjected to two types of harm if the Final Rule is not enjoined. However, Petitioners have not made the requisite showing for either of these harms, which are speculative and unsubstantiated. First, they assert that the Final Rule "intrudes upon the States' sovereign interest in … the regulation of hydraulic fracturing[,]" and their "right to be the sole entity regulating hydraulic fracturing within their borders[.]" Pet. Mem. 16-20. As explained above, Federal lands are federal property, to be managed by federal agencies on the basis of delegations of Congressional authority pursuant to the Property Clause of the U.S. Constitution. *See, e.g., United States v. Wyoming*, 331 U.S. 440 (1947) (State cannot lease Federal lands for oil and gas development); *Kirkpatrick Oil & Gas Co. v United States*, 675 F.2d 1122 (10th Cir. 1982) (State cannot pool federal lands for oil and gas development without the Secretary's consent). State regulations may apply, but they do not displace federal regulation and in fact may be preempted by United States' sovereign authority. *Ventura County v. Gulf Oil Corp.*, 601 F.2d 1080, 1086 (9th Cir. 1979), *aff'd mem.*, 445 U.S. 947 (1980). Nor have

---

[13] While Petitioners have failed to meet any of the elements required for a preliminary injunction, should the Court disagree, any such relief should be narrowly tailored to protect only those parties that have shown *irreparable harm* from the Final Rule. *See* 5 U.S.C. § 705 (a court "may issue" orders under the APA to "preserve status or rights pending conclusion of the review proceedings," but *only* "to the extent necessary to prevent irreparable injury.")

Petitioners asserted a basis on which they can claim sovereignty or a sole right to regulate lands and minerals held in trust for sovereign tribes or individual Indians.

That said, the Final Rule specifically *preserves* states' regulatory authority. As discussed earlier, the Final Rule expressly contemplates concurrent state regulation of hydraulic fracturing, maintaining states' ability to regulate hydraulic fracturing within their borders under state law, including on federal lands,[14] so the sovereign interests of the States remain fully intact. The Final Rule simply supplements existing federal regulations applicable to Federal and Indian trust lands – and Petitioners have not established that any law requires BLM to avoid any overlap with or duplication of a State's regulation. Thus, the Final Rule is appropriately limited and does not inappropriately intrude on any State prerogative.

Second, Petitioners and Amicus allege economic harm, in the form of tax revenue delayed and lost, purportedly when industry elects to relocate its operations to states with lesser regulatory burdens – losses that Petitioners will be unable to recoup due to the United States' sovereign immunity. Pet. Mem. 20-22; Amicus Curiae Brief in Support Of Wyoming and Colorado's Motion for Preliminary Injunction ("Amic. Br.") 1-6. These harms are speculative and unsubstantiated. As an initial matter, the argument that the Final Rule will "delay" approvals for hydraulic fracturing and therefore the flow of tax revenue to the states, *id*. 20, is facially not irreparable harm. Mere "delay" can hardly justify the extraordinary relief sought here.

Petitioners' arguments as to lost revenues also fail. Petitioners have not established a basis to deviate from the general rule that potential economic loss is insufficient to establish irreparable harm. *See, e.g*., *Port City Props. v. Union Pac. R.R. Co*., 518 F.3d 1186, 1190 (10th

---

[14] 80 Fed. Reg. at 16,130 ("Operators with leases on Federal lands must comply with both the BLM's regulations and with state operating requirements"). Indeed, existing BLM regulations require all operators to comply with all applicable laws and regulations, including state authorities. *See, e.g.,* 43 C.F.R. 3162.1(a).

Cir. 2008). The cases cited by Petitioners and Amicus do not support their contention that any reduced state tax revenue or similar economic losses constitute irreparable harm. *See* Pet. Mem. 22, Amic. Br. 1-2.[15] In *Crowe & Dunlevy, P.C. v. Stidham*, the Tenth Circuit addressed a situation where a tribal court order, if not enjoined, would force the movant to return his fees to an Indian tribe. 640 F.3d 1140, 1156-57 (10th Cir. 2011). Similarly, in *Chamber of Commerce v. Edmondson*, the Tenth Circuit addressed an imposition of fines on businesses that failed to comply with a state law on the employment of illegal immigrants, *i.e.*, the actual payment of money by the plaintiff to the authority from which it was then unrecoverable. 594 F.3d 742, 770-71 (10th Cir. 2010). Here, by contrast, Petitioners are not alleging that the Final Rule would result in payment of any fines or fees to the federal government.

Even if potential economic loss could satisfy the irreparable harm requirement, however, Petitioners have not demonstrated that the Final Rule would cause such harm. While they speculate that the challenged rule will cause a decrease in production that would result in lost tax revenue, this result is refuted by BLM's analyses. BLM's Regulatory Impact Analysis estimates that the Final Rule will increase compliance costs by an average of about $11,400 per well, and thus will increase the average cost of drilling a well (which is between $5.4 – 9 million) by 0.13 to 0.21 percent. *See, e.g.*, 80 Fed. Reg. at 16,130, 16,205, 16,208. "Since the estimated compliance costs are not substantial when compared with the total costs of drilling a well," BLM concluded "that the rule is unlikely to have an effect on the investment decisions of firms. . . ."

---

[15] In each of the other two cases cited by Amicus, *see* Amic. Br. 1-2, the U.S. District Court for the District of Columbia found that plaintiffs had failed to demonstrate irreparable harm, and rejected their motion for a preliminary injunction. *See Sterling Commercial Credit--Michigan, LLC v. Phoenix Indus. I, LLC,* 762 F. Supp. 2d 8, 16 (D.D.C. 2011) (finding "no reason for this Court to depart from the established rule 'that economic harm does not constitute irreparable injury."); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50-52 (D.D.C. 2011) (finding that, while "economic loss that threatens the survival of the movant's business can" be an exception to the "well settled [rule] that economic loss does not, in and of itself, constitute irreparable harm[,]"industry plaintiffs had failed to demonstrate that their harm was imminent or certain).

*Id*. at 16,208. This analysis refutes the premise that the Final Rule will cause a decrease in oil and gas production – for which Petitioners offer only unsubstantiated and irrelevant assertions.

Specifically, Petitioners cite Wyoming's Kropatsch Affidavit for the propositions that, as a result of the Final Rule, "the length of time it will take to obtain approval on a permit or notice of intent will increase[,]" which "will lead to a delay for any well harvesting federal minerals or located on public land[,]" and as a result, "operators [will] seek out other states with less federal mineral interests," resulting in tax revenue, job, and spending losses in Wyoming. *See* Pet. Mem. 20, citing Kropatsch Aff. ¶¶ 27-28, 39-40. But the cited passages in that affidavit provide no substantiation on those points, *see id.*, and the affiant, the Deputy State Oil and Gas Supervisor for the Wyoming Oil and Gas Conservation Commission, *id*. ¶ 1, never explains how he is qualified, without any supporting documentation, to make generalizations about the future behavior of private entities as a result of the Final Rule. *See generally, id*. The only place where the Affidavit refers to a source for these conclusions is its statement that "[a]ccording to Western Energy Alliance, the BLM takes approximately 200 days to approve an APD[,]" *id*. ¶ 27. This statement is uncited hearsay, and inconsistent with BLM's own data, *see* 2nd Wells Decl. ¶ 25. Moreover, approval of an application for a permit to drill ("APD") is already required under preexisting regulations for drilling a well, *see* 80 Fed. Reg. at 16,129; 43 C.F.R. § 3162.3-1(c). Operators must obtain an APD whether or not they are engaged in hydraulic fracturing. Thus, the time necessary to obtain an APD *is the status quo*, and Petitioners do not explain how the Final Rule *adds* substantial additional delay. In contrast, the analyses conducted in preparation of the Final Rule concluded that processing a request to conduct hydraulic fracturing operations will increase the time required to process an APD by only *four hours*. *See* 80 Fed. Reg. at 16,196; 2nd Wells Decl. ¶ 24 (citation omitted). Under the Final Rule, operators have the option of either

23

submitting a request to conduct hydraulic fracturing operations with their APD or after the fact, as part of a Sundry Notice. *See, e.g.,* 80 Fed. Reg. at 16,129. Petitioners do not claim, and could not with any credibility, that this additional delay causes them irreparable harm. With respect to harms to Colorado, Petitioners offer no further details or substantiation of any delays that allegedly will occur due to the Final Rule. *See* Pet. Mem. 21.

Similar deficiencies plague Petitioners' assertion that the Final Rule will result in oil and gas operators departing their states for other states in which there is less Federal land, and thus less "duplication" in regulation. *Id*. 20-21. This premise is contradicted by BLM's analysis supporting its determination that "that the rule is unlikely to have an effect on the investment decisions of firms. . . [,]" *see* 80 Fed. Reg. at 16,208, and Petitioners have no substantiated basis to argue otherwise.[16] On the contrary, the fact that oil and gas operators have not been deterred from operating in Wyoming and Colorado despite the existence of both extensive state and federal oil and gas regulations – including the preexisting APD requirement, which Petitioners assert results in a 200-day delay, Kropatsch Aff. ¶ 27 – undermines Petitioners' assertion that the Final Rule will result in a significant loss of operators to other states.

### C. <u>The Balance of Harms and Public Interest Do Not Favor a Preliminary Injunction</u>

When, as here, the non-movant is the federal government, it is appropriate for the Court to consider jointly the balance of harms between Petitioners and Respondents and the broader public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). An examination of these factors confirms that an injunction should not issue. As explained in greater detail in Respondents' Brief

---

[16] BLM's conclusion, which is based on the minimal incremental cost imposed by the rule *as a percentage* of total drilling costs (0.13 to 0.21 percent), is not undermined by Amicus' assertion that BLM has failed to aggregate the rule's costs to account for the fact that "development … typically occur[s] in the hundreds or thousands" of wells. Amic. Br. 4; *see also id*. 5. Such aggregation would not change the per-well incremental cost of the rule nor its value in proportion to the overall cost of drilling the wells.

in Opposition to Petitioners' Motion for Preliminary Injunction, at 52-57, filed in consolidated case *Independent Petroleum Ass'n of America v. Jewell*, No. 2:15-cv-00041-SWS (D. Wyo. June 1, 2015) (ECF. No. 20), a preliminary injunction would frustrate the public interests motivating the Final Rule and deny BLM the tools needed to respond to risks and public concerns associated with the growth of hydraulic fracturing of oil and gas wells.

Petitioners' arguments to the contrary are unavailing. As discussed above, Petitioners' assertions concerning the "adequacy" of their regulation of fracturing–a characterization asserted but sparsely supported, *see* Pet. Mem. 23-24–says nothing of the adequacy of regulation by the numerous other states subject to the final rule. Petitioners' contentions regarding "responsive government[,]" *see id*. 25, are similarly unpersuasive, because the delay they reference corresponds to a requirement under existing regulations, *see* 80 Fed. Reg. at 16,129 (an APD is already required under preexisting regulations for drilling a well); 43 C.F.R. § 3162.3-1(c) (same). Petitioners' arguments also face a strong contrary presumption in the Tenth Circuit "that all governmental action pursuant to a statutory scheme . . . is taken in the public interest." *N. Arapaho Tribe*, 2015 U.S. Dist. LEXIS 30480, at *41, quoting *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006) (internal quotations omitted). Having failed to counter that presumption, Petitioners' public interest arguments also must fail.

## III. CONCLUSION

For the foregoing reasons, Petitioners Wyoming and Colorado have failed to establish any of the requirements for preliminary injunctive relief, and therefore the Court should deny Petitioners' motion for preliminary injunction.

Respectfully submitted this 12th day of June 2015.

/s/ William E. Gerard
WILLIAM E. GERARD
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 305-0475
Facsimile: (202) 305-0506
Email: william.gerard@usdoj.gov

DAVID A. CARSON
U.S. Department of Justice
Environment and Natural Resources Division
South Terrace – Suite 370
999 18th Street
Denver, CO 80202
Telephone: 303-844-1349
Fax: 303- 844-1350
david.a.carson@usdoj.gov

CHRISTOPHER A. CROFTS
United States Attorney

/s/ Nicholas Vassallo
NICHOLAS VASSALLO (WY Bar #5-2443)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
nick.vassallo@usdoj.gov

Of Counsel:

RICHARD MCNEER
Attorney-Advisor
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W., MS-5358
Washington, DC  20240

*Attorneys for Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of June 2015 a copy of the foregoing **Respondents'**

**Brief in Opposition to Wyoming's and Colorado's Motion for Preliminary Injunction** was

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.


  /s/ William E. Gerard
WILLIAM E. GERARD