Michael S. Freeman, Colo. Bar #30007 (*Admitted Pro Hac Vice*)
R. Benjamin Nelson, Cal. Bar #300274  (*Admitted Pro Hac Vice*)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO  80202
(303) 623-9466 (phone)
(303) 623-8083 (facsimile)
mfreeman@earthjustice.org
bnelson@earthjustice.org

Nathan Maxon, WY Bar #7-4588
MAXON LAW OFFICE
945 S. 4th Street
P.O. Box 898
Lander, WY  82520
(307) 438-9823 (phone)
nate.maxon@gmail.com

Attorneys for Respondent-Intervenors Sierra Club, Earthworks, The
Wilderness Society, Western Resource Advocates, Conservation Colorado
Education Fund, and Southern Utah Wilderness Alliance

Nathan Matthews, Cal. Bar # 264248 (*Admitted Pro Hac Vice*)
SIERRA CLUB
85 Second Street, 2nd Floor
San Francisco, CA 94105
(415) 977-5695 (phone)
nathan.matthews@sierraclub.org

Attorney for Applicant for Respondent-Intervenor Sierra Club

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| **STATE OF WYOMING, et al.,** | **2:15-CV-00043-SWS [Lead]** |
| **Petitioners,** | |
| **v.** | **[Consolidated With 2:15-CV-00041]** |
| | **Assigned:  Hon. Scott W. Skavdahl** |
| **UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,** | |
| **Respondents,** | **RESPONDENT-INTERVENORS' BRIEF IN OPPOSITION TO NORTH DAKOTA'S** |
| **SIERRA CLUB, et al.,** | **MOTION FOR PRELIMINARY INJUNCTION** |
| **Respondent-Intervenors.** | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

DISCUSSION ....................................................................................................................2

I.     STANDARD OF REVIEW ....................................................................................2

II.    NORTH DAKOTA CANNOT SHOW A LIKELIHOOD OF SUCCESS ON
THE MERITS BECAUSE BLM HAS AUTHORITY TO PROMULGATE
THE RULE UNDER THE MINERAL LEASING ACT, FLPMA, AND
OTHER STATUTES. ...............................................................................................2

      A.     The MLA And FLPMA Give BLM Authority To Promulgate The Rule...............2

      B.     SDWA And The 2005 Act Did Not Repeal BLM's Authority...............................5

      C.     North Dakota's SDWA UIC Regulations Do Not Cover The Activities
Regulated By The Rule. .....................................................................................6

III.   NORTH DAKOTA WILL NOT SUFFER IRREPARABLE HARM IN THE
ABSENCE OF AN INJUNCTION..........................................................................9

      A.     The Rule Does Not Impair Any Sovereign Interest Of North Dakota....................9

      B.     North Dakota Will Not Suffer Irreparable Harm From Lost Taxes Or
Mineral Revenues ............................................................................................13

  IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
DENYING NORTH DAKOTA'S REQUEST FOR AN INJUNCTION.........................18

      A.     North Dakota's Arguments Do Not Withstand Scrutiny .......................................19

      B.     The Recently-Issued EPA Draft Study Illustrates The Environmental
Benefits Of BLM's Rule .....................................................................................23

CONCLUSION.................................................................................................................25

## INTRODUCTION

Petitioner-Intervenor North Dakota's motion for preliminary injunction (Dkt # 52) should be denied.  First, North Dakota (the State) cannot show a likelihood of success on the merits because the Bureau of Land Management (BLM) has clear authority to adopt its new rule on hydraulic fracturing, 80 Fed. Reg. 16128 (Mar. 26, 2015) (the Rule).  The Mineral Leasing Act (MLA), 30 U.S.C. § 181 et seq., the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., and other statutes give BLM broad authority to regulate oil and gas development on public lands – including technical aspects of drilling like hydraulic fracturing. Nothing in the Safe Drinking Water Act, 42 U.S.C. § 300f, et seq. (SDWA), or the 2005 Energy Policy Act, Pub. L. No. 109-58, § 322, 119 Stat. 594 (2005) (codified at 42 U.S.C. § 300h(d)) (the 2005 Act), repeal that authority.

Nor will North Dakota suffer any irreparable harm in the absence of an injunction.  BLM has merely adopted a regulation setting terms for activities that the agency is charged with managing on federal lands.  That does not impair any sovereign right or authority held by the State.  And North Dakota's far-fetched claim that the Rule will result in massive losses of taxes and mineral revenues is nothing more than unsupported speculation.  Finally, the balance of equities and public interest favor allowing the Rule to take effect because of the environmental benefits it will provide.

Much of North Dakota's argument rests on a false premise: that its federally-approved SDWA regulations cover hydraulic fracturing and the other activities addressed by BLM's Rule. This theory underlies the State's legal argument on the merits as well as its claim that the BLM Rule will provide no environmental benefits in North Dakota.  But this suggestion is simply incorrect.  North Dakota's SDWA regulations – like the federal statute they implement – do not cover hydraulic fracturing of oil and gas wells.  Nor do they address the other activities

addressed by BLM's Rule, like construction of oil and gas wells and the use of pits at those

wells.  There is no conflict between the Rule and North Dakota's SDWA regulations.  And a

review of the North Dakota rules that actually apply to oil and gas wells shows that BLM's Rule

will represent a substantial improvement in protection for aquifers, lands and public health.

North Dakota's motion should be denied.

## DISCUSSION

## I.      STANDARD OF REVIEW

To obtain a preliminary injunction, North Dakota must demonstrate: (a) a likelihood of

success on the merits; (b) that it is likely to suffer irreparable harm in the absence of injunctive

relief; (c) that the balance of equities favors an injunction; and (d) that an injunction is in the

public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S.  7, 20 (2008); Greater

Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1255 (10th Cir. 2003).  The State bears the burden

of establishing all four factors, and its "right to relief must be clear and unequivocal."  Greater

Yellowstone Coal., 321 F.3d at 1256.  The State cannot meet this standard.

## II.     NORTH DAKOTA CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE BLM HAS AUTHORITY TO PROMULGATE THE RULE UNDER THE MINERAL LEASING ACT, FLPMA, AND OTHER STATUTES.

### A.      The MLA And FLPMA Give BLM Authority To Promulgate The Rule.

BLM relies on the MLA and FLPMA for its authority to promulgate the Rule.  80 Fed.

Reg. at 16217.[1]  The agency's interpretation of these statutes is reviewed under the two-step test

established in Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).  First,

courts consider whether Congress has directly addressed the issue in the statute.  Where "the

intent of Congress" is clear, that ends the inquiry.  Id. at 842-43.  Second, if a statute is "silent or

---

[1] Other statutes also support BLM's authority to promulgate the Rule.  See 80 Fed. Reg. at 16217.  For example, the Indian Mineral Leasing Act (IMLA), 25 U.S.C. § 396a–g, vests the agency with rulemaking power on Indian lands.

2

ambiguous" on an issue, courts uphold the agency's interpretation where it reflects a "permissible construction of the statute." Id. at 843.

BLM's interpretation must be upheld under both steps of Chevron. As discussed in response to the Wyoming and Colorado preliminary injunction motion, FLPMA and the MLA assign the Interior Department responsibility for managing oil and gas development on federal lands, and give the agency sweeping authority to issue regulations governing the technical aspects of that development. See Dkt # 67 at 2-9. In the MLA, Congress authorized the Interior Department to impose "exacting restrictions and continuing supervision" over companies developing oil and gas, and to issue "rules and regulations governing in minute detail all facets of the working of the land." Boesche v. Udall, 373 U.S. 472, 477-78 (1963) (citing 30 U.S.C. § 189); see also, Ventura Cnty. v. Gulf Oil Corp., 601 F.2d 1080, 1083 (9th Cir. 1979) (MLA provides for "extensive regulation of oil exploration and drilling"); Dkt # 67 at 2-3.

FLPMA also assigns BLM responsibility for managing oil and gas development on federal lands. New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 689 n. 1 (10th Cir. 2009). As part of that authority, BLM must avoid "unnecessary or undue degradation of the lands," 43 U.S.C. § 1732(b), and apply "multiple use and sustained yield" principles" that balance mineral development with protection of wildlife, water, and other resources. Id. § 1701(a)(7), 1701(a)(8), 1702(c). In FLPMA, Congress also directed BLM to issue regulations implementing these duties. Id. §§ 1701(a)(5), 1733(a), 1740. These provisions give BLM "ample authority" to promulgate regulations addressing mineral development. Humboldt Cnty. v. United States, 684 F.2d 1276, 1283 (9th Cir. 1982); see also, Dkt # 67 at 3-4.

Nothing in the MLA or FLPMA suggests that Congress intended to exempt well stimulation techniques like hydraulic fracturing from the broad regulatory authority granted to

BLM.  Contrary to North Dakota's argument, the Rule does not interfere with "traditional" state authority over water resources or violate FLPMA's provision regarding water rights.  See ND Br. at 18-20, 29-30; 43 U.S.C. § 1701 note (g)(1)–(2), (4) (stating that FLPMA shall not be construed to affect water rights or govern water appropriation).[2]  BLM is not attempting to modify water appropriation laws or limit state water rights.  The agency is merely trying to ensure that the oil and gas activities it approves will not contaminate aquifers and other water resources.  Dkt # 67 at 4-7.  As BLM noted in the preamble: "no commenter has explained how a requirement" that oil and gas wells be constructed to protect aquifers "will preempt or interfere with states' . . . regulation of their ground water quality or quantity."  80 Fed. Reg. at 16144; see also, id. at 16186 (noting that "BLM will not be issuing or vetoing rights to use water or discharge permits").  BLM's view that it has authority to issue the Rule under FLPMA and the MLA should be upheld under the first Chevron step.  See Chevron, 467 U.S. at 842-43.

BLM's authority also should be affirmed under Chevron step two as a permissible reading of the MLA and FLPMA.  See id. at 843-44.  For the reasons discussed above, BLM's view represents an entirely reasonable interpretation of the two statutes.  Numerous courts have acknowledged BLM's broad authority to regulate the technical aspects of oil and gas development.  See Dkt # 67 at 8-9 (collecting cases); Boesche v. Udall, 373 U.S. at 477-78.  Moreover, BLM's view should get particular deference because it reflects a long-standing agency interpretation.  Barnhart v. Walton, 535 U.S. 212, 219–20 (2002); see Dkt # 67 at 7-8.

---

[2] The arguments by North Dakota regarding Section 202(c)(8) of FLPMA, 43 U.S.C. § 1712(c)(8), and the savings clause in MLA Section 189, 30 U.S.C. § 189, also are meritless.  Dkt # 67 at 4-7; ND Br. at 29-30.  In addition, North Dakota's reliance on Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs, 531 U.S. 159 (2001) (SWANCC), is misplaced.  See ND Br. at 18, 20, 33.  SWANCC addressed the extent of Congress's Commerce Clause authority to regulate non-federal lands – it did not address regulation of federal property under the Property Clause.  531 U.S. at 162.  SWANCC has no applicability to a BLM rule addressing activities the agency is charged with managing on federal lands.

For many decades, Interior Department oil and gas regulations have addressed the same kind of issues covered by the Rule.  Dkt # 67 at 7-8.  For example, 1942 Interior Department rules addressed activities that "stimulate production by . . . water injection, or any other method . . . ." 7 Fed. Reg. 4132, 4135 (June 2, 1942); see also, 31 Fed. Reg. 6414, 6415 (Apr. 28, 1966) (same).  And for more than thirty years – since at least 1982 – the Department has interpreted its statutory authority as extending specifically to hydraulic fracturing.  47 Fed. Reg. 47758, 47770 (Oct. 27, 1982) (adopting 30 C.F.R. § 221.27 (1982)).

### B.     SDWA And The 2005 Act Did Not Repeal BLM's Authority.

Congress did not repeal the Interior Department's authority when it passed the underground injection control (UIC) provisions of SDWA in 1974, or amended them with the 2005 Act.  Dkt # 67 at 9-13.  On their face, SDWA and the relevant section of the 2005 Act do not even mention FLPMA or the MLA.  The 1974 legislative history of SWDA, in fact, expressly states that its UIC requirements were not intended to repeal or limit the Department's authority under other statutes.  H.R. Rep. No. 93-1185 (1974), as reprinted in 1974 U.S.C.C.A.N. 6454, 6484-85; Dkt # 67 at 10.  Thirty years later, the legislative history of the 2005 Act offered no suggestion that Congress intended to repeal BLM's well-established authority to regulate hydraulic fracturing and other technical issues on federal lands.  Dkt # 67 at 11-13.  Even after the 2005 Act, "under the MLA and FLPMA, BLM has direct authority to regulate [hydraulic fracturing] operations when they occur on federal lands."  Rebecca Watson et al., Hydraulic Fracturing and Water Supply Protection – Federal Regulatory Developments, 2012 Rocky Mtn. Min. L. Inst. 6, *6-26 (available on Westlaw at 2012 NO. 3 RMMLF-INST PAPER NO. 6).[3]

---

[3] North Dakota's suggestion that the Rule conflicts with SDWA's federal facilities provision, 42 U.S.C. § 300j-6(a)(4), is also wrong.  ND Br. at 21-22.  This provision makes a federal agency that is itself "engaged in . . . underground injection" that may endanger drinking water subject to

**C.      North Dakota's SDWA UIC Regulations Do Not Cover The Activities Regulated By The Rule.**

North Dakota attempts to portray a conflict between the Rule and SDWA by repeatedly (and incorrectly) suggesting that the State's federally-delegated SDWA UIC program applies to activities covered under BLM's Rule.  See, e.g., ND Br. at 2 (stating that North Dakota "regulates hydraulic fracturing and related activities . . . under the underground injection control program"); id. at 24 (stating that North Dakota's UIC program "manages flowback water from hydraulic fracture sites" and citing 1983 state UIC regulations on well casing, pressure testing and other requirements related to "fracturing"); id. at 26 (stating that BLM's Rule involves "regulation of the same sources . . . and setting standards for the same practices" as state UIC regulations).

In particular, North Dakota accuses BLM of "interference" with the State's UIC program by adopting the Rule.  See ND Br. at 21 (asserting that SDWA "clearly prohibits federal interference with state regulation of USDWs [underground sources of drinking water]" under the UIC program), 25-27 (arguing that the Rule "interferes with" North Dakota UIC regulations), 29 (similar), 35 (claiming there is "direct conflict" between the Rule and North Dakota's jurisdiction under the SDWA UIC program).

In reality, there is no conflict between BLM's new Rule and the North Dakota UIC program.  The State's UIC rules – like the federal statute they implement – do not regulate hydraulic fracturing of oil and gas wells.  North Dakota is incorrect in suggesting that its UIC program covers the same activities as BLM's Rule.

---

liability in the same manner as any other entity conducting such activities.  42 U.S.C. § 300j-6(a)(4).  The federal facilities provision does not remove any authority that an agency has under statutes other than SDWA.  See Pamela King, The Protection of Groundwater and Public Drinking Supplies: Recent Trends in Litigation and Legislation, 42 Vand. L. Rev. 1649, 1660-63 (1989) (discussing function of federal facilities provision).

SDWA's UIC provisions address the underground injection of chemicals and other materials.  42 U.S.C. §§ 300h-300h-8.  Federal law, and North Dakota's UIC regulations, prohibit any underground injection unless a permit is issued.  See 42 U.S.C. §§ 300h(b)(1)(A)-(D); 40 C.F.R. Part 144; ND Admin. Code § 43-02-05-04.[4]  In the late 1990s, the Eleventh Circuit Court of Appeals ruled that hydraulic fracturing constituted "underground injection" subject to SDWA's UIC requirements.  See Legal Assistance Found., Inc. v. U.S. Envtl. Protection Agency, 118 F.3d 1467, 1474, 1478 (11th Cir. 1997) ("[I]t is clear that Congress dictated that all underground injection be regulated under the" SDWA) (emphasis original).  In 2005, however, Congress amended SDWA to exempt hydraulic fracturing from the UIC program except when diesel fuel is used.  Energy Policy Act of 2005, Pub. L. No. 109-58 § 322 (2005) (codified at 42 U.S.C. § 300h(d)(1)(B)).  Thus, SDWA's UIC requirements today generally do not cover hydraulic fracturing.  Id.

A review of North Dakota's UIC regulations illustrates how distinct that program is from BLM's Rule.  Consistent with the federal statute, North Dakota's UIC regulations do not mention hydraulic fracturing.  See ND Admin. Code Ch. 43-02-05.  The State also does not require a UIC permit when a company hydraulically fractures an oil and gas well.[5]  And the UIC regulations impose a variety of requirements for an underground injection well that do not apply

[4] As in many other states, the United States Environmental Protection Agency has delegated primary authority for enforcing SDWA to North Dakota.  48 Fed. Reg. 38238 (Aug. 23, 1983).
[5] The one limited exception is when diesel fuel is used.  See 42 U.S.C. § 300h(d)(1)(B) (2005 Act excluded hydraulic fracturing from definition of "underground injection," except when diesel used).  Since February 2014, pursuant to EPA direction, North Dakota has required a UIC permit for hydraulic fracturing with diesel.  North Dakota Diesel Fuel Guidance (Feb. 2014), attached as Ex. 1, available at:
https://www.dmr.nd.gov/oilgas/EPAHFguidelines2014_02_14.pdf.  But even in that limited circumstance, there is no conflict: the legislative history of SDWA makes clear that it does not limit the Interior Department's authority under the MLA or other statutes.  P. 5, supra.  There is no reason BLM and North Dakota cannot both regulate diesel fracturing using different sources of authority.

to oil and gas wells.  These include a detailed UIC permit application, quantitative analysis of existing ground water quality in the area as well as of the fluids to be injected, assurances that the injection will not endanger any underground sources of drinking water, and public notice to all landowners within a quarter mile.  Compare ND Admin. Code § 43-02-05-04 (UIC permitting regulations) with ND Admin. Code § 43-02-03-16 (permit requirements for drilling oil and gas well).

UIC injection wells are often used to dispose of wastes generated by activities at oil and gas wells.  The injection wells, however, typically are located at different sites from the oil and gas wells, and are subject to a different regulatory scheme.  BLM's Rule regulates only hydraulic fracturing and other activities at the oil and gas well – not disposal or other activities at UIC injection wells.  See, e.g., 80 Fed. Reg. at 16220 (43 C.F.R. § 3162.3-3(h)) (Rule addresses management of fluids recovered from fracturing operations until "approval of a produced water disposal plan under BLM requirements"); 58 Fed. Reg. 47354, 47363 (Sept. 8, 1993) (BLM order addressing produced water disposal plans notes that UIC permits are required for disposal in injection wells).

North Dakota's focus on its UIC program is a red herring.  By exempting hydraulic fracturing from UIC requirements, the 2005 Act created a gap in SDWA's program protecting underground sources of drinking water.  The Rule takes steps to close that regulatory gap using BLM's independent statutory authority.  BLM's effort does not violate SDWA, or conflict with North Dakota's UIC regulations implementing that statute.  North Dakota cannot show a likelihood of success on the merits.

### III. NORTH DAKOTA WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

North Dakota claims it will suffer two forms of irreparable harm if the Rule takes effect: (a) impairment of the State's "sovereign authority" to regulate hydraulic fracturing, and (b) harm to the State's "economic interests in the form of substantially decreased royalties and taxes." ND Br. at 7, 11. Both arguments fail.

### A. The Rule Does Not Impair Any Sovereign Interest Of North Dakota.

North Dakota has no sovereign right to be the only entity regulating hydraulic fracturing on federal lands. The Property Clause of the United States Constitution makes management of federal property – including federal mineral development – the prerogative of Congress. Kleppe v. New Mexico, 426 U.S. 529, 540 (1976) (quoting Utah Power & Light Co. v. United States, 243 U.S. 389, 405 (1917)); Ventura Cnty., 601 F.2d at 1083. "State jurisdiction over federal land does not extend to any matter that is not consistent with the full power in the United States" under the Property Clause. Wyoming v. United States, 279 F.3d 1214, 1227 (10th Cir. 2002) (internal quotations omitted); see Dkt # 67 at 14-15.

Congress has delegated its authority under the Property Clause to the Interior Department through FLPMA and the MLA. That "federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." Ventura Cnty., 601 F.2d at 1083. If state laws conflict with federal regulation under the Property Clause, "the law is clear: The state laws must recede." Kleppe, 426 U.S. at 543; accord Calif. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 580-81 (1987); see e.g., Tex. Oil & Gas Corp. v. Phillips Petroleum Co., 406 F.2d 1303, 1304 (10th Cir. 1969) (state police power over oil and gas can apply on federal land "unless and until the federal government has asserted its constitutionally paramount power by appropriate statute and regulation"); Ventura Cnty., 601 F.2d at 1083-86 (local zoning regulation that conflicted with

federally-approved oil and gas development on national forest was preempted by MLA and other federal statutes).

As discussed above, the MLA and FLPMA give BLM the authority to regulate hydraulic fracturing and other technical aspects of federal oil and gas development on federal lands.  North Dakota therefore cannot claim to have any sovereign interest that is violated by BLM's promulgation of the Rule.  See N. Arapaho Tribe, 2015 WL 872190 at **15-16 (rejecting argument that tribe suffered irreparable harm from Affordable Care Act rules infringing on its sovereign authority where tribe was unlikely to succeed on merits of that claim); Dkt # 67 at 15.

The State's argument that the Rule is "an affront" to its sovereign interests, ND Br. at 1, also ignores North Dakota's own laws.  The State has an existing oil and gas regulation addressing "United States government leases" that states: "The commission recognizes that all persons drilling and producing on United States government land shall comply with the United States government regulations."  ND Admin. Code § 43-02-03-07.  The regulation allows companies to use a variety of federal forms in lieu of state forms on those leases, and requires that companies developing such leases also must comply with state regulations.  Id.  This rule confirms that North Dakota's claim of a sovereign right to regulate oil and gas without federal involvement is meritless.

The cases cited by North Dakota also do not support its claim of irreparable harm.  For example, in Kansas v. United States the federal government designated privately-owned lands as "Indian lands," a decision that transferred authority to the Miami Tribe and limited the ability of the State of Kansas to apply its laws there.  249 F.3d 1213, 1218-19, 1223 (10th Cir. 2001).  In contrast, the Rule does not transfer jurisdiction over any lands or change their legal status.  The Rule applies only to lands and minerals owned by the federal government, where (regardless of

the Rule) the federal government is the primary sovereign.  The Rule simply addresses how

BLM will manage oil and gas activities on those lands.[6]  Dkt # 67 at 15.

International Snowmobile Manufacturer's Association v. Norton, 304 F. Supp. 2d 1278

(D. Wyo. 2004), also does not help North Dakota's argument.  There, the plaintiffs argued that a

regulation limiting snowmobile use at Yellowstone and Grand Teton National Parks "infringes

on Wyoming's sovereignty."  Id. at 1287.  But the court did not find any such sovereign

impairment.  Instead, the court found irreparable harm based on concrete evidence of economic

impacts "to a whole group of businesses which supply lodging, dining, gas, and other services to

snowmobilers in the Parks."  Id.  That holding has no bearing on the State's sovereign injury

argument.  Dkt 52-1 at 8-9.

Nor does the Rule impair North Dakota's ownership and management of state-owned

groundwater resources.  ND Br. at 10-11.  North Dakota cannot identify any provision of the

Rule that modifies state water laws or limits water rights.  BLM is just trying to ensure that the

oil and gas development activities it approves will not harm the State's water resources.  See p.

4, supra.  If North Dakota's concern is for protection of its state-owned groundwater resources, it

should support BLM's effort rather than challenging it.

The presence of split estate lands (where the federal government owns minerals that

underlie private or state-owned surface lands) does not mean the Rule "improperly infringes on

North Dakota's sovereign regulatory jurisdiction."  See ND Br. at 9-10, 35-36.  Tellingly, North

---

[6] Two other cases cited by North Dakota, Akiachak Native Cmty. v. Jewell, 995 F. Supp. 2d 7 (D.D.C. 2014), and Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163 (10th Cir. 1998), are distinguishable for similar reasons.  Akiachak found that the State of Alaska would suffer irreparable harm if the Interior Department took land into trust for native tribes because doing so would "cause chaos over clouded title to land in Alaska."  995 F. Supp. 2d at 15-16 and n. 6.  No such change of title is involved here.  Kiowa involved efforts to seize tribal assets by an Oklahoma state court that lacked jurisdiction over the tribe.  150 F.3d at 1171-72.  In contrast, BLM here is not seizing or attempting to exert new authority over non-federal property.

Dakota cannot cite a single case supporting this argument.  Id.[7]  Congress's Property Clause

power, and BLM's authority under the MLA and FLPMA, extend to federally-owned minerals as

much as they do the federal surface estate.  See James D. Harris, Relative Property Interests on

the Federal Oil and Gas Lease, 2008 Rocky Mtn. Min. L. Inst. Paper No. 13B (available on

Westlaw at 2008 No. 1 RMMLF-INST Paper No. 13B) (Mineral rights are "federal property in

the full meaning of the Property Clause of the Constitution.").

    North Dakota's split estate theory attempts to create a threat to its "sovereign interests"

out of a situation that already exists.  The presence of split estate lands is nothing new in North

Dakota and many other western states.  BLM already requires a permit to drill on federal leases,

regardless of whether the minerals underlie private lands.  See 72 Fed. Reg. at 10336 (Onshore

Order No. 1 describing permitting requirements for "Lands With Non-Federal Surface and

Federal Oil and Gas").  And North Dakota has coordinated state permitting with BLM for

decades when development involves federal minerals.  See, e.g., ND Admin Code § 43-02-03-07

(historical note) (North Dakota's rule acknowledging federal authority over "United States

leases" has been in current form since 1994).  BLM rules, for example, require a federal mineral

---

[7] The two cases cited by North Dakota (Dkt # 52-1 at 35), are inapplicable.  In Hydro Resources, Inc. v. U.S. EPA, 608 F.3d 1131 (10th Cir. 2010), the court addressed whether New Mexico or EPA had SDWA permitting authority over a project.  There was no dispute, however, that a SDWA permit was required.  Id. at 1134.  Here, EPA is not involved and SDWA UIC permits are not at issue.  Instead, BLM is exercising its authority under the MLA and FLPMA.  See pp. 2-5, supra.  North Dakota also cites Hunt Oil Co. v. Kerbaugh, 283 N.W.2d 131 (N.D. 1979), for the proposition that state law only allows a mineral owner to use only as much of the surface as "reasonably necessary" to develop the minerals.  Dkt # 52-1 at 35.  But what is "reasonably necessary" is a question of fact that is determined when on-the-ground activity is proposed.  See, e.g., Hunt, 283, N.W.2d at 137.  In this facial challenge, there is no basis for concluding that the Rule's provisions will require using more of the surface than "reasonably necessary."  Moreover, use of the surface to comply with federal laws is considered "reasonably necessary" when developing a federal mineral lease.  See, e.g., 72 Fed. Reg. 10308, 10336 (Mar. 7, 2007) (a "Federal mineral lessee has the right to enter [non-federal surface] property" to conduct surveys required by federal law because it is necessary "to develop[ ] the dominant mineral estate").

lessee to consult with the non-federal surface owner and attempt to reach agreement on surface use issues.  72 Fed. Reg. at 10336.  These same rules will apply under the new Rule.  North Dakota cannot claim that it will suffer any irreparable harm to its sovereignty from continuing to coordinate with BLM on split estate and other lands, just as the State has done for years.

**B.      North Dakota Will Not Suffer Irreparable Harm From Lost Taxes Or Mineral Revenues.**

North Dakota's argument that the Rule will cost it billions of dollars in lost taxes and revenues, ND Br. at 14, also fails.  The general rule is that potential economic loss does not establish irreparable harm.  See, e.g., Port City Props. v. Union Pac. R.R. Co., 518 F.3d 1186, 1190 (10th Cir. 2008).  To support a preliminary injunction, moreover, a threatened injury must be imminent and "certain, great, actual 'and not theoretical.'"  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "Speculation or unsubstantiated fear of what may happen in the future cannot provide the basis for a preliminary injunction."  Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005).  The Tenth Circuit, for example, has rejected a state government's effort to establish an injury to state revenues based on conclusory affidavits that lacked any substantial supporting analysis.  Wyoming v. U.S. Dep't of Interior, 674 F.3d 1220, 1232-33 (10th Cir. 2012).

North Dakota's irreparable harm theory is exactly the kind of speculation the Tenth Circuit has rejected.  The State claims that:

(a) the Rule will delay the issuance of each BLM permit by 6-10 months – supposedly "doubl[ing]" current processing times, ND Br. at 12;

(b) those delays "will cut the production of oil and gas in half," id.; and

(c) nearly half of the companies currently drilling on public lands in North Dakota (10 of 22) will "permanently" leave the state to avoid complying with the Rule.  Id. at 14.

13

These far-fetched claims are based on an affidavit from Lynn Helms, the director of the North

Dakota Industrial Commission's Department of Mineral Resources (the state oil and gas

regulatory agency).  See id. at 12, 14.  Mr. Helms, however, provides no analysis or evidence to

support his remarkable predictions.

For example, his opinion that permitting times will "nearly double[ ]" under the Rule is

based only on (a) "my understanding of BLM's current drilling permit approval times," and (b)

"my understanding that BLM has not hired additional staff" to implement the Rule in North

Dakota.  Dkt # 52-4 (Helms Decl.) ¶ 15.  But those two assumptions just describe existing

conditions.  Mr. Helms fails to explain at all how he concluded that the requirements of the new

Rule will cause delays of 6-10 months for every permit issued by BLM.  Id. ¶¶ 14-15.  Based on

the affidavit, his opinion is nothing more than speculation.[8]

Mr. Helms also fails to explain why he disagrees with BLM's conclusions on this issue.

Unlike North Dakota, BLM has done an analysis and determined that the Rule will not require

significant delays.  BLM estimates that applications would require "only 4 hours of additional

review time" by agency staff.  80 Fed. Reg. at 16196.  "This does not present a measureable

delay in processing time."  Id.  The Rule also allows companies to seek approval of hydraulic

fracturing operations as part of the existing drilling permit process, 80 Fed. Reg. at 16218 (43

C.F.R. § 3162.3-3(c)(1)), in which case no new delays would result.  "BLM believes that the

additional information that would be required by this rule would be reviewed in conjunction with

the [application for permit to drill (APD)] and within the normal APD processing timeframe."

Id. at 16177.

---

[8] Mr. Helms' statement that a 6-10 month delay would "nearly double[ ]" BLM permitting times
also appears inconsistent with his statement earlier in the case that companies "generally wait
between nine months and 1.5 years before receiving a [drilling] permit from BLM."  Dkt # 6-3 ¶
35.

In addition, the Rule allows a company to submit a "master hydraulic fracturing plan" (MHFP) to obtain approval for fracturing multiple wells.  Id. at 16217-218 (43 C.F.R. §§ 3160.0-5, 3162.3-3(c)(3)).  An MHFP allows BLM to "frontload" and "streamline" the approval process for hydraulic fracturing operations, which should avoid delays.  Id. at 16147-48.  While some additional time may be required if companies fail to take advantage of either of these procedures, that time is likely to be minimal.  See id. at 16177, 16196.  North Dakota has offered no reason to doubt these conclusions.  Nor has the State shown that any permit processing delays that do occur would be substantial enough to affect oil and gas production.

North Dakota's prediction that BLM permitting delays caused by the Rule will dramatically cut oil and gas production is even less plausible.  ND Br. at 12.  Again, this claim relies on Mr. Helms' affidavit.  Mr. Helms provides only a single sentence stating that the claimed 6-10 month permitting delay "will result in approximately one-half the rate of development and in turn result in decreased royalties and taxes. . . ."  Helms Decl. ¶ 16.  He offers no analysis or explanation to support this statement.

Mr. Helms' opinion conflicts with BLM statistics, which indicate that federal permitting times are not constraining development in North Dakota.  Obtaining a federal drilling permit in North Dakota already takes longer than a state approval.  See Dkt # 6-3 ¶ 35 (stating that federal permits require 9-18 months); Deborah Sontag and Robert Gebeloff, The Downside of the Boom, New York Times (Nov. 22, 2014), attached as Ex. 2 (state permits processed in 10 days as of 2011).[9]  Despite the additional time required for BLM approvals, the number of new federal wells drilled each year in North Dakota has nearly doubled since 2010.  See Ex. 3 (BLM statistics on wells started ("spudded")).  In every year from 2010-2014, BLM also approved

---

[9] Available at: http://www.nytimes.com/interactive/2014/11/23/us/north-dakota-oil-boom-downside.html?_r=0 .

more permits than companies drilled.  Compare id. with Ex. 4 (BLM statistics on drilling permits approved).[10]  For example, in 2013 and 2014 BLM approved about 50 percent more permits in North Dakota than companies chose to drill.  Id.  By September 2014, companies had stockpiled 356 approved federal permits in North Dakota, which amounted to a two-year supply based on 2013-2014 drilling rates.  See Dkt # 45-4 at p. 284; Ex. 3.  Mr. Helms does not explain why he believes the Rule will reverse this situation so dramatically.

Similarly, Mr. Helms provides no support for his prediction that numerous companies will flee federal lands permanently to avoid the "substantial delay and additional costs of complying with the BLM Rule."  Helms Decl. ¶ 18; accord ND Br. at 14.  BLM calculated that compliance costs for the Rule will amount to only 0.13 to 0.21 percent of the expense of drilling a well.  80 Fed. Reg. at 16130.  Even if that figure were doubled or tripled, the requirements of the Rule would represent much less than one percent of the drilling cost.  North Dakota offers no basis to question BLM's numbers.  Nor does the State explain why such modest costs will result in a mass exodus of oil and gas companies from federal lands.  In particular, Mr. Helms' opinion does not appear to consider many other factors that go into the drilling decisions of oil and gas companies, and have a much larger impact on the economics of a project.  These factors include the price of oil and natural gas, the amount of oil recoverable in North Dakota compared to other states, the number of leases held by each company in the state, costs of equipment and labor, etc.  See Dkt # 67 at 20-21.  Given the numerous other considerations involved, there is no basis to conclude that the Rule will have any systemic impact on state revenues.

The conclusory opinions offered by Mr. Helms fall far short of what is required to establish irreparable harm.  As the Tenth Circuit held in rejecting a similar challenge on standing

---

[10] Exhibits 3 and 4 are available at:
http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/statistics.html .

grounds, "conclusory" affidavits that "provide[ ] no underlying evidence to support [the] claim that a reduction in revenue even exists . . . . [or that] revenues will decrease in the future" are insufficient to demonstrate that the State faces any injury. Wyoming, 674 F.3d at 1232. The Wyoming decision makes clear that North Dakota's speculation about hypothetical lost taxes and mineral revenue fails to establish irreparable harm. See id. at 1227, 1232; see also Schrier, 427 F.3d at 1266 (claim of "lost opportunities" by terminated employee was too speculative to support finding of irreparable harm where plaintiff "provided no evidence of actual lost opportunities").[11]

If states could rely on conclusory opinions about potential lost tax revenues, the requirement to show irreparable harm would effectively be written out of the preliminary injunction test any time a state challenges a federal decision. The Tenth Circuit recognizes that almost every major federal land management action has some "generalized" impact on the surrounding area. Wyoming, 674 F.3d at 1234-35. But more than that is required to establish an injury for purposes of litigation. Because of "'the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers,'" a state must provide specific, direct proof of lost tax revenues where it seeks to challenge a federal action. Id. (quoting Pennsylvania v. Kleppe, 533 F.2d 668, 672-73 (D.C. Cir. 1976)). North Dakota has failed to do so.

---

[11] Moreover, any hypothetical slowdown in state revenues would only be temporary if the Rule is later set aside by this Court. Such a temporary impact does not cause irreparable harm. See Dkt # 67 at 19 n. 6; Heideman, 348 F.3d at 1189-90. While North Dakota relies on Oklahoma v. International Registration Plan, Inc., 264 F. Supp. 2d 990 (W.D. Okla. 2003), ND Br. at 11-12, that case is readily distinguishable. In Oklahoma, the court emphasized that the loss was irreparable because Oklahoma was "as a practical matter, precluded from ever seeking judicial review" of the decision harming it. Id. at 997. Moreover, unlike this case, there was no dispute that Oklahoma actually was suffering a significant injury: an interstate regulatory organization had imposed sanctions directing other states to withhold vehicle registration fees from Oklahoma. Id. at 993, 997.

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DENYING NORTH DAKOTA'S REQUEST FOR AN INJUNCTION.

The other two factors – the balance of equities and the public interest – also support denial of North Dakota's motion.[12]  The State is not asking the Court to maintain the status quo on the ground.  Instead, it seeks to allow companies to drill thousands of new oil and gas wells with outdated and inadequate rules while this case is pending.  See 80 Fed. Reg. at 16130 (estimating Rule will affect 2,800-3,800 operations per year).  Such an outcome would have a substantial adverse impact on the environment and members of the public who are affected by oil and gas development on public lands.  For that reason, the public interest and balance of equities strongly weigh against granting the relief sought by North Dakota.

First, as discussed in response to the preliminary injunction motion filed by Western Energy Alliance, et al. (the Industry Associations), the balance of equities and public interest favor BLM because it is exercising its statutory authority to protect public lands and the environment.  See Dkt # 45 at 11-32; Safari Club Int'l v. Salazar, 852 F. Supp. 2d 102, 125 (D. D.C. 2012); N. Arapaho Tribe, 2015 WL 872190 at *16.  That public interest is underscored by the almost 1.35 million public comments submitted to BLM urging the agency to adopt protections as strong as or stronger than those in the Rule.

Second, the environmental benefits of the Rule weigh against injunctive relief.  The Rule represents a much-needed update to BLM regulations.  It will benefit numerous members of the public by reducing damage to land, water, and wildlife from waste pits; by protecting aquifers from contamination due to well construction defects and hydraulic fracturing-related accidents;

---

[12] The balance of equities and public interest factors are addressed together because they overlap to a great degree in this case.  See Nken v. Holder, 556 U.S. 418, 435 (2009) (balance of harms and public interest factors for stay "merge when the Government is the opposing party").

and by providing informational tools so that members of the public can better protect their health and safety.  See Dkt # 45 at 11-32 (response to Industry Associations' motion); Dkt ## 38-2 to 38-4 (declarations supporting intervention).  Preserving the environmental benefits of the Rule advances the public interest and outweighs the minimal impacts to North Dakota and the other Petitioners.  See Dkt # 45 at 11-32; Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 545 (1987); Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1124-25 (9th Cir. 2002); San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv., 657 F. Supp. 2d 1233, 1242 (D. Colo.  2009); Wilson v. Amoco Corp., 989 F. Supp. 1159, 1177-78 (D. Wyo. 1998).

### A.    North Dakota's Arguments Do Not Withstand Scrutiny.

North Dakota's claim that the public interest supports an injunction because "regulatory chaos" will result if the Rule is later struck down fails because the State is not likely to succeed on the merits.  ND Br. at 37.  BLM has ample authority to issue the Rule under FLPMA and the MLA, and nothing in SDWA or the 2005 Act narrowed that authority.  See pp. 2-5, supra; see also N. Arapaho Tribe, 2015 WL 872190 at *16 (ruling that balance of harms and public interest did not support injunction against agency regulations that were authorized by Congress).

North Dakota also is wrong that no environmental harm will result from an injunction because state regulations "adequately protect[ ]" groundwater.  See ND Br. at 16-17, 38-39 (citing State's UIC and other regulations).  Here again, the State mistakenly relies on its federally-approved SDWA UIC program for many of its claims about environmental protection and "the comprehensive and protective regulations" that supposedly already apply.  See, e.g., ND

Br. at 2-6, 16-17, 23-25.  Those UIC regulations do not apply to the activities covered by BLM's new Rule.  See pp. 6-8, supra.[13]

When considering the North Dakota laws that do apply, it becomes apparent that the Rule will provide substantial environmental benefits in that state.  North Dakota law is unlike FLPMA, and the statutes of some other states, which require agencies to strike a balance between oil and gas development and environmental protection.  See, e.g., 43 U.S.C. §§ 1701(a)(7), 1701(a)(8), 1702(c) (FLPMA multiple use mission); id. § 1732(b) (requirement to prevent unnecessary or undue degradation); Colo. Rev. Stat. § 34-60-102(1)(a)(I) (Colorado statutory goal of fostering "responsible, balanced [oil and gas] development . . . in a manner consistent with protection of . . . the environment and wildlife resources").  North Dakota's statutory policy contains no reference to environmental protection.  ND Cent. Code § 38-08-01. Instead, it aims "to promote the development, production, and utilization of . . . oil and gas in the state" and to "encourage and to authorize . . . the greatest possible economic recovery of oil and gas . . . ."  Id.; see also ND Br. at 1 (emphasizing that "North Dakota is required by statute to encourage the development of oil and gas").

North Dakota's focus on promoting oil and gas production is reflected in its environmental record.  According to reports made to the North Dakota Industrial Commission, more than 1,900 spills occurred in the past year at North Dakota oil and gas sites – an average of more than five per day.  More than 20 percent of those incidents (approximately 400) were not

---

[13] The State also attempts to support its public interest and balance of harms arguments by asserting that "economic harm . . . amounting to $300 million a year in economic losses" will befall North Dakota under the Rule.  ND Br. at 16 (emphasis original); see also, id. at 37-38 (asserting that public interest in "generation of revenue from mineral development" is served by preventing North Dakota's alleged loss of $300 million per year).  These arguments fail for the reasons discussed above: the State's claim of lost taxes and mineral revenue from the Rule is just unsupported speculation.  Pp. 13-17, supra.

contained within the facility boundary.  See Oilfield Environmental Incidents, available on

website of North Dakota Dep't of Public Health.[14]  For perspective, those 1,900 incidents

represent a rate of spills per well more than twelve times greater than in Colorado.[15]  A 2014

analysis of North Dakota records by the New York Times also showed that the per-well spill rate

is increasing there.[16]

 North Dakota's oil and gas regulations are weaker than the BLM Rule in a number of

respects.  For example, the Rule defines "usable water" that must be protected to include

underground sources of drinking water as defined under SDWA, as well as certain other aquifers

that states and tribes have determined are usable.  80 Fed. Reg. at 16144; id. at 16217-19, 16222

(43 C.F.R. §§ 3160.0-5, 3162.3-3(e), 3162.5-2).  This appears to require companies constructing

wells to isolate a broader range of aquifers than are protected by North Dakota.  See ND Br. at

26-28.

 BLM's Rule also requires a company to take remedial action on any well "if there is an

indication of inadequate cement on any casing used to isolate usable waters."  80 Fed. Reg. at

16219 (43 C.F.R. § 3162.3-3(e)(3)).  In contrast, North Dakota regulations give the agency

---

[14] Available at: http://www.ndhealth.gov/EHS/Spills/ (links to "Oilfield Environmental
Incidents" for contained and uncontained spills).  The North Dakota Industrial Commission does
not appear to post these records on its web page, but the "Department of Health is allowed read-
only access to a portion of this data and provides it to the public as received without
modification."  Id.

[15] In 2013, there were more than 600 reported spills at oil and gas sites in Colorado.  Dkt # 45-1
at p. 136.  But Colorado has more than four times the number of producing oil and gas wells as
North Dakota.  Compare COGCC Weekly and Monthly Oil and Gas Statistics (June 1, 2015) at
11 (53,514 producing wells in Colorado), available at:
http://cogcc.state.co.us/documents/data/downloads/statistics/CoWklyMnthlyOGStats.pdf , with
North Dakota Industrial Comm'n, Director's Cut (May 13, 2015) (12,439 producing wells in
North Dakota), available at: https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2015-05-
13.pdf .

[16] See Ex. 2; p. 15 n. 9, supra; see also id. (database of records compiled by New York Times).

discretion to excuse companies from doing remedial cement work on defective cementing.  ND Admin. Code § 43-02-03-22.

While North Dakota has a regulation addressing hydraulic fracturing, its rule does not require agency review or approval in advance of fracturing operations.  ND Admin. Code § 42-02-03-27.1.  Nor does the State require any post-fracturing reporting to the agency.  Id.  In contrast, BLM's Rule requires submittal of a variety of information in advance so that BLM can ensure the safety of the fracturing operation, including details about the expected length and direction of fractures, the location of nearby wells, the depth of the confining zone and the depth of usable water, the source and volume of water used and anticipated volumes of fluids to be recovered.  80 Fed. Reg. at 16218 (43 C.F.R. § 3162.3-3(c)); see also Dkt # 6-3 ¶ 29.

The pit limits in BLM's Rule also are more protective.  The Rule generally requires the use of tanks instead of pits to store fluids recovered from a fracturing operation because tanks are "less prone to leaking, are safer for wildlife, and will have less air emissions." 80 Fed. Reg. at 16162.  BLM also mandates that each tank be no larger than 500 barrels in size because larger tanks can be susceptible to failures that "pose particular risks of harm to humans and wildlife because of the amount of fluid involved."  Id. at 16163.  In contrast, North Dakota allows companies to use pits or tanks, and puts no limit on the size of either the pits or tanks.  Dkt # 6-3 ¶ 31.

Finally, if North Dakota does have any state requirements that are more protective than the Rule, the State may continue to apply them.  BLM makes clear that "Operators on federal leases must comply both with this rule and any applicable state requirements."  See 80 Fed. Reg. at 16178; id. at 16130.  The BLM Rule is designed to give groundwater and the environment the benefit of both state and federal regulations, depending on which is most protective.

**B.     The Recently-Issued EPA Draft Study Illustrates The Environmental Benefits Of BLM's Rule.**

North Dakota and the Industry Associations also claim a recently-released draft report by the United States EPA assessing potential impacts on drinking water shows that concerns about hydraulic fracturing are "unfounded."  ND Br. at 38 n. 4; accord Dkt # 72 at 7 (Industry Associations' reply).  A review of EPA's report tells a much different story.[17]  EPA found ample evidence showing that that hydraulic fracturing fluids, gas, wastewater and produced water can contaminate surface and groundwater.  EPA draft report (June 2015) at ES-23.  EPA's draft findings, in fact, illustrate the utility of many of the requirements in the BLM Rule.  For example:

- It supports the Rule's use of 10,000 parts per million (ppm) total dissolved solids (TDS) for the definition of "usable water" that must be protected.  80 Fed. Reg. at 16142.  EPA observed that because of drought conditions and other factors, groundwater sources containing up to and above 10,000 ppm TDS "are increasingly being used to meet water demand . . . [t]hrough treatment or desalination."  Id. ch. 3 at 3-3.  EPA also emphasized the need to isolate usable aquifers.  Id. ch. 6 at 6-19 to 6-20.

- EPA's findings support the Rule's stricter requirements for cementing and for reporting cement results to BLM.  80 Fed. Reg. at 16217, 16219 (43 C.F.R. § 3162.3-3(e)).  EPA identified wells where "casing or cement are inadequately designed or constructed, or fail," as a potential pathway for aquifer contamination.  EPA draft report at ES-14.  EPA surveyed 23,000 wells that were fractured in 2009-2010.  It found that in 600 wells, cementing did not isolate the "protected ground water resource identified by well operators."  Id.; id. ch. 6 at 6-19.

- EPA also identified different ways in which hydraulically-induced fractures can "extend beyond their desired extent" or intersect existing wells or natural fractures, and thus provide paths for gas or fluids to reach aquifers.  Id. ch. 6 at 6-1 to 6-3.  BLM's new requirement for advance review of fracturing operations allows the agency to identify and avoid such risks.  80 Fed. Reg. at 16147, 16181-82.

- The report highlights the risk of "frack hits" (or "well communications") when wells are drilled and fractured close to each other.  EPA draft report ch. 6 at 6-42 to 6-48.  The agency cited a study from Oklahoma finding that "the likelihood of well communication .

---

[17] The report, including its Executive Summary (ES), all chapters and appendices, is available at: http://cfpub.epa.gov/ncea/hfstudy/recordisplay.cfm?deid=244651.

. . rose to nearly 50% between wells less than 1,000 ft [ ] apart." Id. at ES-16.  BLM's advance review of fracturing operations will help avoid frack hits.

- EPA identified spills of fracturing flowback and produced water as a source of impacts to water.  Id. ch. 7 at 7-1.

- The draft report discussed several examples in North Dakota, Colorado, Wyoming and other states where well casing or cementing problems resulted in impacts to drinking water resources.  Id. at ES-14 to ES-15, ch. 6 at 6-14 to 6-15, 6-26.  The Industry Associations incorrectly characterize such examples as a finding by EPA that they were the "only" incidents that may have affected water resources.  Dkt # 72 at 7.  The EPA report makes clear that these were examples and not intended to represent the entire scope of the problem.

- The draft report shows how widespread the risk is to usable drinking water when fracturing and drilling operations are conducted improperly.  It states that approximately 6,800 public drinking water sources lie within one mile of a hydraulically-fractured well.  EPA draft report at ES-6.  And there are a number of counties in Wyoming, Colorado and New Mexico (among other states) where substantial hydraulic fracturing is occurring and more than 30 percent of the population is served by private water systems (e.g., water wells).  Id. ch. 3 at 3-10.

- EPA's report also emphasizes the need for more complete information about the chemicals used during hydraulic fracturing.  Id. at ES-22.  This supports the value of the Rule's chemical reporting requirement and the need to further strengthen it.

EPA did conclude that "data limitations preclude a determination of the frequency of impacts [to drinking water sources] with any certainty."  Id.; see also, id. at ES-22 to 23.  That statement of uncertainty, however, was not the stamp of approval claimed by North Dakota and the Industry Associations.[18]  While EPA's report recognizes the many data gaps that remain, it provides

---

[18] The Industry Associations focus on EPA's statement that "[w]e did not find evidence that these mechanisms have led to widespread, systemic impacts on drinking water resources in the United States."  Id. at ES-6 (quoted in Dkt # 72 at 8).  But they ignore EPA's explanation that there is "insufficient" data to make such a determination, id. at ES-25, and the "limited amount of information hinders our ability to evaluate" how frequently  drinking water contamination is occurring.  Id. ch. 6 at 6-57.

 Media reports indicate that EPA had originally planned to conduct several studies to provide more definitive information, but those efforts had to be dropped due to lack of cooperation from energy companies.  See Neela Banerjee, Can Fracking Pollute Drinking Water? Don't Ask the EPA, Inside Climate News (Mar. 2, 2015), attached as Ex. 5, available at:

further evidence that the BLM Rule will better protect drinking water and other resources.  The

balance of equities and public interest weigh in favor of allowing the Rule to take effect.

## CONCLUSION

For the reasons stated above, North Dakota's motion for preliminary injunction should be

DENIED.

Dated:  June 19, 2015

s/Michael S. Freeman
Michael S. Freeman
R. Benjamin Nelson
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO  80202
(303) 623-9466 (phone)
(303) 623-8083 (facsimile)
mfreeman@earthjustice.org
bnelson@earthjustice.org

Nathan Maxon
MAXON LAW OFFICE
945 S. 4th Street
P.O. Box 898
Lander, WY  82520
(307) 438-9823 (phone)
nate.maxon@gmail.com

*Attorneys for Respondent-Intervenors
Sierra Club, Earthworks, The Wilderness
Society, Western Resource Advocates,
Conservation Colorado Education Fund,
and Southern Utah Wilderness Alliance*

---

http://insideclimatenews.org/news/02032015/can-fracking-pollute-drinking-water-dont-ask-epa-hydraulic-fracturing-obama-chesapeake-energy ; see also EPA draft report at ES-22 (noting resulting lack of data on pre-fracturing water quality).  Some of the other reasons for insufficient data identified by EPA include: (a) widespread withholding of information about fracturing chemicals that companies claim are trade secrets, id. at ES-22, (b) "very limited information" on actual performance and "as-built construction" of wells used in hydraulic fracturing (as opposed to the design goals and best practices for such wells), id. ch. 6 at 6-55 to 6-56, and (c) the absence of a definitive count of the number of oil and gas wells and private water wells, which "limit[s] any kind of cumulative impact assessment" regarding total water use or wastewater volumes.  Id. at ES-23.

Nathan Matthews
SIERRA CLUB
85 Second Street, 2nd Floor
San Francisco, CA 94105
(415) 977-5695 (phone)
nathan.matthews@sierraclub.org

*Attorney for Respondent-Intervenor*
*Sierra Club*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2015, I filed a true and correct copy of **RESPONDENT-INTERVENORS' BRIEF IN OPPOSITION TO PETITIONERS' NORTH DAKOTA MOTION FOR PRELIMINARY INJUNCTION** via the Court's ECF system, with notification sent to those listed below.

| | |
|---|---|
| Nicholas Vassallo<br>US ATTORNEY'S OFFICE<br>P O Box 668<br>Cheyenne, WY 82003-0668<br>Telephone:  (307) 772-2124<br>Fax: (307) 772-2123<br>Email: nick.vassallo@usdoj.gov<br><br>Attorney for Respondents Sally Jewell, Neil Kornze, United States Department of the Interior and United States Bureau of Land Management | William E Gerard<br>US DEPARTMENT OF JUSTICE<br>ENVIRONMENT & NATURAL<br>RESOURCES DIVISION<br>WILDLIFE & MARINE RESOURCES<br>Benjamin Franklin Station<br>PO Box 7611<br>Washington, DC 20044-7611<br>Telephone:  (202) 305-0475<br>Facsimile: (202) 305-0274<br>Email: william.gerard@usdoj.gov<br><br>Attorney for Respondents Sally Jewell, Neil Kornze, United States Department of the Interior and United States Bureau of Land Management |
| Jeremy A Gross<br>Michael James McGrady<br>WYOMING ATTORNEY GENERAL'S<br>OFFICE<br>Natural Resources Division<br>123 State Capitol<br>Cheyenne, WY 82002<br>Telephone:  (307) 777-6946<br>Facsimile: (307) 777-3542<br>Email: mike.mcgrady@wyo.gov<br>Email: jeremy.gross@wyo.gov<br><br>Attorneys for Petitioner State of Wyoming | Andrew J Kuhlmann<br>WYOMING ATTORNEY GENERAL'S<br>OFFICE<br>123 Capitol Building<br>Cheyenne, WY 82002<br>Telephone: (307) 777-3537<br>Facsimile: (307) 777-3542<br>Email: andrew.kuhlmann@wyo.gov<br><br>Frederick R. Yarger<br>COLORADO ATTORNEY GENERAL'S<br>OFFICE<br>1300 Broadway 10th Floor<br>Denver, CO 80203<br>Telephone:  (720) 508-6168<br>Email: fred.yarger@state.co.us<br><br>Attorneys for Petitioner State of Colorado |

| | |
|---|---|
| Andrew C Emrich<br>HOLLAND & HART<br>6380 South Fiddlers Green Circle<br>Suite 500<br>Greenwood Village, CO 80111<br>Telephone:  (303) 290-1621<br>Facsimile: (866) 711-8046<br>Email: ACEmrich@hollandhart.com<br><br>Attorney for Intervenor Petitioner State of<br>North Dakota | Lauren R Caplan<br>HOLLAND & HART LLP<br>975 F Street NW<br>Suite 900<br>Washington, DC 20004<br>Telephone:  (202) 654-6919<br>Email: lrcaplan@hollandhart.com<br><br>Attorney for Intervenor Petitioner State of<br>North Dakota |
| Paul M Seby<br>HOLLAND & HART<br>555 Seventeenth Street<br>Suite 3200<br>Denver, CO 80202<br>Telephone:  (303) 295-8430<br>Email: pmseby@hollandhart.com<br><br>Attorney for Intervenor Petitioner State of<br>North Dakota | Wayne Stenehjem<br>NORTH DAKOTA ATTORNEY GENERALS<br>OFFICE<br>600 E Boulevard Avenue #125<br>Bismarck, ND 58505<br>Telephone:  (701)328-2210<br>Email: ndag@nd.gov<br><br>Attorney for Intervenor Petitioner State of<br>North Dakota |
| Hope Hogan<br>Matthew A Sagsveen<br>NORTH DAKOTA ATTORNEY<br>GENERALS OFFICE<br>500 North 9th Street<br>Bismarck, ND 58501<br>Telephone:  (701) 328-3640<br>Email: hhogan@nd.gov<br>Email: masagsve@nd.gov<br><br>Attorney for Intervenor Petitioner State of<br>North Dakota | David A. Carson<br>DEPARTMENT OF JUSTICE<br>999 18th Street, Suite 945 North<br>Denver, CO 80202<br>Telephone: (303) 312-7346<br>Fax: (303) 312-7331<br>Email: david.a.carson@usdoj.gov<br><br>Attorney for Respondents Sally Jewell and<br>Bureau of Land Management |

| | |
|---|---|
| L. Poe Leggette<br>Mark S. Barron<br>Alexander K. Obrecht<br>Baker & Hostetler LLP<br>1801 California, Suite 4400<br>Denver, CO  80202-5835<br>Telephone:  (303) 861-0600<br>Facsimile:  (303) 861-7805<br>Email:  pleggette@bakerlaw.com<br>Email:  mbarron@bakerlaw.com<br>Email:  aobrecht@bakerlaw.com<br><br>Attorneys for Petitioners Independent<br>Petroleum Association of America and<br>Western Energy Alliance | Gregory M. Cowan<br>Natural Resource Staff Attorney<br>Wyoming County Commissioners Association<br>2300 Capitol Ave., 1st Fl NW<br>P.O. Box 86<br>Cheyenne, WY  82003<br>Telephone:  (307) 632-5409<br>Facsimile:  (307) 632-6533<br>Email:  gcowan@wyo-wcca.org<br>Attorney for Amicus Curiae |
| Daniel B. Frank<br>Frank Law Office, P.C.<br>519 East 18th Street<br>Cheyenne, Wy  82001<br>Telephone:  (307) 432-0520<br>Email:  frank@tribcsp.com<br><br>Attorney for Petitioner State of Utah | |

/s/ Michael S. Freeman