JOHN C. CRUDEN
Assistant Attorney General
WILLIAM E. GERARD
JODY H. SCHWARZ
STEPHEN R. TERRELL
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:      202-305-0475
                202-305-0245
                202-616-9663
william.gerard@usdoj.gov
jody.schwarz@usdoj.gov
stephen.terrell@usdoj.gov
DAVID A. CARSON
Environment and Natural Resources Division
U.S. Department of Justice
South Terrace – Suite 370
999 18th Street
Denver, CO 80202
Telephone: 303-844-1349
Fax: 303- 844-1350
david.a.carson@usdoj.gov

CHRISTOPHER A. CROFTS
United States Attorney
NICHOLAS VASSALLO (WY Bar #5-2443)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
nick.vassallo@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, et al., | ) | |
| | ) | Civil Case No. 15-CV-43-SWS |
| *Petitioner*, | ) | |
| v. | ) | (consolidated with 15-CV-41-SWS) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | **RESPONDENTS' OPPOSITION TO** |
| THE INTERIOR; et al., | ) | **INTERVENOR-PETITIONER UTE** |

|  |  |  |
|---|---|---|
| *Respondents.* | ) | **INDIAN TRIBE'S MOTION FOR** |
|  | ) | **TEMPORARY RESTRAINING** |
|  | ) | **ORDER AND PRELIMINARY** |
|  | ) | **INJUNCTION** |

## I.    INTRODUCTION

After robust tribal consultation—including four regional consultation meetings, to which over 175 tribal entities were invited, and additional regional consultation meetings attended by eighty-one tribal members representing twenty-seven tribes—the Bureau of Land Management ("BLM") issued its Final Rule on Hydraulic Fracturing on Federal and Indian Lands ("BLM Rule"). 80 Fed. Reg. 16,128-222 (March 26, 2015). The BLM Rule amended existing onshore oil and gas permitting regulations that currently apply to all federal and Indian lands. The BLM Rule has nothing to do with leasing on Indian lands, it has nothing to do with surface permitting on Indian lands, and it has nothing to do with royalty collection from oil and gas operations on Indian lands. Instead, the BLM Rule applies only to well permitting and well operations and was developed to address "the increasing use and complexity of hydraulic fracturing coupled with advanced horizontal drilling technology." *Id.* at 16,128.

BLM has authority to promulgate the BLM Rule. The Indian Mineral Leasing Act and Indian Mineral Development Act grant the Secretary of the Interior ("Secretary") broad regulatory jurisdiction over oil and gas operations on Indian lands, and the Department of the Interior invoked that statutory authority as a basis for the BLM Rule. 80 Fed. Reg. at 16,217. BLM did not base its authority to promulgate the BLM Rule exclusively on the Federal Land Policy and Management Act ("FLPMA"). BLM's exercise of regulatory jurisdiction over hydraulic fracturing on Indian lands is supported by statute, is reasonable, and is entitled to substantial deference by this Court.

The BLM Rule is also consistent with, not in derogation of, the Secretary's statutory trust

obligations to Indian tribes.  To establish that the BLM Rule should be vacated as a breach of the Secretary's trust obligations to Indians, Petitioner[1] must show that the BLM Rule is inconsistent with a specific statutory or regulatory trust obligation.  Petitioner cannot rest on an argument that the BLM Rule is inconsistent with any alleged general trust relationship or a common law trust obligation.  Because Petitioner has not shown that the BLM Rule is contrary to any specific statutory, regulatory, or treaty trust obligation, Petitioner is unlikely to prevail on the merits of its breach of trust claims.

The Secretary considered the costs associated with the BLM Rule, disclosed those costs to the public, and concluded that the costs were reasonable in light of the need for the rule and the fact that "no law requires the BLM to wait for a significant pollution event before promulgating common-sense preventative regulations."  80 Fed. Reg. at 16,189.  Petitioner's claim that BLM failed to consider the "socio-economic" impacts of the BLM rule are without merit and not likely to succeed.

Petitioner is also unlikely to prevail on the merits of its claims that BLM failed to appropriately consult with tribes consistent with certain Executive Orders.  As mentioned above, the Secretary engaged in robust tribal consultation before publishing the final BLM Rule.  Petitioner's dissatisfaction with the outcome of those tribal consultations is not a basis to vacate the BLM Rule.

Also, Petitioner has presented no evidence of likely, grave, and irreparable injury if the BLM Rule is allowed to go into effect.  Instead, Petitioner speculates that there may be consequential ramifications of the BLM Rule that could reduce oil and gas development on its

---

[1]        Intervenor-Petitioner the Ute Tribe of the Unitah and Ouray Reservation is referred to as "Petitioner" herein.

land in the future.  But Petitioner's speculation is unsupported, and any indirect economic

impacts from the BLM Rule are uncertain, not predicted to occur by BLM's analysis, and will

take months or years to materialize.  Thus, Petitioner has failed to show imminent irreparable

harm should an injunction not issue.

BLM has carefully balanced the benefits of mineral development on federal and Indian

lands with the need for environmental protection.  The public interest is served by the BLM

Rule, and Petitioner has failed to establish that the public interest would be served by enjoining

the BLM Rule which was carefully developed with public (and tribal) input over several years.

Accordingly, Petitioner's motion for a preliminary injunction should be denied and the BLM

Rule should be allowed to take effect.

## II.     STANDARD OF REVIEW

The factors governing issuance of a preliminary injunction are well-established.

Petitioner is entitled to such extraordinary relief only if it can establish each of four propositions:

"(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable

harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's

favor; and (4) that the injunction is in the public interest."  *RoDa Drilling Co. v. Siegal*, 552 F.3d

1203, 1208 (10th Cir. 2009) (citations omitted).  "[A] preliminary injunction is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A

Charles Allen Wright, *et al.*, Federal Practice and Procedure § 2948 (2d ed.1995)) (emphasis

omitted).

It is Petitioner's burden to come forth with evidence to support its entitlement to the

extraordinary remedy of a preliminary injunction.  The "burdens at the preliminary injunction

stage track the burdens at trial."  *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012) (quoting

*Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)).  "A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action."  *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) (quoting *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010)).  It is irrelevant at the preliminary injunction stage whether Respondents have lodged the administrative record.  *Nat'l Org. for Women, Wash. D.C. Chapter v. Soc. Sec. Admin. of the Dep't of Health and Human Servs.*, 736 F.2d 727, 733 (D.C. Cir. 1984) ("Assessing the likelihood of success on the merits, particularly where, as here, the full administrative record is not before the Court, 'does not involve a final determination of the merits, but rather the exercise of sound judicial discretion on the need for interim relief.'").

The test to be applied under 5 U.S.C. § 705, which permits a reviewing court to "postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings," is the same test "which applies to requests for preliminary injunctions."  *Corning Sav. and Loan Ass'n v. Federal Home Loan Bank Bd.*, 562 F. Supp. 279, 280 (D. Ark. 1983).  Thus, Petitioner must satisfy the preliminary injunction standard in order to obtain its requested relief.

Even if the Court were to determine Petitioner has met its burden on this motion for a preliminary injunction, any injunction should be narrowly tailored to address only the likely irreparable harm demonstrated by Petitioner, and should be limited to the application of the BLM Rule to Petitioner's land.  *See Tape Head Co. v. RCA*, 452 F.2d 816, 819 (10th Cir. 1971) (vacating injunction because it was, *inter alia*, "grossly broad, indefinite and all inclusive"); *see also Hollon v. Mathis Indep. Sch. Dist.*, 491 F.2d 92, 93 (5th Cir. 1974) (when suit was brought by individual challenging school regulations, a preliminary injunction enjoining enforcement of

the regulation against anyone else went further than necessary to serve the purpose of maintaining the parties' status quo pending trial on the merits); *Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974) ("Relief cannot be granted to a class before an order has been entered determining that class treatment is proper").

## III.    OIL AND GAS ACTIVITIES ON INDIAN LAND

Oil and gas leasing on Indian lands implicates several bureaus within the Department of the Interior.  The Bureau of Indian Affairs ("BIA") is responsible for approving leases and surface permitting.  *See*, *e.g.*, 25 C.F.R. § 211.20; 25 C.F.R. §§ 169.1, *et seq.*  BLM is responsible for approving applications for permits to drill ("APDs").  *See* 25 C.F.R. §§ 211.4, 211.49.  Once wells are drilled and oil and gas are producing in paying quantities, the Office of Natural Resource Revenue ("ONRR") is responsible for royalty collection and enforcement.  *See* 25 C.F.R. §§ 211.6, 211.40.[2]  Reclamation and remediation efforts during and upon conclusion of the oil and gas operation are overseen by BIA and BLM.  *See* 25 C.F.R. § 211.48.  The actions of each bureau are prescribed by regulations.

Relevant here, existing BIA regulations incorporate 43 C.F.R. Part 3160 (Onshore Oil and Gas Operations—General) and require BLM to oversee implementation of those regulations on Indian lands.  25 C.F.R. §§ 211.4 and 225.4.  The BLM Rule amends and revises the Part 3160 regulations.  *See* 80 Fed. Reg. at 16,217.  Thus, under existing regulations, there already is a "one rule," a "single rule," that applies to oil and gas operations on all federal and Indian lands. *Cf.* Memorandum in Support of Temporary Restraining Order and Preliminary Injunction, ECF No. 82, ("Mot.") at 7-8.  The BLM Rule simply amends and modifies that existing nationwide set of regulations "in light of the increasing use and complexity of hydraulic fracturing coupled

---

[2]        ONRR is a successor bureau to the Minerals Management Service ("MMS").

- 6 -

with advanced horizontal drilling technology." 80 Fed. Reg. at 16,128. The BLM Rule has nothing to do with BIA regulations addressing leasing on Indian lands, surface disturbing activities on Indian lands, or the payment of royalties for oil and gas produced on Indian lands.

## IV.   ARGUMENT

### A.   Petitioner is Unlikely to Succeed on the Merits.

#### 1.   BLM has statutory authority to promulgate the BLM Rule for Indian lands.

The Secretary and, by delegation, BLM have statutory authority to regulate oil and gas operations, including hydraulic fracturing, on Indian lands. The Indian Mineral Leasing Act authorizes the Secretary to promulgate regulations governing "[a]ll operations under any oil, gas, or other mineral lease . . . affecting restricted Indian lands . . . ." 25 U.S.C. § 396d. Similarly, Congress directed the Secretary to promulgate rules and regulations implementing the Indian Mineral Development Act. 25 U.S.C. § 2107. As authority for the BLM Rule, BLM explicitly relied upon the Indian Mineral Leasing Act and the Indian Mineral Development Act. 80 Fed. Reg. at 16,217. Contrary to Petitioner's assertion, Mot. at 17-18, BLM did not base its authority to promulgate the BLM Rule for Indian lands on FLPMA. *See* 80 Fed. Reg. at 16,184.

Petitioner's argument that BLM is precluded from being the arm of the Secretary to regulate oil and gas operations on Indian lands does not withstand legal scrutiny. Nothing in FLPMA precludes BLM from exercising the Secretary's regulatory authority under the Indian Mineral Leasing Act or Indian Mineral Development Act.[3] Those Indian statutes give the

---

[3] FLPMA expressly authorizes the Secretary to delegate to the Director of BLM "such duties as the Secretary may prescribe with respect to the management of lands and resources under [her] jurisdiction according to the applicable provisions of this Act and any other applicable law." 43 U.S.C. §1731(a); *see also* 80 Fed. Reg. at 16,184 and 16,211. Thus, FLPMA authorizes BLM to implement parts of the Secretary's duties that come from other statutes and apply to lands other than "public lands."

Secretary (not any specific bureau) regulatory authority, and Congress did not further specify or limit which bureau within the Department of the Interior could carry out the Secretary's regulatory authority.

*BIA*, pursuant to its delegated authority, *see* 209 DM (Department Manual) 8, issued regulations pursuant to the Indian Mineral Leasing Act and the Indian Mineral Development Act. 25 C.F.R. Parts 211, 212, 225.  Thus, consistent with Petitioner's plea, the "federal agency [that] regulate[s] tribal lands [is] the U.S. Bureau of Indian Affairs."  *See* Mot. at 20.  BIA, in turn, has lawfully incorporated BLM's Onshore Oil and Gas Operations regulations (43 C.F.R. Part 3160) into its regulations.  25 C.F.R. §§ 211.4, 225.4.  There is no unlawful "shell game" in derogation of FLPMA, as insinuated by Petitioner, Mot. at 17-18, at issue here.  Petitioner has to acknowledge that a plethora of BLM regulations currently apply to Indian lands, *see*, *e.g.*, 25 C.F.R. § 211.4, and does not argue that those regulations are *ultra vires*.  Thus, Petitioner has to concede that BLM has authority to regulate Indian lands pursuant to the Secretary's regulatory jurisdiction.  Petitioner's argument that BLM has no authority to regulate hydraulic fracturing on Indian lands is wholly unsupported by the plain language of the Indian Mineral Leasing Act, the Indian Mineral Development Act, and FLPMA.

When Congress enacts a statutory scheme, and therein directs an agency to devise an appropriate response to some interstitial problem, the agency cannot reasonably be expected to approach the matter as though it were writing on a blank slate.  Rather, the agency is typically expected to make interstitial choices that are logically consistent with, and promote the effective implementation of, the larger congressional design.  Because BLM has nationwide experience on "approximately 700 million mineral acres," Mot. at 10, in regulating well construction and operation activities, it is quite reasonable for BIA to call upon BLM's expertise to regulate and

oversee drilling activities on Indian land.

"No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. ___, 133 S. Ct. 1863, 1868 (2013). Here, the Department of the Interior, through regulations promulgated by BIA decades ago[4/], determined that BLM has regulatory jurisdiction over well operations on Indian lands. 25 C.F.R. § 211.4. That interpretation is entitled to substantial deference by this Court and Petitioner has not established that "the statutory text" of the Indian Mineral Leasing Act or Indian Mineral Development Act "forecloses the agency's assertion of authority." *Id.* at 1870-71. Petitioner's argument that BLM lacks regulatory jurisdiction over Indian lands, Mot. at 17-20, is wrong as a matter of law. Both the Indian Mineral Leasing Act and the Indian Mineral Development Act afford the Secretary broad regulatory jurisdiction over oil and gas operations on Indian lands, including the authority to regulate hydraulic fracturing on Indian lands.

> **2.    The Indian statutes do not impose different standards on BLM for regulating hydraulic fracturing on Indian lands and the BLM Rule does not breach Respondents' trust responsibilities to Indians.**

Congress has not mandated that the Department of the Interior apply different standards for regulating hydraulic fracturing on federal and Indian lands. *Cf.* Mot. at 18-19. BIA, by adopting BLM regulations, may lawfully base regulatory decisions for Indian lands on principles of sustained use, multiple-use development, environmental protection, and avoidance of undue degradation. As recognized by Petitioner, Congress has vested the Department of the Interior with broad discretion to assess the purpose and need for regulations under the Indian Mineral

---

[4/]    For example, 25 C.F.R. Parts 211 and 212 were last updated in 1996. "Leasing of Tribal Lands for Mineral Development and Leasing of Allotted Lands for Mineral Development," 61 Fed. Reg. 35,634 (July 8, 1996).

Leasing Act and Indian Mineral Development Act.  Mot. at 7 (citing *Cheyenne-Arapaho Tribes of Okla. v. United States*, 966 F.2d 583, 588 (10th Cir. 1992)).

Although the relationship between the United States and Indian tribes has been described as a trust, "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare' compared to a trust relationship between private parties at common law."  *United States v. Jicarilla Apache Nation*, 564 U.S. ___, 131 S. Ct. 2313, 2323 (2011) (citing *United States v. Mitchell*, 445 U.S. 535, 542 (1980) ("*Mitchell I*") and *United States v. Mitchell*, 463 U.S. 206, 224 (1983) ("*Mitchell II*")).  Indian tribes cannot simply rely upon "inherent" or common law duties imposed on a private trustee to state a claim against the United States or its agencies; instead, tribes must point to specific statues and regulations that "establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities."  *Id.* at 2325 (quoting *Mitchell II*, 463 U.S. at 224).  "When 'the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter.'"  *Id.* at 2325 (quoting *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009) ("*Navajo II*")).

Thus, to establish that the Secretary has failed to comply with her trust responsibilities in promulgating the BLM Rule, *see* Mot. at 4-9, 19-20, Petitioner must point to "a specific, applicable, trust-creating statute or regulation," *Navajo II*, 556 U.S. at 302, that: (1) enumerates standards that the Secretary was required to consider in promulgating the Rule, but did not, *see* 5 U.S.C. § 706(2)(A); or (2) precludes the Secretary from regulating hydraulic fracturing, *id.* § 706(2)(C).  Petitioner has done neither and it is therefore unlikely to succeed on the merits of its breach of fiduciary duty claims.

The Supreme Court has specifically addressed the Indian Mineral Leasing Act and the Indian Mineral Development Act, which Petitioner incorrectly argues impose upon BLM a duty to "maximize lease revenues," to avoid "decreases [to] the opportunities for the tribes," and to elevate tribal sovereignty and self-determination over all other factors motivating the BLM Rule (including environmental protection and public disclosure of fracturing chemicals).  *See* Mot. at 6, 8-9.  While the Indian Mineral Leasing Act was designed "to provide Indian tribes with a profitable source of revenue," Congress was also concerned with other factors, including achieving parity between mineral leasing on Indian lands with mineral leasing on other federal land.  *Cotton Petroleum Cor. v. New Mexico*, 490 U.S. 163, 179 (1989).  Accordingly, the Supreme Court has held that "we find no solid basis in the [Indian Mineral Leasing Act], its regulations, or lofty statements in legislative history for a legally enforceable command that the Secretary disapprove [mineral leases] unless they survive 'an independent market study,' . . . or satisfy some other extratextual criterion of tribal profitability."  *United States v. Navajo Nation*, 537 U.S. 488, 511 n.16 (2003) ("*Navajo I*").  This Supreme Court decision forecloses Petitioner's breach of trust claims.

Petitioner's trust argument boils down to its belief that any regulations that may adversely impact the tribe's economic interests are a breach of trust.  Mot. at 5-8, 19-20.  But that is not the law.  "The trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law, and in fulfilling its statutory duties, the Government acts not as a private trustee but pursuant to its sovereign interest in the execution of federal law."  *Jicarilla*, 131 S. Ct. at 2318.[5/]  Many statutes govern Indian property and economic

---

[5/]     The Supreme Court has long recognized that the United States has a distinctly sovereign interest in the administration of acts of Congress concerning tribal property, including property it holds in trust for tribes. *See*, *e.g.*, *United States v. Candelaria*, 271 U.S. 432, 443-44 (1926);

activity on Indian lands but do not give rise to a claim for breach of trust against the government, either at law or in equity. *See El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 896-99 (D.C. Cir. 2014) (Hopi-Navajo Settlement Act, Indian Agricultural Act, Indian Dump Cleanup Act, and Mill Tailings Act do not "create a conventional fiduciary relationship that is enforceable as a breach of trust either under the [Administrative Procedure Act] or as a separate cause of action implied from the nature of the trust relationship"). Petitioner has failed to establish as a matter of law that the general trust relationship between the government and Indian tribes constrains, limits, or modifies the Secretary's authority under the Indian Mineral Leasing Act or Indian Mineral Development Act to regulate hydraulic fracturing on Indian lands. Nor has Petitioner pointed to any specific statute or regulation that precludes the Secretary from regulating hydraulic fracturing on Indian land. Thus, Petitioner's breach of trust arguments are unfounded, and the Secretary should be afforded great deference in balancing both the interests of her tribal beneficiaries and environmental protection in developing the BLM Rule.

### 3. The Secretary properly considered the economic impacts of the BLM Rule.

Nothing in the Indian Mineral Leasing Act or the Indian Mineral Development Act require the Secretary to perform a detailed "socio-economic" analysis of rules regulating hydraulic fracturing on Indian lands. *Cf.* Mot. at 10-13. Here, the only statute that might require the Secretary to consider the costs of the BLM Rule is the Regulatory Flexibility Act ("RFA").

The RFA requires agencies to consider the effect that their regulations will have on small entities, including small businesses. *See generally Washington v. Daley*, 173 F.3d 1158, 1171 (9th Cir. 1999). When applicable, it requires agencies to publish an "initial regulatory flexibility

---

*United States v. Minnesota*, 270 U.S. 181, 194 (1926); *Heckman v. United States*, 224 U.S. 413, 437-38 (1912).

analysis" at the time a proposed rule is published, and a "final regulatory flexibility analysis" at the time a final rule is published.  5 U.S.C. §§ 603 and 604.  But, the RFA imposes no substantive requirements on an agency; rather, its requirements are "purely procedural" in nature.  *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001); *see also Envtl. Defense Ctr., Inc. v. EPA*, 344 F.3d 832, 879 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004) ("the analyses required by the RFA are essentially procedural hurdles; after considering the relevant impacts and alternatives, an administrative agency remains free to regulate as it sees fit.").  To satisfy the RFA, an agency must only demonstrate a "reasonable, good-faith effort" to fulfill its requirements.  *U.S. Cellular*, 254 F.3d at 88; *Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000); *Assoc. Fisheries of Me. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997).

Accordingly, the challenged rule may only be set aside based on Petitioner's economic arguments if Petitioner shows that BLM's "reasonable, good-faith effort" to comply with the RFA was arbitrary, capricious, or contrary to law.  5 U.S.C. § 611(a)(1); 5 U.S.C. § 706(2).[6/] Petitioner has not made that showing.

BLM studied the rule's likely impact on Indian lands and concluded that it "would impact 670 hydraulic fracturing operations per year in the near-term future and that the rule poses an incremental cost of about $10 million per year."  Regulatory Impact Analysis ("RIA") at 83, Attachment A to the Declaration of James Tichenor, ECF No. 20-1.  BLM acknowledged that "[t]he highest total costs are associated with operations in," *inter alia*, Petitioner's reservation "due to the volume of activity within those reservations."  *Id.* at 83-84.  BLM appropriately

---

[6/]     Because BLM performed and made available to the public a final regulatory impact analysis, judicial review under 5 U.S.C. § 706(1) is unavailable.

considered and evaluated the economic impact of the rule.[7/]

Again, the RFA does not preclude Respondents from enacting regulations that impose additional costs on small businesses, it only requires that Respondents consider and publicly disclose those costs.  BLM has met and exceeded those requirements here.  *See* 80 Fed. Reg. at 16,186-89 (summarizing RIA and responding to public comments).

### 4.  The Secretary appropriately consulted with tribes.

Petitioner's claim that the Secretary allegedly failed to engage in appropriate tribal consultation when promulgating the BLM Rule should fail as a matter of law.  Petitioners base their tribal consultation argument on Executive Order 13175.  Mot. at 15.  An Executive Order may only be the basis for a claim under the Administrative Procedure Act if three conditions are met.  *City of Albuquerque v. U.S. Dept. of the Interior*, 379 F.3d 901, 913-14 (10th Cir. 2004).  First, the Executive Order must have a "specific statutory foundation."  *City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997).  Second, neither the statutory foundation nor the executive order must preclude judicial review.  *See* 5 U.S.C. § 701(a)(1).  Third, there must be "law to apply"—that is, there must be an objective standard by which a court can judge the agency's actions.  *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Here, Executive Order 13175 fails the second test.  The Executive Order provides explicitly:

> **Sec. 10.**  *Judicial Review.*  This order is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person.

---

[7/]      BLM also determined that the BLM Rule "would not have a significant economic impact on a substantial number of small entities," even after assuming that all affected entities would be "small entities," and thus determined that a regulatory flexibility analysis was not required under the RFA, and that the BLM Rule was not a "major rule" under the Small Business Regulatory Enforcement Fairness Act.  *Id.* at 96-99.

Because Executive Order 13175 precludes judicial review, it cannot be a basis for Petitioner's Administrative Procedure Act challenge to the BLM Rule. *City of Albuquerque*, 379 F.3d at 913. Petitioner is unlikely to succeed on the merits of its tribal consultation claim for this reason alone.

Even if the Court were to consider the merits of Petitioner's tribal consultation claim, Petitioner's claim should still fail because BLM engaged in extensive tribal consultation when promulgating the BLM Rule. In January 2012, BLM held four regional tribal consultation meetings. 80 Fed. Reg. at 16,132. A draft of the BLM rule was also distributed to tribes for comment at that time. *Id.* BLM offered to meet individually with tribes after that meeting. *Id.*

In June 2012, BLM held additional tribal consultation meetings, including one in Salt Lake City, Utah, near Petitioner's reservation. *Id.* "Eighty-one tribal members representing 27 tribes attended the meetings." *Id.* Thereafter, BLM engaged in additional individual tribal consultations, *id.*, including consultations with Petitioner, *see* Mot. at 13 (admitting BLM met with the tribe).

Additional tribal consultation meetings were held after BLM published the supplemental proposed rule. 80 Fed. Reg. at 16,132. Again, after these meetings, BLM engaged in follow-up individual tribal consultation. *Id.* In March 2014, BLM held another tribal consultation meeting in Denver, Colorado. *Id.* BLM once again offered to meet individually with tribes after this meeting. *Id.*

Throughout the rulemaking process, BLM demonstrated that it "understands the importance of tribal sovereignty and self-determination, and seeks to continuously improve its communications and government-to-government relations with tribes." *Id.* at 16,185. BLM followed "an accountable process to ensure meaningful and timely input by tribal officials in the

development of regulatory policies that have tribal implications." Executive Order 13175 § 5.

Petitioner is unlikely to succeed on the merits of its tribal consultation claims and its motion for a

preliminary injunction should be denied.

**B.      Petitioner is not Likely to Suffer Irreparable Harm if an Injunction is not Issued.**

Petitioner's motion for a preliminary injunction should be denied because it fails to

establish, by a preponderance, that Petitioner will suffer irreparable harm should the challenged

rule go into effect as planned.  A showing of probable irreparable harm is the single most

important prerequisite for the issuance of a preliminary injunction.  *Dominion Video Satellite,*

*Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).  To be entitled to an

injunction, Petitioner "must show that the injury complained of is of such imminence that there is

a clear and present need for equitable relief to prevent irreparable harm."  *Heideman v. S. Salt*

*Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Prairie Band of Potawatomi Indians v.*

*Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (emphasis omitted)).  Petitioner is under the

obligation to show that "irreparable injury is likely in the absence of an injunction."  *Winter v.*

*Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis omitted).  Thus, to be entitled to its

requested injunction, Petitioner must show that there is "likely," "imminent," and "irreparable"

injury.  Petitioner has not made this showing.

Indian tribes earn income from oil and gas operations on Indian lands in various ways.

Indian tribes may receive minimum payments or "bonuses" during lease sales.  *See Wright v.*

*Brush*, 115 F.2d 265, 267 (10th Cir. 1940) ("A 'bonus' is a consideration in addition to or in

excess of that which would ordinarily be given.") (citation omitted).[8]  Tribes receive rent for oil

---

[8]      Oil and gas leasing of Indian lands commonly involves an up-front bonus payment in addition to future rentals and royalties.  BIA can assist tribes in public auctions of oil and gas

and gas leases, set by regulation at a minimum of $2.00 per acre.  25 C.F.R. § 211.41.  Tribes

also receive royalties of at least 16 2/3 % of the value of produced oil and gas, 25 C.F.R. §

211.41, although the competitive bid process often results in royalty rates on Indian lands above

the regulatory minimum.  While leases on Indian lands include rights to reasonable use of the

surface within the leased premises, they do not include rights or easements on adjacent Indian

lands.  Thus, tribes often receive additional income for off-lease surface uses by operators.  *See*

25 C.F.R. Part 162.  Tribes may also tax or impose excise fees on oil and gas produced on their

land.  *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137-38 (1982) (tribes have inherent

sovereign authority to tax oil and gas operations on tribal lands).

 The BLM Rule does not modify those potential income streams, and therefore has no

direct effect on any source of tribal income from oil and gas operations.  Petitioner acknowledges

as much, and only argues that the BLM Rule may "lengthen delays" and may cause operators to

consider development on federal and fee land adjacent to Petitioner's reservation.  Mot. at 9, 12-

13, 20-21.  But BLM concluded, after a detailed economic analysis, that the BLM Rule will lead

to only twelve additional hours of work to submit and process APDs, 80 Fed. Reg. at 16,196, and

will not "alter the investment or employment decisions of firms," *id.* at 16,209.  Thus,

Petitioner's claims of indirect economic effects are speculative and are contradicted by BLM's

own analysis.

 All existing producing wells on Petitioner's reservation will continue to generate rental

and royalty income for the tribe.  For all others, the BLM Rule imposes relatively minor

requirements on operators planning to hydraulically fracture new wells on Petitioner's

---

leases, but more often tribes lease their lands through other means subject to BIA's approval of
the lease terms.

reservation or planning to "recomplete" (*i.e.*, stimulate production from) existing wells by hydraulic fracturing. *See* 80 Fed. Reg. at 16,205 (estimating compliance costs at $11,400 per well). Petitioner will not suffer irreparable harm if the BLM Rule is allowed to go into effect.

The general rule that potential economic loss is insufficient to support a preliminary injunction applies here. *Port City Propos. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008). Petitioner's argument that potential economic harms constitute irreparable injury should be rejected for the same reasons advanced by Respondents in response to the States' motions. *See* Respondents' Brief in Opposition to Wyoming and Colorado's Motion to Preliminary Injunction at 19-24 ("Opp'n to Wyo. and Colo."), ECF No. 68; Respondent's Brief in Opposition to North Dakota's Motion for Preliminary Injunction at 37-38 ("Opp'n to N.D."), ECF No. 83.

Additionally, just as the BLM Rule does not displace the authority of the States, the BLM Rule does not displace the tribe's ability to regulate oil and gas operations on its lands. *Cf.* Mot. at 20. Tribal regulations still apply to oil and gas operations on Petitioner's lands. The BLM Rule will also apply on Petitioner's lands, just as the other provisions of 43 C.F.R. Part 3160 currently apply to Petitioner's lands. Additionally, the BLM Rule contemplates tribal variances where appropriate. 43 C.F.R. §3162.3-3(k)(2). Nothing prohibits Petitioner from discussing with BLM one or more variances based on Petitioner's regulatory program. Petitioner will not suffer irreparable harm to its "jurisdictional authority," Mot. at 20, for the same reasons advanced by Respondents in response to the States' motions. *See* Opp'n to Wyo. and Colo. at 20-21; Opp'n to N.D. at 32-35.

### C.    The Balance of Equities and Public Interest Support Denying the Injunction.

The BLM Rule "complement[s] existing regulations designed to ensure the environmentally responsible development of oil and gas resources on Federal and Indian lands."

80 Fed. Reg. at 16,128.  Thus, strong public interests, both in protection of the environment and in resource development, are served by the BLM Rule and enjoining the rule from becoming effective would not serve the public interest.  In considering the extraordinary relief Petitioner requests, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences . . . ." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (internal quotations and citations omitted).  With respect to the federal government, those two inquiries merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Petitioner has failed to meet its heavy burden of establishing that an injunction would serve the public interest.  Petitioner's entire argument on these points consists of three paragraphs.  Mot. at 21-22.

As explained in greater detail in Respondents' Brief in Opposition to Petitioners' Motion for Preliminary Injunction, filed in Case 2:15-cv-00041-SWS (ECF. No. 20) at 52-57, the injunction sought by Petitioner would frustrate BLM's considerable efforts to develop a rational, supportable and effective rule of national scope to adapt a long-standing regulatory framework to substantial changes in the technology and practice of modern oil and gas drilling, while meeting a suite of federal statutory guidelines.  A preliminary injunction would frustrate the public interests motivating the BLM Rule and deny BLM the tools needed to respond to risks and public concerns associated with the growth of hydraulic fracturing of oil and gas wells (among them, potential groundwater contamination, use of chemicals during the fracturing process, frack hits, and spills of recovered fluids on the surface).

This Court should presume "that all governmental action pursuant to a statutory scheme . . . is taken in the public interest."  *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th

Cir. 2006) (internal quotations omitted).  Petitioner has not overcome that presumption.  As

stated by BLM, when it promulgated the BLM Rule it considered, and balanced, the public's

interest in both environmental protection, *see V-1 Oil Co. v. State of Wyo., Dept. of Envtl.*

*Quality*, 902 F.2d 1482, 1486 n.1 (10th Cir. 1990) ("protection of the environment and the public

from pollution in general . . . is a substantial governmental interest"), and resource development.

BLM does not have to "wait for a significant pollution event before promulgating common-sense

preventative regulations."  80 Fed. Reg. at 16,189.  Thus, Petitioner's claim that there have been

no pollution events from hydraulic fracturing on its lands to date, Mot. at 21, carries no weight.

Neither the balance of the equities nor the public interests favor issuance of the injunction

requested by Petitioner.  Thus, Petitioner's request for a preliminary injunction should be denied.

## V.   CONCLUSION

Wherefore, Respondents respectfully request that Petitioner's motion be denied in full

because Petitioner is unlikely to succeed on the merits of its claims, Petitioner is unlikely to

suffer irreparable harm should a preliminary injunction not issue, and the balance of equities and

public interest favor denying Petitioner's request for a preliminary injunction.

Respectfully submitted, July 1, 2015,

JOHN C. CRUDEN
Assistant Attorney General

 /s/ Stephen R. Terrell
WILLIAM E. GERARD
JODY H. SCHWARZ
STEPHEN R. TERRELL
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
Telephone:(202) 305-0475
        (202) 305-0245
        (202) 616-9663
Facsimile: (202) 305-0506

Email:    william.gerard@usdoj.gov
          jody.schwarz@usdoj.gov
          stephen.terrell@usdoj.gov

DAVID A. CARSON
U.S. Department of Justice
Environment and Natural Resources Division
South Terrace – Suite 370
999 18th Street
Denver, CO 80202
Telephone: 303-844-1349
Fax: 303- 844-1350
david.a.carson@usdoj.gov

CHRISTOPHER A. CROFTS
United States Attorney

 /s/ Nicholas Vassallo
NICHOLAS VASSALLO (WY Bar #5-2443)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
nick.vassallo@usdoj.gov

Of Counsel:

RICHARD MCNEER
Attorney-Advisor
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W., MS-5358
Washington, DC  20240

*Attorneys for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of Jly 2015 a copy of the foregoing **Respondents'**

**Opposition to Intervenor-Petitioner Ute Indian Tribe's Motion for Temporary Restraining**

**Order and Preliminary Injunction** was electronically filed with the Clerk of the Court using

the CM/ECF system, which will send notification of such filing to all counsel of record.

 /s/ Stephen R. Terrell
STEPHEN R. TERRELL