Jeffrey R. Rasmussen (Admitted *Pro Hac*)
Jeremy P. Patterson (Admitted *Pro Hac*)
Christopher J. Reagen (Admitted *Pro Hac*)
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive, Louisville, CO 80027
Telephone: (303) 673-9600; Fax: (303) 673-9155
Email: jrasmussen@ndnlaw.com
Email: jpatterson@ndnlaw.com
Email: creagen@ndnlaw.com
*Attorneys for Ute Indian Tribe, Petitioner-Intervenor*

Scott P. Klosterman (Bar No. 6-3081)
**WILLIAMS, PORTER, DAY, & NEVILLE, P.C.**
159 North Wolcott, Suite 400
Casper, WY  82601
Telephone: (307) 265-0700
Facsimile: (307) 266-2306
Email:  sklosterman@wpdn.net
*Local Counsel for Ute Indian Tribe, Petitioner-Intervenor*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

| | |
|---|---|
| STATE OF WYOMING, et al.,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, in her Official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management,<br><br>Respondents. | PETITIONER/INTERVENOR UTE TRIBE'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION<br>Case No. 2:15-cv-00043-SWS<br><br>(consolidated with 15-cv-00041-SWS)<br><br>Assigned:  Judge Scott W. Skavdahl |

In its brief in support of its motion for Preliminary Injunction, Dkt. 90, the Ute Tribe provided a detailed discussion of BLM's significant failures to comply with law while considering regulation of Indian mineral rights.  BLM, displaying the type of paternalism which Congress and the Executive Branch both rejected more than fifty years ago, has decided that it, but not tribes, knows what is best for tribes.  And in what BLM would have this Court believe is an incredible coincidence, what is best for tribes on tribal lands is exactly what BLM decided is best for the United States under the very different standards applicable to the United States' own lands.

BLM's decision that the same rule should apply to federal and tribal mineral rights despite the enormous difference in federal rights, interests, and duties is not coincidence.  It is instead a result of BLM plainly, simply, violating yet again its duties to Indian Tribes.  This Court must enjoin the application of the Fracking Rule to tribal lands.

The United States forced the Ute Tribe onto the portion of their original homeland which the non-Indians viewed as "one vast contiguity of waste, and measurably valueless, excepting for nomadic purposes, hunting grounds for Indians and to hold the world together.  Report of Utah Expedition, *printed in* Deseret News, Sept. 25, 1961, *quoted in* John D. Barton & Candace M. Barton, *Jurisdiction of Ute Reservation Lands*, 26 Am. Indian L. Rev. 133, 137 (2002).  But, unbeknownst to the United States at the time, the Reservation contains valuable minerals which can be recovered by fracking.  The United States is willing to sacrifice that sole significant source of tribal income for chimeric gain.  The Tribe is not, and it asks this Court to issue a preliminary injunction until the Court can obtain a full record of the BLM's violations of United States' duties to the Tribe.

I.   **THE TRIBE WILL LIKELY SUCCEED ON THE MERITS**

    A.   **THE STANDARD AND FACTORS WHICH BLM WAS REQUIRED TO CONSIDER ARE SUBSTANTIALLY DIFFERENT BETWEEN TRIBALLY-OWNED AND FEDERALLY OWNED OIL AND GAS RIGHTS, AND BIA CONFIRMS IT REFUSED OR FAILED TO APPLY THE CORRECT STANDARD TO TRIBALLY-OWNED OIL AND GAS.**

In its brief, BLM concedes that the FLPMA provides the standard and factors regarding regulation of federally-owned mineral rights, but that the IMLA and IMDA, and not the FLPMA, applies to tribal mineral interests. Dkt 102 at 7. The IMLA and IMDA provide a very different standard and factors than the FLMPA for regulation of tribal mineral interest.

But then to attempt to avoid the logical consequence of its necessary concessions, BLM changes the Tribe's actual argument into a strawman, claiming that the Tribe's argument is that BLM "base[d] its authority to promulgate the BLM Rule for Indian lands on the FLPMA." Dkt. 102 at 7. That is plainly the opposite of the Tribe's argument. BLM has no substantial response to the argument the Tribe did make—that even if the Fracking Rule is proper for federally owned interests under the FLPMA standard, it is not proper for tribal or Indian-owned interests under the IMLA/IMDA's "best interest" standard. BLM does not seriously dispute that it failed to apply this "best interest" standard in creating its Fracking Rule. Instead it argues that the best interest standard is not a judicially enforceable standard. It is wrong. *Wood Petroleum. Corp. v. Dep't of Int.*, 47 F. 3d 1032 (10th Cir. 1995). In *Woods Petroleum,* the Tenth Circuit held:

> In evaluating the Secretary's actions [regarding federal regulation of oil and gas on Indian lands], we must keep in mind that the Secretary and his delegates act as the Indians' fiduciary and thus must represent the Indians' best interests. *Cheyenne-Arapaho,* 966 F.2d at 588-89; *Cotton Petroleum,* 870 F.2d at 1524; *Kenai,* 671 F.2d at 386. The power to manage and regulate Indian mineral interests carries with it the duty to act as a trustee for the benefit of the Indian landowners.

47 F.3d at 1038. *See also* 25 U.S.C. §§ 2102, 2103. Similarly, the Secretary's own regulations refer to this "best interest" standard. 25 C.F.R. § 211.3 ("In the best interest of the Indian mineral owner refers to the standards to be applied by the Secretary in considering whether to take an

administrative action affecting the interests of an Indian mineral owner."); 25 C.F.R. § 225.3 (same).  25 C.F.R. Subchapter I (Federal Indian Energy and Mineral Regulations) contains at least 21 regulations requiring the Secretary to make decisions in the "best interests" of a tribe or Indian lessor.  *E.g.*, 25 C.F.R. § 225.20; 25 C.F.R. § 225.22; 61; *see also* Fed Reg. 35634, 35640, Cmt. 17, 18 (July 8, 1996).  This is substantially different than the more general standard that the United States applies when deciding how to regulate its own mineral interest.  *E.g.*, *Woods Petroleum Corp.,* 47 F.3d 1032; *Cheyenne-Arapaho Tribe of Oklahoma v. United States*, 966 F.2d 583 (10th Cir. 1992); 77 Fed. Reg. 31644.  Putting aside for now whether the United States should give up of its own potential economic benefit for conjectural or perceived environmental gains on federal lands, it is a very different question whether it can or should impose those sacrifices upon tribes-- imposing what the Ute Tribe believes will be devastating economic harm to the Tribe for no discernable advantage.

In attempting to justify its Rule to this Court, BLM actually confirms that it failed to apply the proper legal standard and factors.  It asserts, without supporting argument: "**The Indian statutes do not impose different standards on BLM for regulating hydraulic fracturing on Indian lands.**" Dkt. 102 at 9 (emphasis in original).  It is simply wrong, and its clear but erroneous statement that the same standard and factors apply in the two very different contexts confirms its error and confirms that this Court must enjoin the Fracking Rule on tribal lands.  In fact, it is the BIA, not BLM which is to implement the standard under on Indian lands.  And while BLM claims BIA has delegated the authority over Indian oil and gas development to the BLM, BIA cannot deviate from its congressional mandate to confer that jurisdiction on BLM thereby enabling BLM to impose public lands standards to Indian lands.

3

### B. THE UNITED STATES HAS ENFORCEABLE TRUST DUTIES TO TRIBES AND INDIANS REGARDING OIL AND GAS REGULATIONS.

In its motion for preliminary injunction, the Tribe showed that BLM violated its trust responsibilities when enacting the Fracking Rule. The Tribe also discussed the established legal rule that an agency's trust responsibility to tribes and Indians enhances the standard of review of an agency decision. Dkt 90 at 4 (citing, inter alia, *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252 (D.D.C. 1972)). BLM does not dispute the enhanced standard and does not dispute that it violated these trust standards. Instead it responds that it does not matter if it violated trust standards because trust standards do not apply to it when it is regulating Ute oil and gas production. BLM bases its argument on the broad brush stroke holdings in *United States v. Mitchell*, 445 U.S. 535 (1980), and *United States v. Mitchell*, 463 U.S. 206 (1983). Dkt. 102 at 10-12.[1] But this Court does not need to and should not go back as far as the generalized *Mitchell* holdings, because the Tenth Circuit has already applied the general holding in *Mitchell* to the specific context of Indian oil and gas regulations.[2] As discussed above, the Tenth Circuit cases applying the general rule to this specific context hold that the United States does have enforceable trust responsibilities. *E.g.*, *Wood Petroleum. Corp.*, 47 F. 3d 1032.

---

[1] BLM implies that the two *Mitchell* cases overrule all cases which hold that the United States has a trust obligation based upon the United States special relationship and duties to tribes. *E.g. Seminole Tribe v. United States*, 316 U.S. 286, 296-97 (1942); *Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981), *cert denied* 454 U.S. 1081 (1981) (holding that when redesignating air quality standards which could impact the Crow Tribe's coal development, the EPA was required to proceed in a trust capacity to the Crow Tribe). While the Court should not need to reach that issue in the current matter, the Tribe notes that it adamantly disagrees with BLM's argument.

[2] As noted, binding Tenth Circuit precedent in the Indian oil and gas context is contrary to BLM's argument. The closest BLM comes to a case discussing the issue before this Court is its citation to *United States v. Navajo Nation*, 537 U.S. 488 (2003). That case actually supports the Tribe's argument, and plainly does not overrule the binding Tenth Circuit cases which the Tribe has cited to this Court. In *Navajo Nation*, the Court expressly stated that its holding was limited to: 1) claims for monetary damages for the alleged breach of trust (in the present matter, the Tribe is not seeking money damages) related to 2) coal leasing. The Court, in language highly favorable to the Tribe, expressly contrasted coal leasing with oil and gas leasing: "both the IMLA and its implementing regulations address oil and gas leases in considerably more detail than coal leases. Whether the Secretary has fiduciary or other obligations, enforceable for money damages, with respect to oil and gas leases is not before us. 537 U.S. at 508.

Next, BLM provides another straw man argument that "Petitioner's trust argument boils down to its belief that any regulation that may adversely impact the tribe's economic interests are a breach of trust." Dkt. 102 at 11.  The Tribe is not nearly as naïve or incompetent as BLM is claiming.  The Tribe made no such argument.

The inability to compete with private and public lands is one of the Tribe's concern.  On many occasions, federal agencies have justified regulations that protect the environment at the expense of profit maximization.  The Tribe can accept such compromise when the action is supported by evidence.  Here, without adequate justification, the Secretary seeks to impose a regulatory wall that will prevent oil and gas operators from helping the Tribe earn *a reasonable and satisfactory* profit from the Tribe's trust resources.

Contrary to BLM's assertion, the Tribe does not expect the Secretary to "disapprove [mineral leases] unless they survive 'an independent market study,' . . . or satisfy some other extratextual criterion of tribal profitability." Dkt. 102 at 11.  However, the Tribe does expect the Secretary to fully analyze the impact on Indian lands.  BLM's analysis is clearly inadequate when it assumes that the Fracking Rule will not impact the business decisions of operators.  The BLM's Vernal Field Office does not have the manpower to take on more work.  The Secretary conducted an overview with basic calculations, not an economic impact analysis.

BLM also oversimplified the Secretary's duties under the IMLA and the IMDA.  The "basic purpose" of the Secretary's powers under IMLA is to "maximize tribal revenues from reservation lands."  *United States v. Navajo Nation*, 537 U.S. 488, 516 (2003) (Souter, J., dissenting) (quoting *Kerr-McGee Corp. v. Navajo Tribe*, 471 U.S. 195, 200 (1985)).  The IMLA was intended to "remove disadvantages in mineral leasing on Indian lands that were not present with respect to public lands . . . ."  *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 164

(1989). Consequently, BLM's allusion to "parity" is inverted, Dkt. 102 at 11, as the IMLA was intended to make Indian lands competitive with federal lands, not vice versa.

The Secretary's trust duty to make Indian lands competitive is clear in the IMDA of 1982. Congress designed this act "first, to further the policy of self-determination and second, to maximize the financial return tribes can expect for their valuable mineral resources." *Quantum Exploration, Inc. v. Clark*, 780 F. 2d 1457, 1458 (9th Cir. 1986) (citing S.Rep. No. 97-472, 97th Cong.2d Sess. 2 (1982)). The IMDA provides authority for the Tribe to enter into exploration and development agreements and to issue oil and gas leases. Promulgating the Fracking Rule under this authority requires the Secretary to do so in a manner that will maximize returns.

The Tenth Circuit recognizes that the Secretary must oversee the Tribe's economic interests and has a duty to maximize lease revenues. *Cheyenne-Arapaho,* 966 F.2d at 588-89. This duty is not one of ensuring the highest royalty rate possible for tribal minerals as Indian tribes are capable of negotiating their own rates. Instead, the duty constrains the Secretary's ability to enact a rule that will substantially impair the Tribe's opportunity to compete for lease revenues in the first place. Due to the burdensome and paternalistic multi-agency review process for Indian mineral development, the Tribe is already at a competitive disadvantage. The Secretary should help the Tribe to become *more* competitive, not *less*.

### C. BLM FAILED TO MEET ITS DUTIES TO CONSIDER SOCIO-ECONOMIC HARM.

In section IV.B.3 of its brief, BLM argues that the only economic analysis it needs to complete is regarding impact on small businesses under the Regulatory Flexibility Act, and that as long as its lip service to that act is not arbitrary, its regulation survives scrutiny. Dkt. 102 at 12. As discussed in the Tribe's opening brief and as also discussed above, that is simply not the only economic analysis BLM was required to do. The "best interest" standard discussed above requires consideration of all factors, with economic harm to tribes as one of the core factors. NEPA also

requires socio-economic analysis, and the Court should presume that BLM's failure to comply with NEPA is irreparable harm.  *Davis v. Mineta*, 302 F.3d 1104, 1115 n.6 (10th Cir. 2002).  *See S. Utah Wilderness Alliance v. Thompson*, 811 F. Supp. 635, 641 (C.D. Utah 1993).  Again BLM's own continued erroneous denial of the existence of the duty illustrates that it did not provide the required analysis before adopting the Rule.

BLM's argument is also wrong because it avoids the glaring procedural deficiency:  BLM could not properly complete any required socio-economic or economic analysis because it did not consult and solicit comments regarding the same.  BLM's response brief simply illustrates its clear lack of understanding of its failure to comply with its duties.

Finally, and troubling, BLM cavalierly states that the likely economic impact on Indian lands will only be about $10,000,000 per year, and that the "highest total costs are associated with operations in, inter alia," the Ute Tribe's Reservation.  Dkt. 102 at 13.  Perhaps $10,000,000 per year is not a big deal to the United States.  It is to tribes.  It is to the Ute Tribe.  Oil companies are not going to absorb these increased costs, and because the Tribe competes with lessors who will not be subject to the Fracking Rule, standard economic rules lead to the conclusion that the increased regulatory costs will fall to the mineral rights owners—here the Ute Tribe.  Yet again, the United States shows its lack of concern for its duties to tribes and Indians, and concisely shows why its ill-considered Fracking Rule must be enjoined.  The Tribe will prevail on the merits.  Here it only needs to show it is likely to prevail, and it has shown this.

### D.     BLM FAILED TO COMPLY WITH ITS TRIBAL CONSULTATION OBLIGATIONS.

As the Tribe discussed in section I. A.4 and I.C of its opening brief, BLM did not adequately consult with tribes.  BLM's primary response is a straw man argument that the Tribe's argument was solely based upon Executive Order 13175.  That is plainly not correct.  Dkt. 90 at 1, 12-16.  Other parties had already discussed in detail BLM's duty to provide notice, consult, and

obtain comments and BLM's failures on all fronts. The Tribe agreed with those arguments, and discussed the additional requirements and process due to tribes during such consultation. The IMDA mandates consultation with tribes both for initial formulation of rules and for any future revisions or amendments of such rules or regulations. 25 U.S.C. § 2107. *See also* 25 U.S.C. § 3501n (under the Energy Policy Act of 2005, "the Secretary of the Interior *shall* . . . involve and consult with tribes"). The Executive Order and the Department's own manual provide additional details regarding the manner of consultation. As the Tribe discussed, BLM did not comply with any of these consultation requirements.[3] It did not consult in initial formulation. It did not provide adequate or timely notice of the scope of its ultimate rule, and therefore it did not consult or solicit comments on all components of the rule. It did not consider the Tribe's concerns. It simply decided it knew what was best for the Tribe and seeks to impose its will upon the Tribe, instead of consulting as required by law.[4]

**II.    BLM'S RULE WILL, WITHOUT ANY DOUBT, IMPOSE IRREPARABLE HARM ON THE TRIBE.**

   **A.    THE ECONOMIC HARM TO THE TRIBE IS IRREPARABLE HARM.**

As the Tribe discussed in its opening brief, and as BLM does not dispute, any economic harm to the Tribe is irreparable harm because of the United States' sovereign immunity from suit. BLM concedes that the Tribe will be economically harmed, only asserting (without basis) that the

---

[3] Humorously, BLM relies upon its own self-serving statement that it "understand the importance of tribal sovereignty and self-determination, and seeks to continuously improve its communications and government to government relations with tribes." Dkt. 102 at 15. The Tribe disagrees with BLM's self-assessment, and suggests that if BLM wants to actually improve such government-to-government communications, it has a perfect opportunity to do so by agreeing to scrap the Fracking Rule it adopted without such communications and engage in the required consultation.
[4] BLM suggests (but does not show) that it can dispute on the facts some, but not all, of these deficiencies in its notice, solicitation of comments, and consultation. As this Court held in a similar context on the states' motions, BLM's delay in producing the administrative record hampers petitioners from responding and hampers the Court from deciding the merits of BLM's claims regarding the administrative record. The Tribe's position is that it has adequately established the lack of required notice, comment, and consultation, but it would not oppose delaying decision pending the belated receipt of the administrative record, which it expects will provide additional evidence of BLM's failures.

8

economic harm will be significantly less than the Tribe expects.[5] Even if the amount or extent of irreparable harm is disputed, the fact is that the Tribe will be irreparable harmed.

B.  **HARM TO THE TRIBE'S SOVEREIGN INTERESTS ARE IRREPARABLE.**

In its opening brief, the Tribe discussed the multiple ways that its sovereign interests would be harmed by the Fracking Rule, and that such harms are irreparable harm. The United States does not provide any rebuttal to the Tribe's discussion of most of these irreparable harms.

C.  **THE TRIBE WOULD BE SUBSTANTIALLY HARMED DURING THE PHASE-IN OF THE FRACKING RULE.**

Under the Fracking Rule, there is a phase-in period. BLM apparently does not know the scope or duration of the phase-in, but the duration is no more than 6 months.[6] If an entity who has an APD does not begin drilling during that phase-in period, its permit is effectively void and it must submit an application for a new permit. Because the phase-in period is much shorter than the wait for the United States to issue APDs, application of the Fracking Rule will <u>completely shut down new drilling</u> on the Ute Reservation and in numerous other areas of the United States for the period of time after the phase-in and until new APDs are issued. Even without the additional administrative burden of the new rule, the length of time for issuance of an APD on the Ute Reservation is already approximately 16 months, Dkt. 90 at 12, but <u>no new drilling can occur between the end of the phase-in and the issuance of new APDs</u>. On the Ute Reservation, that means new drilling will stop for about one year!

As the Tribe also described in its motion for preliminary injunction and as BLM did not dispute, the federal office that issues APDs for the Ute Reservation (the Vernal, Utah, office) is

---

[5] BLM claims that the new rule will only impose 12 hours delay per well (in addition to the 480 days in the Vernal office as of 2012, Dkt. 90 at 12). The Tribe found the Industry's contrary evidence to be clearly persuasive.

[6] The evidence from the states and industry associations showed that BLM has provided contradictory statements about the scope and duration of the phase-in. Even the United States attorneys at the hearing had to repeatedly huddle to answer questions about implementation and had to retract and correct their own misstatements during the hearing.

9

always and substantially understaffed. *See also* Myore Aff. Ex. 1, 2. Conspicuously, while BLM claimed it had a plan to cure understaffing in other areas of the country, it does not make a similar assertion regarding its chronic inability to obtain and maintain staff in its Vernal office. The substantial period of time where new drilling will cease on the Ute Reservation will cause enormous, irreparable harm.

### III. THE BALANCE OF THE HARM AND PUBLIC INTEREST.

BLM asserts that immediate implementation of its rule is appropriate because of the "strong public interest both in protection of the environment and resource development." Dkt. 102 at 19. Regarding resource development, as discussed above the public interest will obviously and unquestionably be harmed, not benefited by implementation of the rule. Regarding protection of the environment, the Tribe, in its motion for injunctive relief, discussed the fact that there is no documented environmental issue regarding fracking on the Tribe's Reservation. The United States does not dispute this. There is only harm, and no benefit, from immediate implementation of the ill-conceived Fracking Rule.

### CONCLUSION

All four factors clearly and strongly favor a preliminary injunction. For all of the reasons stated in the Tribe's motion and in this Reply, this Court must enjoin implementation of the Fracking Rule on tribal lands pending trial in this matter.

Respectfully submitted this 8th day of July, 2015.

FREDERICKS PEEBLES & MORGAN LLP

 */s/   Jeffrey S. Rasmussen*
Jeffrey S. Rasmussen, *Pro Hac Vice*
Christopher Reagen, *Pro Hac Vice*
1900 Plaza Drive
Louisville, Colorado   80027
Telephone: (303) 673-9600

        Facsimile:  (303) 673-9155
        Email:  jrasmussen@ndnlaw.com
        Email:  creagen@ndnlaw.com

        Scott P. Klosterman (Bar No. 6-3081)
        WILLIAMS, PORTER, DAY, & NEVILLE, P.C.
        159 North Wolcott
        Suite 400
        Casper, WY  82601
        Telephone: (307) 265-0700
        Facsimile: (307) 266-2306
        Email:  sklosterman@wpdn.net
        *Attorneys for Petitioner-Intervenor*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 8th, 2015, I filed a true and correct copy of **Petitioner/Intervenor Ute Tribe's Reply in Support of Motion for Preliminary Injunction** via the court's ECF system, with notification sent to those listed below.

Nicholas Vassallo
US ATTORNEY'S OFFICE
P O Box 668
Cheyenne, WY 82003-0668
Telephone:  (307) 772-2124
Fax: (307) 772-2123
Email: nick.vassallo@usdoj.gov

Attorney for Respondents Sally Jewell, Neil Kornze, United States Department of the Interior and United States Bureau of Land Management

William E Gerard
US DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
WILDLIFE & MARINE RESOURCES
Benjamin Franklin Station
PO Box 7611
Washington, DC 20044-7611
Telephone:  (202) 305-0475
Facsimile: (202) 305-0274
Email: william.gerard@usdoj.gov

Attorney for Respondents Sally Jewell, Neil Kornze, United States Department of the Interior and United States Bureau of Land Management

Jeremy A Gross
Michael James McGrady
WYOMING ATTORNEY GENERAL'S OFFICE
Natural Resources Division
123 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-6946
Facsimile: (307) 777-3542
Email: mike.mcgrady@wyo.gov
Email: jeremy.gross@wyo.gov

Attorneys for Petitioner State of Wyoming

Andrew J Kuhlmann
WYOMING ATTORNEY GENERAL'S OFFICE
123 Capitol Building
Cheyenne, WY 82002
Telephone: (307) 777-3537
Facsimile: (307) 777-3542
Email: andrew.kuhlmann@wyo.gov

Attorney for Petitioner State of Wyoming

Frederick R. Yarger
COLORADO ATTORNEY GENERAL'S OFFICE
1300 Broadway 10th Floor
Denver, CO 80203
Telephone: (720) 508-6168
Email: fred.yarger@state.co.us

Attorneys for Petitioner State of Colorado

Andrew C Emrich
HOLLAND & HART
6380 South Fiddlers Green Circle
Suite 500
Greenwood Village, CO 80111
Telephone: (303) 290-1621
Facsimile: (866) 711-8046
Email: ACEmrich@hollandhart.com

Attorney for Intervenor Petitioner State of North Dakota

Paul M Seby
HOLLAND & HART
555 Seventeenth Street
Suite 3200
Denver, CO 80202
Telephone: (303) 295-8430
Email: pmseby@hollandhart.com

Attorney for Intervenor Petitioner State of North Dakota

Lauren R Caplan
HOLLAND & HART LLP
975 F Street NW
Suite 900
Washington, DC 20004
Telephone: (202) 654-6919
Email: lrcaplan@hollandhart.com

Attorney for Intervenor Petitioner State of North Dakota

Wayne Stenehjem
NORTH DAKOTA ATTORNEY GENERALS OFFICE
600 E Boulevard Avenue #125
Bismarck, ND 58505
Telephone: (701)328-2210
Email: ndag@nd.gov

Attorney for Intervenor Petitioner State of North Dakota

Hope Hogan
Matthew A Sagsveen
NORTH DAKOTA ATTORNEY
GENERALS OFFICE
500 North 9th Street
Bismarck, ND 58501
Telephone: (701) 328-3640
Email: hhogan@nd.gov
Email: masagsve@nd.gov

Attorney for Intervenor Petitioner State of North Dakota

Michael S. Freeman
R Benjamin Nelson
EARTHJUSTICE
633 17th Street
Suite 1600
Denver, CO 80202-3625
Telephone: (303) 623-9466
Email: mfreeman@earthjustice.org
Email: bnelson@earthjustice.org

Attorneys for Intervenor Respondents Conservation Colorado Education Fund, Earthworks, Sierra Club, Southern Utah Wilderness Alliance, Western Resource Advocates, and Wilderness Society

Nathan Matthews
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
85 Second Street
Second Floor
San Francisco, CA 94105
Telephone: (415) 977-5695
Email: Nathan.matthews@sierraclub.org

Attorney for Intervenor Respondent Sierra Club

/s/ *Ashley Klinglesmith*
Ashley Klinglesmith
Legal Secretary/Paralegal