IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 JUN 21  PM 4:44

STEPHAN HARRIS, CLERK
CASPER

| | | |
|---|---|---|
| STATE OF WYOMING, STATE OF COLORADO, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| STATE OF NORTH DAKOTA, STATE OF UTAH, | ) | |
| and UTE INDIAN TRIBE, | ) | |
| | ) | |
| Intervenor-Petitioners, | ) | |
| | ) | |
| vs. | ) | Case No. 2:15-CV-043-SWS |
| | ) | **(Lead Case)** |
| UNITED STATES DEPARTMENT OF THE | ) | |
| INTERIOR; SALLY JEWELL, in her official | ) | |
| capacity as Secretary of the Interior; UNITED | ) | |
| STATES BUREAU OF LAND MANAGEMENT; | ) | **ORDER ON PETITIONS FOR** |
| and NEIL KORNZE, in his official capacity as | ) | **REVIEW OF FINAL AGENCY ACTION** |
| Director of the Bureau of Land Management, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| SIERRA CLUB, EARTHWORKS, WESTERN | ) | |
| RESOURCE ADVOCATES,     CONSERVATION | ) | |
| COLOARDO EDUCATION FUND, THE | ) | |
| WILDERNESS SOCIETY, and SOUTHERN | ) | |
| UTAH  WILDERNESS ALLIANCE, | ) | |
| | ) | |
| Intervenor-Respondents. | ) | |

| | | |
|---|---|---|
| INDEPENDENT PETROLEUM | ) | |
| ASSOCIATION OF AMERICA, and | ) | |
| WESTERN ENERGY ALLIANCE, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| vs. | ) | Case No. 2:15-CV-041-SWS |
| | ) | |
| SALLY JEWELL, in her official capacity as | ) | |
| Secretary of the United States Department of the | ) | |
| Interior; and BUREAU OF LAND | ) | |
| MANAGEMENT, | ) | |
| | ) | |
| Respondents. | ) | |

This matter comes before the Court on the *Petitions for Review of Final Agency Action* filed separately in each of these consolidated actions, challenging the Bureau of Land Management's issuance of regulations applying to hydraulic fracturing on federal and Indian lands. The Court, having considered the briefs and materials submitted in support of the petitions and the oppositions thereto, including the Administrative Record, and being otherwise fully advised, FINDS that the Bureau of Land Management lacked Congressional authority to promulgate the regulations.

Our Constitutional form of government is built upon three separate but equal branches of government: the legislative branch (Congress) which makes the laws; the executive branch (President) which enforces the laws; and the judicial branch (Courts) which interpret the laws. In this case, the threshold issue before this Court is a Constitutional one—has Congress (the legislative branch) delegated its legal authority to the Department of Interior to regulate hydraulic fracturing. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The issue before this Court is *not* whether hydraulic fracturing is good or bad for the environment or the citizens of the United States. "Regardless of how serious the problem an administrative agency seeks to address; . . . it may not exercise its authority 'in a manner that is inconsistent with administrative structure that Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)). The Constitutional role of this Court is to interpret the applicable statutory enactments and determine whether Congress has delegated to the Department of Interior legal authority to regulate hydraulic fracturing. It has not.

2

BACKGROUND

On March 26, 2015, the Bureau of Land Management ("BLM") issued the final version of its regulations applying to hydraulic fracturing on federal and Indian lands. 80 Fed. Reg. 16,128-16,222 (Mar. 26, 2015) ("Fracking Rule"). The Fracking Rule's focus is on three aspects of oil and gas development – wellbore construction, chemical disclosures, and water management (*id.* at 16,128 & 16,129) – each of which is subject to comprehensive regulations under existing federal and/or state law. The rule was scheduled to take effect on June 24, 2015. Following a hearing on the Petitioners' preliminary injunction motions, this Court postponed the effective date of the Fracking Rule pending the BLM's lodging of the Administrative Record ("A.R.") and the Court's ruling on the preliminary injunction motions. (*See* ECF No. 97.)[1] Ultimately the Court granted the motions, preliminarily enjoining the BLM from enforcing the Fracking Rule. (ECF No. 130.) The Court now fully considers the merits of the Petitioners' challenges.

For the better part of the last decade, oil and natural gas production from domestic wells has increased steadily. Most of this increased production has come through the application of the well stimulation technique known as hydraulic fracturing (or "fracking") – the procedure by which oil and gas producers inject water, sand, and certain chemicals into tight-rock formations (typically shale) to create fissures in the rock and allow oil and gas to escape for collection in a well.[2] *See* 80 Fed. Reg. at 16,131 (estimating that ninety percent of new wells drilled on federal lands in 2013 were

---

[1] Unless otherwise noted, all filings referenced herein are from the docket in Case No. 15-CV-043, which has been designated the Lead Case in these consolidated cases. (*See* ECF No. 44.)

[2] The water and sand together typically make up 98 to 99 percent of the materials pumped into a well during a fracturing operation. 80 Fed. Reg. at 16,131.

stimulated using hydraulic fracturing techniques).   Hydraulic fracturing has been used to stimulate wells in the United States for at least 60 years – traditionally in conventional limestone and sandstone reservoirs – and meaningful attempts to use the technique to extract hydrocarbons from shale date back to at least the 1970s.   *See* U.S. DEP'T OF ENERGY, *How is Shale Gas Produced?*[3]   "More recently, hydraulic fracturing has been coupled with relatively new horizontal drilling technology in larger-scale operations that have allowed greatly increased access to shale oil and gas resources across the country, sometimes in areas that have not previously or recently experienced significant oil and gas development."   80 Fed. Reg. 16,128.

Purportedly in response to "public concern about whether fracturing can lead to or cause the contamination of underground water sources," and "increased calls for stronger regulation and safety protocols," the BLM undertook rulemaking to implement "additional regulatory effort and oversight" of this practice.   *Id.* at 16,128 & 16,131.   In May of 2012, the BLM issued proposed rules "to regulate hydraulic fracturing on public land and Indian land."   77 Fed. Reg. 27,691 (May 11, 2012).   The stated focus of the rules was to: (i) provide disclosure to the public of chemicals used in hydraulic fracturing; (ii) strengthen regulations related to well-bore integrity; and (iii) address issues related to water produced during oil and gas operations.   *Id.*   The BLM reports it received approximately 177,000 public comments on the initial proposed rules "from individuals, Federal and state governments and agencies, interest groups, and industry representatives."   80 Fed. Reg. at 16,131.

---

[3] Available at https://perma.cc/VJE9-399W

Just over a year later, the BLM issued revised proposed rules, representing that the agency has "used the comments on [the May 11, 2012 draft proposed rules] to make improvements" to the agency's proposal.  78 Fed. Reg. 31,636 (May 24, 2013).  Key changes included an expanded set of cement evaluation tools to help ensure protection and isolation of usable water zones and a revised process for how operators could report information about chemicals they claim to be protected as trade secrets.  *Id.* at 31,636 & 31,637.  The BLM also expressed its intent to "work with States and tribes to establish formal agreements that will leverage the strengths of partnerships, and reduce duplication of efforts for agencies and operators, particularly in implementing the revised proposed rule as consistently as possible with State or tribal regulations."  *Id.* at 31,637.  The BLM reportedly received over 1.35 million comments on the supplemental proposed rule.  80 Fed. Reg. at 16,131.

The BLM ultimately published its final rule regulating hydraulic fracturing on federal and Indian lands on March 26, 2015.  The BLM determined the Fracking Rule fulfills the goals of the initial proposed rules: "[t]o ensure that wells are properly constructed to protect water supplies, to make certain that the fluids that flow back to the surface as a result of hydraulic fracturing operations are managed in an environmentally responsible way, and to provide public disclosure of the chemicals used in hydraulic fracturing fluids."  *Id.* at 16,128.

The Industry Petitioners (Independent Petroleum Association of America and Western Energy Alliance) and the States of Wyoming and Colorado filed separate *Petitions for Review of Final Agency Action* on March 20th and 26th, 2015, respectively,

seeking judicial review of the Fracking Rule pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  The States of North Dakota and Utah, and the Ute Indian Tribe of the Uintah and Ouray Reservation, later intervened in the States' action as Petitioners and various environmental groups intervened as Respondents, and the Court granted the parties' motion to consolidate the two separate actions.

Petitioners contend the Fracking Rule should be set aside because it is arbitrary, not in accordance with law, and in excess of the BLM's statutory jurisdiction and authority.  *See* 5 U.S.C. § 706(2)(A) & (C).  The Ute Indian Tribe additionally contends the Fracking Rule is contrary to the Federal trust obligation to Indian tribes.

### STANDARD OF REVIEW

The APA's scope of review provisions relevant here are:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> * * *
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> * * *
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> * * *
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Judicial review of agency action is governed by the standards set forth in § 706 of the APA, requiring the reviewing court to engage in a "substantial inquiry." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)). While an agency's decision is entitled to a "presumption of regularity," the presumption does not shield the agency from a "thorough, probing, in-depth review." *Id.* at 1574. "[T]he essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Id.* "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Id.*

## DISCUSSION

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125. Accordingly, an "essential function" of a court's review under the APA is to determine "whether an agency acted

within the scope of its authority." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015).

Where a case involves an administrative agency's assertion of authority to regulate a particular activity pursuant to a statute that it administers, the court's analysis is governed by *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Brown & Williamson*, 529 U.S. at 132.

> Under *Chevron*, a reviewing court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress. But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated[.]

*Id.* (internal quotation marks and citations omitted). In other words, "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990). "Although agency determinations within the scope of delegated authority are entitled to deference, it is fundamental 'that an agency may not bootstrap itself into an area in which it has no jurisdiction.'" *Id.* (quoting *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973)). This Court must first determine, then, whether Congress has directly addressed the issue of BLM's authority to regulate hydraulic fracturing.

The Supreme Court has provided the following guidance for determining whether Congress has directly addressed the question at issue:

8

In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. *See Brown v. Gardner*, 513 U.S. 115, 118, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context"). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989). A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995), and "fit, if possible, all parts into a harmonious whole," *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389, 79 S. Ct. 818, 3 L. Ed. 2d 893 (1959). Similarly, **the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.** *See United States V. Estate of Romani*, 523 U.S. 517, 530–531, 118 S. Ct. 1478, 140 L. Ed. 2d 710 (1998); *United States v. Fausto*, 484 U.S. 439, 453, 108 S. Ct. 668, 98 L. Ed. 2d 830 (1988). In addition, we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency. Cf. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994).

*Id.* at 132-33 (bold emphasis added). Guided by the foregoing principles, the Court finds that Congress has directly spoken to the issue and precluded federal agency authority to regulate hydraulic fracturing not involving the use of diesel fuels.

The BLM asserts authority to promulgate the Fracking Rule under an array of various statutes: the Federal Land Policy and Management Act of 1976 ("FLPMA"),[4] 43 U.S.C. §§ 1701-1787; the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181-287; the 1930 Right-of-Way Leasing Act, *id.* §§ 301-306; the Mineral Leasing Act for

---

[4] FLPMA was not initially asserted as a basis for BLM's authority to promulgate the Fracking Rule; FLPMA was added to the authorities' section in the supplemental rules issued in May of 2013. 78 Fed. Reg. at 31,646.

Acquired Lands, *id.* §§ 351-360; the Federal Oil and Gas Royalty Management Act of 1982, *id.* §§ 1701-1759; the Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a-396g; and the Indian Mineral Development Act of 1982 ("IMDA"), *id.* §§ 2101-2108.  80 Fed. Reg. at 16,217.  The Petitioners argue none of these statutes authorize the BLM to regulate hydraulic fracturing activities.  Substantively, BLM relies on the MLA, FLPMA, IMLA, and IMDA as granting it "broad authority" to regulate all oil and gas operations on federal and Indian lands and does not contend such authority comes from the more tangential statutes listed in the citations of authority for the Fracking Rule. (Fed. Resp'ts Br. at 6-21.)

The MLA creates a program for leasing mineral deposits on federal lands.[5] Congress authorized the Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to *carry out and accomplish the purposes* of the [the MLA]."  30 U.S.C. § 189 (emphasis added).  "The purpose of the Act is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise."  *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) (citing *Harvey v. Udall*, 384 F.2d 883 (10th Cir. 1967)).[6] *See also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) ("broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas").

[5] The MLA applies to deposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite, or gas, and virtually all lands containing such deposits owned by the United States. 30 U.S.C. § 181.
[6] *See* Act of Feb. 25, 1920, ch. 85, 41 Stat. 437.

Specifically, for oil and gas leasing, the MLA, *inter alia,* establishes terms of the lease and royalty and rental amounts (30 U.S.C. §§ 223, 226(d)&(e)), requires the lessee to "use all reasonable precautions to prevent waste of oil or gas developed in the land, or the entrance of water through wells drilled by him **to the oil** sands or oil-bearing strata, **to the destruction or injury of the oil deposits**" (*id.* § 225 (emphasis added)), authorizes the Secretary of Interior to lease all public lands subject to the Act for oil and gas development (*id.* § 226(a)),[7] directs the Secretary to regulate *surface*-disturbing activities (*id.* § 226(g)), and allows for the establishment of cooperative development plans to conserve oil and gas resources (*id.* § 226(m)).  The language of § 225 reflects the general sentiment at the time Congress enacted the MLA that underground water posed a threat to the oil and gas resources of the country.  (DOI AR 01663.)  "Early casing and cementing programs of oil and gas wells were practical measures to prevent waters from adjacent non-productive formations and upper aquifers from flooding the oil-producing reservoir during drilling and subsequent production activities."  *Id.*[8]  "In these early years the principal focus was on protection of the petroleum resource from the effects of water incursion and not on protection of water resources themselves."  *Id.*

The Secretary also invokes the statutory authority granted to the BLM by the Indian Mineral Leasing Act and the Indian Mineral Development Act as a basis for the Fracking Rule.[9]   These statutes, generally, grant the Secretary broad regulatory

---

[7] The MLA expressly excepts wilderness lands from oil and gas leasing. 30 U.S.C. § 226-3.

[8] U.S. Dep't of Energy, *State Oil and Natural Gas Regulations Designed to Protect Water Resources* (May 2009).

[9] "The IMLA aims to provide Indian tribes with a profitable source of revenue and to foster tribal self-determination by giving Indians a greater say in the use and disposition of the resources on their lands." *United States v. Navajo Nation,* 537 U.S. 488 (2003).

jurisdiction over oil and gas development and operations on Indian lands.  25 U.S.C. §§ 396d, 2107.  However, neither the IMLA nor the IMDA delegates any more specific authority over oil and gas drilling operations than the MLA, nor has BLM promulgated separate regulations for operations on Indian lands.  Rather, existing Bureau of Indian Affairs ("BIA") regulations incorporate 43 C.F.R. Part 3160 (Onshore Oil and Gas Operations – General) and require BLM to oversee implementation of those regulations. 25 C.F.R. §§ 211.4, 225.4.  The Fracking Rule amends and revises the Part 3160 regulations.  *See* 80 Fed. Reg. at 16, 217.

BLM contends that, as an oil and gas extraction method, hydraulic fracturing falls directly within its "regulatory sphere," and the Fracking Rule simply supplements existing requirements for oil and gas operations set out in 43 C.F.R. 3162.3-1 and Onshore Oil and Gas Orders 1, 2 and 7.  80 Fed. Reg. at 16,129.  BLM asserts it has long regulated hydraulic fracturing and other well stimulation techniques pursuant to its MLA § 189 authority.  In support, BLM cites to 1 Fed. Reg. at 1998, § 2(d) (1936) (requiring lessee to provide notice and obtain approval prior to "stimulat[ing] production by vacuum, acid, gas, air, or water injection"), 30 C.F.R. § 221.9 (1938) (same), and 30 C.F.R. § 221.21(b) (1982) (same).

Historically, however, BLM's only regulation addressing hydraulic fracturing worked to prevent any additional surface disturbance and impose reporting requirements and did not regulate the fracturing process itself.[10]  *See* 43 C.F.R. § 3162.3-2(b) ("Unless

---

[10] In its opposition brief to the Industry Petitioners' preliminary injunction motion, the Government admits, "Existing BLM regulations included some limited provisions that mentioned, but did not attempt to regulate

additional surface disturbance is involved . . . **prior approval is not required for routine fracturing or acidizing jobs** . . . ; however, a subsequent report on these operations must be filed . . . .") (emphasis added).  This requirement makes sense because the MLA expressly authorizes regulation of "all *surface*-disturbing activities . . . in the interest of conservation of *surface* resources."  30 U.S.C. § 226(g) (emphasis added). The BLM cites to no other existing regulation addressing well stimulation or hydraulic fracturing operations.

The BLM further argues its authority is evident in its previous regulations requiring operators to avoid damaging surface *and* subsurface resources, including groundwater.  *See* 30 C.F.R. § 221.24 (1938) ("B.S. and salt water from tanks or wells shall not be allowed to pollute streams or damage the surface or pollute the underground water of the leased or adjoining land."); 30 C.F.R. § 221.32 (1982) ("The lessee shall not pollute streams or damage the surface or pollute the underground water of the leased or other land."); 43 C.F.R. § 3162.5-1(b) (1988) ("The operator shall exercise due care and diligence to assure that leasehold operations do not result in undue damage to surface or subsurface resources or surface improvements."); 43 C.F.R. § 3162.5-2(d) (protection of fresh water and other minerals).  The BLM suggests authority for these regulations intended "to avoid groundwater pollution" emanates from § 187 of the MLA which, BLM argues, expresses MLA's purpose of ensuring the "exercise of reasonable diligence, skill, and care in the operation" of federal leases, protecting "the interests of the United

---

hydraulic fracturing, [] which is now typically coupled with directional and horizontal drilling that can extend for miles from the drill site." (*Resp't Br. in Opp'n to Pet'rs' Mot. for Prelim. Inj.* at 27) (ECF No. 20 in 15-CV-041).

States," and safeguarding "the public welfare." (Fed. Resp'ts Br. at 8, 14) (quoting select portions of 30 U.S.C. § 187). However, the statutory text Respondents did not reference makes clear what Congress intended when it required lease conditions that protect the public welfare:

> Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property; a provision that such rules for the safety and welfare of the miners and for the prevention of undue waste as may be prescribed by said Secretary shall be observed, including a restriction of the workday to not exceeding eight hours in any one day for underground workers except in cases of emergency; provisions prohibiting the employment of any child under the age of sixteen in any mine below the surface; provisions securing the workmen complete freedom of purchase; provision requiring the payment of wages at least twice a month in lawful money of the United States, and providing proper rules and regulations to insure the fair and just weighing or measurement of the coal mined by each miner, and such other provisions as he may deem necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare.

30 U.S.C. § 187. Read in context, the language quoted by the BLM does not reflect a grant to the BLM of broad authority to regulate for the protection of the environment. Instead, the language requires only that certain, specific lease provisions appear in all federal oil and gas leases for the safety and welfare of miners and prevention of undue waste, and to insure the sale of mined minerals to the United States and the public at reasonable prices.

The existence of a few regulations requiring notice and approval, and requiring operators to avoid pollution to groundwater, falls short of regulating the fracking process itself and is not determinative of whether BLM has *statutory* authority to engage in

comprehensive rulemaking to address the supposed underground environmental effects of hydraulic fracturing.[11]   Indeed, the BLM has previously taken the position, up until promulgation of the Fracking Rule, that it lacked the authority or jurisdiction to regulate hydraulic fracturing. *See Center for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1156 (N.D. Cal. 2013) (.

> When an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy," [the Court] typically greet[s] its announcement with a measure of skepticism. [The Court] expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast "economic and political significance."

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014) (quoting *Brown & Williamson*, 529 U.S. at 159, 160).   BLM's present characterization of their "regulation" of oil and gas well-stimulation techniques to protect groundwater as "long-standing" is without merit.   Moreover, an agency's regulatory authority emanates from Congress, not an agency's self-proclaimed prior regulatory activity.

In 1976, Congress enacted the Federal Land Policy and Management Act to provide "a comprehensive statement of congressional policies concerning the management of the public lands" owned by the United States and administered by the

---

[11] The Intervenor-Respondents cite various cases as support for the notion that, through the MLA, Congress delegated broad authority to the BLM over all facets of oil and gas development on public lands.  (ECF No. 205 at 29-30.)  However, each of these cases discusses aspects of leasing or taxation activities, not rulemaking for environmental protection. *See Boesche v. Udall*, 373 U.S. 472, 477-78 (1963) (explaining that the Secretary retains sufficient ownership interest and authority under the MLA to cancel a lease issued under the MLA in circumstances where such lease was granted in violation of the Act and regulations promulgated thereunder); *Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1042-44 (10th Cir. 2013) (discussing the Secretary's "considerable discretion" to determine which lands will be leased and how the competitive bid process occurs); *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177 (10th Cir. 2011) (concluding that state taxes imposed on non-Indian lessees extracting oil and gas from the Ute Reservation are not preempted by federal law); *Mountain States Legal Found. v. Andrus*, 499 F. Supp. 383, 388 (D. Wyo. 1980) ("the Mineral Leasing Act . . . gives to the Secretary of the Interior broad power to issue oil and gas leases on public lands within known structures of producing oil and gas fields . . . and to accept or reject oil and gas lease offers").

BLM. *Rocky Mtn. Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 737 (10th Cir. 1982).  As

with the MLA, Congress authorized the Secretary of the Interior to "promulgate rules and

regulations *to carry out the purposes of this Act* and of other laws applicable to the public

lands[.]"  43 U.S.C. § 1740 (emphasis added).  FLPMA charges the BLM with managing

public lands on the basis of "multiple use and sustained yield" of their various resources

– that is, utilizing the resources "in the combination that will best meet the present and

future needs of the American people . . . [taking] into account the long-term needs of

future generations for renewable and nonrenewable resources, including, but not limited

to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic,

scientific and historical values[,]" and "achievement and maintenance in perpetuity of a

high-level annual or regular periodic output of the various renewable resources of the

public lands consistent with multiple use." *Id.* §§ 1701(a)(7), 1702(c) & (h).

"'Multiple use management' is a deceptively simple term that describes the

enormously complicated task of striking a balance among the many competing uses to

which land can be put[.]" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004).

The public lands are to be managed in a manner "that will protect the quality of scientific,

scenic, historical, ecological, environmental, air and atmospheric, water resource, and

archeological values," while at the same time recognize "the Nation's need for domestic

sources of minerals, food, timber, and fiber from the public lands[.]"  43 U.S.C. §

1701(a)(8) & (12).  FLPMA "represents an attempt by Congress to balance the use of the

public lands by interests as diverse as the lands themselves." *Rocky Mtn. Oil and Gas

Ass'n*, 696 F.2d at 738.  In pursuit of this general purpose, Congress authorized the BLM,

"by regulation or otherwise," to "take any action necessary to prevent unnecessary or undue degradation of the lands" and to promulgate regulations necessary to achieve FLPMA's goals. 43 U.S.C. §§ 1732(b), 1733(a), and 1740.

Although the Secretary asserts FLPMA delegates to BLM broad authority and discretion to manage and regulate activities on public lands, nothing in FLPMA provides BLM with specific authority to regulate hydraulic fracturing or underground injections of any kind; rather, FLPMA primarily establishes congressional policy that the Secretary manage the public lands under principles of multiple use and sustained yield. At its core, FLPMA is a land use planning statute. *See* 43 U.S.C. § 1712; *Rocky Mtn. Oil and Gas Ass'n*, 696 F.2d at 739 ("FLPMA contains comprehensive inventorying and land use planning provisions to ensure that the 'proper multiple use mix of retained public lands' be achieved"); *S. Utah Wilderness Alliance*, 542 U.S. at 57 (FLPMA establishes a dual regime of inventory and planning); *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006) (FLPMA establishes requirements for land use planning on public land). In the context of oil and gas operations, FLPMA generally comes into play "[a]t the earliest and broadest level of decision-making" when a land use plan is developed identifying allowable uses for a particular area. *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). If oil and gas development is allowed, BLM first determines whether the issuance of a particular oil and gas lease conforms to the land-use plan. *Id.* (citing 43 C.F.R. § 1610.5-3(a)). The lessee must then obtain BLM approval of an Application for Permit to Drill ("APD") before commencing

any "drilling operations" or "surface disturbance preliminary thereto" and comply with other provisions of Part 3160.[12] *See id.*; 43 C.F.R. 3162.3-1(c).

As the Government points out, in the context of a land use plan, "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009). Additionally, § 1732(b) creates a "duty, independent of the planning process, to prevent undue degradation of resources." *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1136 (10th Cir. 2006) ("Because the RMP revision process is much more time-consuming than enacting a temporary closure order, the BLM could not effectively respond to resource degradation only through the formal planning process."). Thus, particularly in the context of requests for approval of specific projects, the BLM has authority to take action necessary to prevent undue degradation to the environment. *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 42 (D.D.C. 2003) (BLM has authority to "disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land"). Still, the Supreme Court has acknowledged the distinction between land use planning and environmental protection.

> The line between environmental regulation and land use planning will not always be bright[.] . . . However, the core activity described by each phrase

---

[12] BLM's administration of oil and gas leases on federal land is also subject to the National Environmental Policy Act ("NEPA"), "which requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1042 (10th Cir. 2011) (internal quotation marks and citation omitted). Thus, oil and gas APD's not otherwise exempted must undergo the NEPA environmental review process. *See Western Energy Alliance v. Salazar*, No. 10-CV-237-F, 2011 WL 3738240, at *3 (D. Wyo. Aug. 12, 2011) (unpublished).  Regulation of the lease and APD process is outlined in 43 C.F.R. § 3101.1-2, which defines what reasonable measures BLM can require.

is undoubtedly different. Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits. Congress has indicated its understanding of land use planning and environmental regulation as distinct activities. . . . Congress has also illustrated its understanding of land use planning and environmental regulation as distinct activities by delegating the authority to regulate these activities to different agencies. . . . Congress clearly envisioned that although environmental regulation and land use planning may hypothetically overlap in some instances, these two types of activity would in most cases be capable of differentiation.

*California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587-88 (1987).   As

discussed below, Congress delegated regulatory authority for environmental protection of

underground water sources to the Environmental Protection Agency, not the BLM.

Moreover, while FLPMA authorizes BLM to take any action necessary to prevent

unnecessary or undue degradation of the lands by regulation or otherwise, the

Government cites no case finding the BLM authorized to engage in the kind of

comprehensive rulemaking at issue here pursuant to this FLPMA duty.[13]

Prior to the enactment of FLPMA, Congress enacted the Safe Drinking Water Act

("SDWA").  Pub. L. No. 93-523, 88 Stat. 1660 (1974) (codified as amended at 42 U.S.C.

§§ 300f through 300j-26).   Part C of the SDWA establishes a regulatory program

specifically for the protection of underground sources of drinking water.   42 U.S.C. §§

300h through 300h-8.   This program requires the Environmental Protection Agency

("EPA") to promulgate regulations that set forth minimum requirements for effective

State underground injection control ("UIC") programs "to prevent underground injection

---

[13] FLPMA's application does not extend to Tribal lands.  43 U.S.C. § 1702(e)(2).

19

which endangers drinking water sources."[14]   *Id.* § 300h(b)(1).   Part C prohibits "any underground injection" without a permit and mandates that a UIC program include "inspection, monitoring, recordkeeping, and reporting requirements[.]"   *Id.* § 300h(b)(1)(A) & (C).   The SDWA defined "underground injection" as "the subsurface emplacement of fluids by well injection."   *Id.* § 300h(d)(1).   *See Legal Envtl. Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1470 (11th Cir. 1997) ("*LEAF*").

For two decades after the enactment of the SDWA, the EPA took the position that hydraulic fracturing was not subject to the UIC program because that technique for enhancing the recovery of natural gas from underground formations did not, by its interpretation, fall within the *regulatory* definition of "underground injection."   *See LEAF*, 118 F.3d at 1471.   Responding to a challenge of Alabama's UIC program because it did not regulate hydraulic fracturing activities, the EPA stated it interpreted the definition of "underground injection" as encompassing only those wells whose "principal function" is the underground emplacement of fluids.   The EPA had determined that the principal function of gas production wells which are also used for hydraulic fracturing is gas production, not the underground emplacement of fluids.   *Id.*   The Eleventh Circuit Court of Appeals rejected the EPA's position.   Applying the first step in the *Chevron* framework, the *LEAF* court concluded the unambiguous language of the statute made clear that Congress intended for the EPA to regulate *all* underground injection under the

---

[14] "A state must submit to the EPA a proposed UIC program that meets these minimum requirements, and receive EPA approval, in order to obtain primary regulatory and enforcement responsibility for underground injection activities within that state.  § 300h–1. The state retains primary responsibility until EPA determines, by rule, that the state UIC program no longer meets the minimum requirements established under the SDWA. § 300h–1(b)(3)." *Legal Envtl. Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1469-70 (11th Cir. 1997).  The SDWA also contains provisions allowing an Indian Tribe to assume primary enforcement responsibility for UIC.  § 300h-1(e).

UIC programs, and the process of hydraulic fracturing obviously fell within the plain meaning of the *statutory* definition of "underground injection." *Id.* at 1474-75. Thus, pursuant to the SDWA's cooperative federalism system for regulating underground injection, including hydraulic fracturing, the States and Indian Tribes could assume primary enforcement responsibility for UIC programs, subject to EPA approval and oversight. *See* 42 U.S.C. § 300h-1(b), (c) & (e). By delegation under the SDWA, Congress vested the EPA with the authority and duty to regulate hydraulic fracturing on all lands, federal, state and tribal.

Such was the state of the law when Congress enacted the Energy Policy Act of 2005 ("2005 EP Act"), a comprehensive energy bill addressing a wide range of domestic energy resources, with the purpose of ensuring jobs for the future "with secure, affordable, and reliable energy." Pub. L. No. 109-58, 119 Stat. 594 (2005). The 2005 EP Act was intended, at least in part, to expedite oil and gas development within the United States. *See Western Energy Alliance v. Salazar*, No. 10-CV-237-F, 2011 WL 3738240, at *2 (D. Wyo. Aug. 12, 2011) (unpublished). Recognizing the EPA's authority to regulate hydraulic fracturing under the SDWA, the 2005 EP Act included an amendment to the SDWA, expressly and unambiguously revising the definition of "underground injection" to *exclude* "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production activities." 2005 EP Act Sec. 322 (codified at 42 U.S.C. § 300h(d)(1)(B)(ii)). There can be no question that Congress intended to remove hydraulic fracturing

21

operations (not involving diesel fuels) from EPA regulation under the SDWA's UIC program.

The issue presented here is whether the 2005 EP Act's explicit removal of the EPA's regulatory authority over non-diesel hydraulic fracturing likewise precludes the BLM from regulating that activity, thereby removing fracking from the realm of federal regulation.[15] Although the BLM does not claim authority for its Fracking Rule under the SDWA, a statute administered by the EPA, it makes no sense to interpret the more general authority granted by the MLA and FLPMA as providing the BLM authority to regulate fracking when Congress has directly spoken to the "topic at hand" in the 2005 EP Act. *Brown & Williamson*, 529 U.S. at 133. The SDWA specifically addresses protection of underground sources of drinking water through regulation of "underground injection," and Congressional intent as expressed in the 2005 EP Act indicates clearly that hydraulic fracturing is not subject to federal regulation unless it involves the use of diesel fuels. "[T]he Executive Branch is not permitted to administer [an] Act in a manner that is inconsistent with the administrative structure that Congress enacted into law." *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988).  If agency regulation is prohibited by a statute specifically directed at a particular activity, it cannot be reasonably concluded that Congress intended regulation of the same activity would be authorized under a more general statute administered by a different agency.[16]  "[I]t is a

---

[15] *See* Hannah Wiseman, *Untested Waters: The Rise of Hydraulic Fracturing in Oil and Gas Production and the Need to Revisit Regulation*, 20 Fordham Envtl. L. Rev. 115, 145 (2009) (EPAct "conclusively withdrew fracing (sic) from the realm of federal regulation," leaving any regulatory control to the states).

[16] "[A]gencies must operate within the bounds of reasonable interpretation."  *Michigan v. EPA*, 135 S.Ct. 2699, 2707 (2015).  The BLM's "interpretation is also unreasonable because it would bring about a [] transformative

commonplace of statutory construction that the specific governs the general[.]" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). *See also In re Gledhill*, 76 F.3d 1070, 1078 (10th Cir. 1996) ("a court should not construe a general statute to eviscerate a statute of specific effect").

In determining whether Congress has spoken directly to the BLM's authority to regulate hydraulic fracturing under the MLA or FLPMA, this Court cannot ignore the implication of Congress' fracking-specific legislation in the SDWA and 2005 EP Act.

> The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S., at 453, 108 S. Ct. 668. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand. As [the Supreme Court] recognized [] in *United States v. Estate of Romani*, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended." 523 U.S., at 530-531, 118 S. Ct. 1478.

*Brown & Williamson*, 529 U.S. at 143. The BLM argues that because no provision in the SDWA or 2005 EP Act expressly prohibits regulation of underground injection under any other federal statute, those Acts do not displace its authority to regulate the activity under FLPMA and the MLA. However, a court "[does] not presume a delegation of power simply from the absence of an express withholding of power[.]" *Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 160 (4th Cir. 2013).[17] At the time the 2005 EP Act was

---

expansion in [BLM's] regulatory authority without clear congressional authorization." *Utility Air Regulatory Group*, 134 S. Ct. at 2444.

[17] *See also Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) ("Plainly, if we were to *presume* a delegation of power from the absence of an express withholding of such power, agencies would enjoy virtually limitless hegemony . . . .") (internal quotation marks and citation omitted); *Sierra Club v. EPA*, 311 F.3d 853, 861 (7th Cir.

enacted, the BLM had not asserted authority to regulate the fracking process itself and a Circuit Court of Appeals had determined Congress intended the activity to be regulated by the EPA under the SDWA. "Congress does not regulate in a vacuum." *Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784, 789 (1st Cir. 1996). "The chief objective of statutory interpretation is to give effect to the legislative will. To achieve this objective a court must take into account the tacit assumptions that underlie a legislative enactment, including not only general policies but also preexisting statutory provisions." *Id.* at 788-89.

In recent years, as does the BLM here, federal agencies have increasingly relied on *Chevron* deference to stretch the outer limits of its "delegated" statutory authority by revising and reshaping legislation. *See Caring Hearts Personal Home Servs., Inc. v. Burwell*, --- F.3d ---, No. 14-3243, 2016 WL 3064870, at *1 (10th Cir. May 31, 2016). However, *Chevron* involved a challenge to an agency construction of a *specific* statutory provision where the agency had clearly been granted regulatory authority over the activity in question. *Chevron*, 467 U.S. at 839-40, 866. This case stands in contrast – Congress has not directed the BLM to enact regulations governing hydraulic fracturing. Indeed, Congress has expressly removed federal agency authority to regulate the activity, making its intent clear. If this Court were to accept Respondents' and Intervenor-Respondents' argument, there would be no limit to the scope or extent of Congressionally delegated authority BLM has, regardless of topic or subject matter.

---

2002) ("Courts will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.") (internal quotation marks and citation omitted).

"[N]o matter how important, conspicuous, and controversial the issue, . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Brown & Williamson*, 529 U.S. at 161. Having explicitly removed the only source of specific federal agency authority over fracking, it defies common sense for the BLM to argue that Congress intended to allow it to regulate the same activity under a general statute that says nothing about hydraulic fracturing. Despite the lack of authority, the BLM persisted in its rulemaking efforts. Comments made by the EPA itself suggest that the Fracking Rule is an attempt to resurrect EPA's pre-2005 EP Act authority (*see* DOI AR 0103278_002-3); that is, the BLM is attempting to regulate hydraulic fracturing as underground injection wells in a manner that the EPA would have done under the SDWA absent the 2005 EP Act. The BLM has attempted an end-run around the 2005 EP Act; however, regulation of an activity must be by Congressional authority, not administrative fiat. The Court finds the intent of Congress is clear, so that is the end of the matter; "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

## CONCLUSION

As this Court has previously noted, our system of government operates based upon the principle of limited and enumerated powers assigned to the three branches of government. In its simplest form, the legislative branch enacts laws, the executive branch enforces those laws, and the judicial branch ensures that the laws passed and enforced are Constitutional. *See Marbury v. Madison*, 5 U.S. 137, 176 (1803). A federal agency is a

creature of statute and derives its existence, authority and powers from Congress alone. It has no constitutional or common law existence or authority outside that expressly conveyed to it by Congress. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Michigan v. EPA*, 268 F.3d 1075, 1081-82 (D.C. Cir. 2001). In the absence of a statute conferring authority, then, an administrative agency has none. *See American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119-20 (D.C. Cir. 1995). This Court "must be guided to a degree by common sense as to the manner in which Congress would likely delegate a policy decision of such economic and political magnitude to an administrative agency." *Brown & Williamson*, 529 U.S. at 133. Given Congress' enactment of the EP Act of 2005, to nonetheless conclude that Congress implicitly delegated BLM authority to regulate hydraulic fracturing lacks common sense. Congress' inability or unwillingness to pass a law desired by the executive branch does not default authority to the executive branch to act independently, regardless of whether hydraulic fracturing is good or bad for the environment or the Citizens of the United States. "[The Supreme] Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989).

Congress has not delegated to the Department of Interior the authority to regulate hydraulic fracturing. The BLM's effort to do so through the Fracking Rule is in excess of its statutory authority and contrary to law. As this finding is dispositive as to each of the Petitions for Review, the Court need not address the other points raised in support of

26

setting aside the Fracking Rule.   THEREFORE, the Court holds the Fracking Rule is unlawful, and it is

   **ORDERED** that the BLM's final rule related to hydraulic fracturing on federal and Indian lands, 80 Fed. Reg. 16,128 (Mar. 26, 2015), is hereby **SET ASIDE**.

   DATED this _21st_ day of June, 2016.


                                    Scott W. Skavdahl
                                    United States District Judge